# 15-496-cv(L)

## 15-499-cv (CON)

### In the United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA; EDWARD O'DONNELL,
PLAINTIFFS-APPELLEES

*v.*

BANK OF AMERICA, N.A.; COUNTRYWIDE BANK, FSB;
COUNTRYWIDE HOME LOANS, INC.; REBECCA MAIRONE,
DEFENDANTS-APPELLANTS

*(additional parties on inside cover)*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 12-1422)
(THE HONORABLE JED S. RAKOFF, J.)*

**BRIEF OF DEFENDANTS-APPELLANTS
BANK OF AMERICA, N.A.; COUNTRYWIDE BANK, FSB;
AND COUNTRYWIDE HOME LOANS, INC.**

RICHARD M. STRASSBERG
WILLIAM J. HARRINGTON
GOODWIN PROCTER LLP
*620 Eighth Avenue
New York, NY 10018*

BRENDAN V. SULLIVAN, JR.
ENU A. MAINIGI
CRAIG D. SINGER
KANNON K. SHANMUGAM
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000*

BANK OF AMERICA CORPORATION, SUCCESSOR TO
COUNTRYWIDE FINANCIAL CORPORATION AND FULL SPECTRUM
LENDING; COUNTRYWIDE FINANCIAL CORPORATION,
DEFENDANTS

## CORPORATE DISCLOSURE STATEMENT

Appellants Bank of America, N.A., and Countrywide Home Loans, Inc., are indirect subsidiaries of Bank of America Corporation; appellant Countrywide Bank, FSB, was merged into appellant Bank of America, N.A. Bank of America Corporation has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

Preliminary statement ...................................................1

Statement of jurisdiction.................................................3

Statement of the issues ..................................................3

Statement of the case ....................................................4

    A.    Background......................................................5

    B.    The complaint ...............................................6

    C.    Pre-trial proceedings .......................................8

    D.    The liability phase ........................................10

    E.    The penalty phase .........................................18

    F.    Post-trial proceedings......................................22

Summary of argument ...................................................22

Standard of review.......................................................27

Argument.................................................................28

I.    The district court erred by permitting the FIRREA claim against the bank defendants to proceed because the bank defendants cannot be liable for 'affecting' themselves ..........................28

    A.    Federally insured financial institutions cannot be liable under Section 1833a(c)(2) on the theory that they engaged in conduct 'affecting' themselves...................................................29

        1.    The text of Section 1833a(c)(2) does not permit liability on a 'self-affecting' theory .......................................30

        2.    The statutory purpose and history demonstrate that Section 1833a was not intended to punish federally insured financial institutions .................................34

        3.    The broader context of FIRREA further demonstrates that Section 1833a was not intended to punish federally insured financial institutions ...................36

Page

Table of contents—continued:

    B.    Federally insured financial institutions cannot be liable under Section 1833a(c)(2) on the theory that they 'affected' a corporate successor through a subsequent merger .....................38

II.    The district court erred by permitting the FIRREA claim against the bank defendants to proceed because the claimed predicate offenses of mail and wire fraud were based exclusively on breaches of preexisting contracts ..........................................40

    A.    A claim of mail or wire fraud may not be based exclusively on a breach of contract ..........................................41

    B.    The principle that a claim of mail or wire fraud may not be based exclusively on a breach of contract applies here ...............46

III.    The district court erred by excluding evidence about the comparative quality of HSSL and non-HSSL loans ..............................50

    A.    Evidence about the comparative quality of HSSL and non-HSSL loans was relevant to several elements of liability ............51

    B.    Defendants' evidence about the comparative quality of HSSL and non-HSSL loans was also relevant to rebut the government's contrary evidence ......................................55

    C.    The district court further erred by preventing defendants from cross-examining the government's experts concerning non-HSSL loans ..............................................57

    D.    The district court's exclusion of evidence about the comparative quality of HSSL and non-HSSL loans was highly prejudicial..........................................................61

IV.    The district court erred by precluding defense witnesses from testifying that they believed the HSSL process was proper .................64

    A.    The district court excluded testimony from defense witnesses that the HSSL process was intended to produce investment-quality loans ..........................................................65

    B.    The defense witnesses' testimony was relevant and should not have been excluded ......................................................68

Page

Table of contents—continued:

C. The district court's exclusion of the defense witnesses' testimony was highly prejudicial.......................................69

V. The government presented insufficient evidence to show that defendants made any material misrepresentation to Fannie or Freddie ...........................................................................71

A. It was undisputed that Fannie and Freddie reasonably expected that a significant percentage of the loans sold to them would not be investment quality............................................72

B. The government presented insufficient evidence to show that HSSL loans were of a lower quality than Fannie and Freddie expected..........................................................................74

1. Countrywide's Quality Control results showed that HSSL loans were well within industry standards for quality.......................................................................74

2. The government offered insufficient evidence to cast doubt on the reliability of Countrywide's Quality Control results ...............................................75

3. FSL's Quality Assurance results did not show that HSSL loans were below industry standards for quality.......................................................................77

4. The government's experts' testimony did not show that HSSL loans were below industry standards for quality.......................................................................78

VI. The district court erred in imposing a penalty of over $1.2 billion on the bank defendants .............................................81

A. The district court's interpretation of 'gain' is invalid...................82

1. The ordinary meaning of 'gain' is profit..............................82

2. Under any definition, 'gain' cannot include the principal amounts that Countrywide initially loaned to borrowers .....................................................84

B. The district court's interpretation of 'loss' is also invalid.............85

iv

Page

Table of contents—continued:

    1.    Fannie and Freddie did not lose the entire amounts they paid for the HSSL loans ................................. 85

    2.    The ordinary meaning of 'loss' takes into account the amount that the victim actually received ........................... 86

    3.    Under Section 1833a, a 'loss' must be proximately caused by the violation ........................................... 87

Conclusion .................................................................. 91

## TABLE OF AUTHORITIES

### CASES

*Adams* v. *Fuqua Industries, Inc.*, 820 F.2d 271 (8th Cir. 1987) ...................... 60

*Ake* v. *Oklahoma*, 470 U.S. 68 (1985) .................................................. 59

*Bogoni* v. *Gomez*, 847 F. Supp. 2d 519 (S.D.N.Y. 2012) ........................... 83

*Bridgestone/Firestone, Inc.* v. *Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir. 1996) .................................................... 41, 47, 48

*Burrage* v. *United States*, 134 S. Ct. 881 (2014) .................................. 88

*Burrill* v. *Stevens*, 73 Me. 395 (1882) .................................................. 41

*Corley* v. *Rosewood Care Center, Inc.*, 388 F.3d 990 (7th Cir. 2004) ............................................. 41, 42, 43

*Dolan* v. *United States Postal Service*, 546 U.S. 481 (2006) ........................... 32

*Durland* v. *United States*, 161 U.S. 306 (1896) ................................. 8, 43, 44, 45

*DynCorp* v. *GTE Corp.*, 215 F. Supp. 2d 308 (S.D.N.Y. 2002) ........................ 49

*Elsevier, Inc.* v. *Grossman*, ___ F. Supp. 3d ___, Civ. No. 12-5121, 2015 WL 72604 (S.D.N.Y. Jan. 5, 2015) ........................... 49

Page

Cases—continued:

*Feine* v. *McGowan*, 188 F.2d 738 (2d Cir. 1951) ..................................83

*First Bank of Americas* v. *Motor Car Funding, Inc.*,
 257 A.D.2d 287 (N.Y. App. Div. 1999)..................................49

*First Nationwide Bank* v. *Gelt Funding Corp.*,
 27 F.3d 763 (2d Cir. 1994) .......................................87, 89

*Heli-Coil Corp.* v. *Webster*, 352 F.2d 156 (3d Cir. 1965)..................83

*Henry* v. *Speckard*, 22 F.3d 1209 (2d Cir. 1994)..................59

*Howard* v. *Walker*, 406 F.3d 114 (2d Cir. 2005) ..................59

*J.E. Morgan Knitting Mills, Inc.* v. *Reeves Bros.*,
 243 A.D.2d 422 (N.Y. App. Div. 1997)..................50

*Kehr Packages, Inc.* v. *Fidelcor, Inc.*,
 926 F.2d 1406 (3d Cir. 1991) ..................42

*Kolar* v. *Preferred Real Estate Investments, Inc.*,
 361 Fed. Appx. 354 (3d Cir. 2010) ..................43

*Kriegel* v. *Donelli*,
 Civ. No. 11-9160, 2014 WL 2936000 (S.D.N.Y. June 30, 2014) ..................49

*Loughrin* v. *United States*, 134 S. Ct. 2384 (2014)..................46

*Malek* v. *Federal Insurance Co.*, 994 F.2d 49 (2d Cir. 1993)..................62, 63, 69

*MBIA Insurance Corp.* v. *Countrywide Home Loans, Inc.*,
 87 A.D.3d 287 (N.Y. App. Div. 2011)..................49

*McEvoy Travel Bureau, Inc.* v. *Heritage Travel, Inc.*,
 904 F.2d 786 (1st Cir. 1990) ..................42, 43

*McLaughlin* v. *American Tobacco Co.*,
 522 F.3d 215 (2d Cir. 2008) ..................89

Page

Cases—continued:

*McLaughlin* v. *Anderson*, 962 F.2d 187 (2d Cir. 1992) .....................................52

*McNally* v. *United States*, 483 U.S. 350 (1987) ....................................................46

*Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007) ..................................................49

*Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ...........................42

*N.V. Maatschappij Voor Industriele Waarden* v. *A.O. Smith
  Corp.*, 590 F.2d 415 (2d Cir. 1978)....................................................59

*Neder* v. *United States*, 527 U.S. 1 (1999)........................................................43, 44

*Perlman* v. *Zell*, 185 F.3d 850 (7th Cir. 1999)....................................................41

*Pescatore* v. *Pan American World Airways, Inc.*,
  97 F.3d 1 (2d Cir. 1996) ..................................................90

*Porter* v. *Quarantillo*, 722 F.3d 94 (2d Cir. 2013) ............................................27

*Sekhar* v. *United States*, 133 S. Ct. 2720 (2013) ...............................................43

*Sussman* v. *New York City Health & Hospitals Corp.*,
  47 Fed. Appx. 19 (2d Cir. 2002)......................................................57

*Thyssen, Inc.* v. *S.S. Fortune Star*, 777 F.2d 57 (2d Cir. 1985).........................42

*Torchlight Loan Services, LLC* v. *Column Financial, Inc.*,
  Civ. No. 11-7426, 2012 WL 3065929 (S.D.N.Y. July 25, 2012) .....................49

*United States* v. *Agajanian*, 852 F.2d 56 (2d Cir. 1988) ...................................60

*United States* v. *Agne*, 214 F.3d 47 (1st Cir. 2000) .......................................33, 39

*United States* v. *Anchor Mortgage Corp.*,
  711 F.3d 745 (7th Cir. 2013)..................................................87

Page

Cases—continued:

*United States* v. *Bank of New York Mellon*,
   941 F. Supp. 2d 438 (S.D.N.Y. 2013) ................................................................73

*United States* v. *Bouyea*, 152 F.3d 192 (2d Cir. 1998) ..................................33, 39

*United States* v. *BP Products North America Inc.*,
   610 F. Supp. 2d 655 (S.D. Tex. 2009) ..............................................................88

*United States* v. *Certified Environmental Services, Inc.*,
   753 F.3d 72 (2d Cir. 2014) ..............................................................................52

*United States* v. *D'Amato*, 39 F.3d 1249 (2d Cir. 1994)..............................43, 55

*United States ex rel. Feldman* v. *Van Gorp*,
   697 F.3d 78 (2d Cir. 2012) ..............................................................................87

*United States* v. *Giovannetti*, 919 F.2d 1223 (7th Cir. 1990) ....................68, 69

*United States* v. *Kaplan*, 490 F.3d 110 (2d Cir. 2007 ..................................69

*United States* v. *Keuylian*,
   23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014) ..................................................42

*United States* v. *Kozeny*, 667 F.3d 122 (2d Cir. 2011) ................................68, 69

*United States* v. *Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994)..............................54

*United States* v. *Mullins*, 613 F.3d 1273 (10th Cir. 2010)..........................30, 33

*United States* v. *Sanford*, 878 F. Supp. 2d 137 (D.D.C. 2012) ........................88

*United States* v. *Schultz*, 333 F.3d 393 (2d Cir. 2003) ......................................68

*United States* v. *Serpico*, 320 F.3d 691 (7th Cir. 2003)....................................34

*United States* v. *Starr*, 816 F.2d 94 (2d Cir. 1987)..........................................54

*United States* v. *Strother*, 49 F.3d 869 (2d Cir. 1995)......................................60

*United States* v. *Trzaska*, 111 F.3d 1019 (2d Cir. 1997) ..................................61

Page

Cases—continued:

*United States* v. *Ubakanma*, 215 F.3d 421 (4th Cir. 2000) ..............................39

*United States* v. *Vanoosterhout*, 898 F. Supp. 25 (D.D.C. 1995).....................33

*United States* v. *Vayner*, 769 F.3d 125 (2d Cir. 2014) ....................61, 62, 63, 69

*Vaknin* v. *United States*, Civ. No. 08-2420,
2010 WL 3394659 (E.D.N.Y. Aug. 23, 2010) ..................................................68

*Varo, Inc.* v. *Alvis PLC*, 261 A.D.2d 262 (N.Y. App. Div. 1999).......................50

*Zeno* v. *Pine Plains Central School District*,
702 F.3d 655 (2d Cir. 2012) ............................................................................27

## STATUTES, REGULATION, AND RULE

Act of Mar. 4, 1909, Pub. L. No. 60-350, § 215, 35 Stat. 1088, 1130.................45

Financial Institutions Reform, Recovery, and Enforcement Act,
Pub. L. No. 101-73, 103 Stat. 183 (1989).................................................*passim*

§ 101(10) .........................................................................................................34

§ 961(i) ............................................................................................................32

§ 961(j).............................................................................................................32

§ 961(*l*)............................................................................................................32

§ 963(c) ............................................................................................................33

12 U.S.C. § 1813(q)............................................................................................37

12 U.S.C. § 1818(i)(2) ........................................................................................37

12 U.S.C. § 1818(i)(2)(A)-(D)............................................................................37

12 U.S.C. § 1818(i)(2)(E)(i)................................................................................37

12 U.S.C. § 1818(i)(2)(G)....................................................................................37

Page

Statutes, regulation, and rule—continued:

12 U.S.C. § 1833a ................................................................*passim*

12 U.S.C. § 1833a(b)(1)........................................................18, 81

12 U.S.C. § 1833a(b)(3)....................................................18, 81, 82

12 U.S.C. § 1833a(b)(3)(A)........................................................85

12 U.S.C. § 1833a(c)..................................................................31

12 U.S.C. § 1833a(c)(2) ......................................................passim

18 U.S.C. § 3571(d).....................................................................88

28 U.S.C. § 1291 ...........................................................................3

28 U.S.C. § 1331 ...........................................................................3

28 U.S.C. § 1345 ...........................................................................3

28 U.S.C. § 2461 note..................................................................81

28 C.F.R. § 85.3(a)(6)............................................................18, 81

Fed. R. Evid. 801(d)(1)(A)...........................................................60

## MISCELLANEOUS

*Black's Law Dictionary* (10th ed. 2014)..................................83

135 Cong. Rec. 11,785 (1989) .....................................................36

135 Cong. Rec. 12,143 (1989) .....................................................36

135 Cong. Rec. 18,860 (1989) .....................................................36

Danielle Douglas, *Wall Street, Beware: These 3 Mean Business*,
    Wash. Post, Sept. 28, 2013, at A13.......................................22

H.R. Rep. No. 101-54 (1989) .......................................................35

Page

Miscellaneous—continued:

Peter Lattman & Ben Protess, *From Anonymity to Scourge of Wall Street*, N.Y. Times, Oct. 31, 2013, at A1 ...............................................7, 8

Adam Liptak, *Judge Raises Questions on Efforts to Prosecute Financial Executives*, N.Y. Times, Dec. 17, 2013, at A23 ...........................21

*Oxford English Dictionary* (2d ed. 1989) ............................................30

*Prosecuting Fraud in the Thrift Industry: Hearings Before the H. Subcomm. on Criminal Justice of the Comm. on the Judiciary*, 101st Cong., 1989 WL 1178203 (1989)..........................................35

The Honorable Jed S. Rakoff, *The Financial Crisis: Why Have No High-Level Executives Been Prosecuted?*, N.Y. Rev. of Books, Jan. 9, 2014, at 4 ...................................................................21

The Honorable Jed S. Rakoff, Stanford University Speech (May 12, 2014) <tinyurl.com/stanfordlecture>.............................21

Restatement (First) of Torts § 530 (1938) .........................................41

S. Rep. No. 101-19 (1989) ..................................................................35

U.S.S.G. § 2B1.1 app. n. 3(E)..............................................................87

U.S.S.G. § 8A1.2 app. n. 3(H)..............................................................83

*Webster's Third New International Dictionary* (2002)............................30, 83

## PRELIMINARY STATEMENT

In the wake of the recent mortgage crisis, the United States Attorney's Office for the Southern District of New York filed a civil action against Bank of America, one of the nation's largest financial institutions, in its capacity as successor in interest to Countrywide Bank. The action focused on certain Countrywide prime loan origination practices that followed the collapse of the subprime-lending market. Curiously, the action was brought under a provision of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which was enacted in the wake of the 1980s savings-and-loan crisis to protect federally insured financial institutions from misconduct *by others*. To the best of our knowledge, that provision had never previously been used to extract penalties *from* a bank, much less from a bank sued only as a successor in interest to alleged wrongdoing.

This case never should have gone to trial. By its terms, the applicable provision of FIRREA does not permit liability against banks on the theory that they engaged in fraud "affecting" themselves. What is more, the alleged misrepresentations in this case consisted exclusively of breaches of contractual representations that, under well-established principles, could not give rise to claims for fraud.

The district court nevertheless permitted the case to go to trial, despite the obvious mismatch between the government's allegations and the

FIRREA provision it invoked. Then, in a series of incorrect evidentiary rulings, the court made it impossible for defendants to offer a meaningful defense on the central issues at trial: whether the mortgage loans that Countrywide sold to Fannie Mae and Freddie Mac were of a materially worse quality than defendants represented them to be, and whether defendants knew and intended that result. In the wake of those rulings, the jury returned a verdict in favor of the government.

The district court then proceeded to award civil penalties of over $1.2 billion, under a statutory provision that typically caps penalties at $1.1 million, on a theory that the government itself did not initially advance. The district judge simultaneously made numerous public statements criticizing the Justice Department for failing to take more aggressive action against bank executives for their roles in the mortgage crisis.

Our legal system is intended to ensure fair treatment for all parties, regardless of their circumstances. From beginning to end, what took place in this case was not only unfair, but utterly unprecedented. The judgment of the district court should be reversed.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345. The district court denied the defendants' post-trial motions on February 3, 2015. S.A. 107. Appellants filed a timely notice of appeal on February 20, 2015. S.A. 124. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the Financial Institutions Reform, Recovery, and Enforcement Act, which authorizes civil penalties for mail fraud or wire fraud "affecting a federally insured financial institution," permits liability against federally insured financial institutions on the theory that they engaged in fraud "affecting" themselves.

2. Whether a claim of mail or wire fraud may be based exclusively on a breach of a preexisting contract, without any evidence of misrepresentations or deception outside the four corners of the contract.

3. Whether the district court erred by excluding as irrelevant all defense evidence tending to prove that the allegedly fraudulent loans were of at least as high quality as other loans, when such evidence would have been relevant to show that defendants did not materially misrepresent the quality of the loans and did not possess fraudulent intent.

4. Whether the district court erred by excluding as irrelevant testimony by defense witnesses that they believed that defendants' loan-

3

origination process was proper and produced good-quality loans, when such evidence would have been relevant to defendants' intent and when the government's witnesses testified at length to the contrary.

    5.    Whether the evidence was insufficient to establish that defendants materially misrepresented the quality of the loans.

    6.    Whether the district court erred by imposing a penalty of over $1.2 billion on the bank defendants.

### STATEMENT OF THE CASE

    The United States Attorney's Office for the Southern District of New York filed this civil action against defendants Bank of America, N.A.; Countrywide Bank, FSB, and Countrywide Home Loans, Inc. (collectively "Countrywide"); and Rebecca Mairone, a former Countrywide executive, seeking penalties under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), 12 U.S.C. § 1833a, for mail and wire fraud affecting a federally insured financial institution. After a jury trial, the jury returned a verdict against defendants, and the district court awarded monetary penalties against the bank defendants in the amount of over $1.2 billion. The district court's principal orders in this case are reported at 961 F. Supp. 2d 598 (2013) (order denying motion to dismiss); 996 F. Supp. 2d 247 (2014) (order holding that the "affecting" element was established as a matter of law); 33

F. Supp. 3d 494 (2014) (order awarding penalties); and ___ F. Supp. 3d ___, 2015 WL 424428 (Feb. 3, 2015) (order denying post-trial motions).

### A.    Background

This case concerns a loan-origination process known as the "High Speed Swim Lane," or "HSSL," which Countrywide's Full Spectrum Lending (FSL) division developed and used in 2007 and 2008 to originate prime mortgage loans for sale to the Federal National Mortgage Association (Fannie Mae or Fannie) and the Federal Home Loan Mortgage Corporation (Freddie Mac or Freddie).  At trial, the government contended that the HSSL process sacrificed loan quality for speed and consequently produced "bad" quality loans.  Knowing of those problems, the government alleged, Countrywide caused HSSL loans to be sold to Fannie and Freddie with "lies" about their quality.  The "lies," according to the government, consisted of presenting HSSL loans for sale to Fannie and Freddie that did not conform to preexisting contractual requirements that the loans meet "investment quality" standards.  The government contended that Countrywide's conduct amounted to mail and wire fraud "affecting a federally insured financial institution" in violation of Section 1833a.

In response, defendants contended that the case should not go to trial because, among other reasons, the government had alleged no "effect" on a federally insured financial institution and had alleged no "scheme to defraud"

5

apart from a breach of contract. The district court disagreed. At trial, defendants argued that the HSSL process was a good-faith method of loan origination and not a "scheme" to defraud Fannie and Freddie. The district court, however, precluded defendants from offering testimony from Countrywide employees that they believed the HSSL process was proper and would generate high-quality loans. The district court also did not permit defendants to introduce evidence that the quality of HSSL loans was no lower than that of other, comparable loans.

## B.  The Complaint

1.  The complaint in this case alleged that personnel in Countrywide's FSL division engaged in a fraudulent scheme to sell substandard mortgage loans to Fannie and Freddie, the government-sponsored enterprises that buy and resell mortgage loans. Notably, the conduct at issue occurred in the aftermath of the collapse of the subprime lending market. Although FSL had previously underwritten and sold subprime loans, it migrated to the prime lending market upon the collapse of the subprime market, offering mortgage loans to borrowers who were perceived to be lower risk. J.A. 103, 118-119. The complaint alleged that, in migrating to the prime market, FSL adopted the HSSL process. J.A. 103, 121-134. According to the complaint, the HSSL process replaced experienced underwriters with

"loan processors," who were given incentives to approve loans quickly in an effort to speed up the origination process. J.A. 103-104, 122-123.

The complaint alleged that, once Countrywide approved and funded the HSSL loans, it sold them to Fannie and Freddie in violation of terms of preexisting contracts requiring every loan to be "investment quality." J.A. 110-115. Fannie and Freddie bought loans without advance scrutiny, but retained the contractual right to require Countrywide to repurchase the loans in the event they later determined that the loans had not been investment quality at the time of sale. J.A. 112-113, 115. FSL allegedly employed the HSSL process from August 2007 until the spring of 2008. J.A. 1320.

Bank of America acquired Countrywide in July 2008—after the HSSL process had ended. Bank of America is a party to this case solely as Countrywide's asserted successor in interest. J.A. 1323.

2.     The government sought to break new ground by using a provision of FIRREA, Section 1833a, which authorizes civil penalties for mail or wire fraud "affecting a federally insured financial institution," to sue a financial institution itself. According to press reports, an Assistant United States Attorney in Los Angeles discovered this provision when he was "thumbing through materials in his office's law library." Peter Lattman & Ben Protess, *From Anonymity to Scourge of Wall Street*, N.Y. Times, Oct. 31, 2013, at A1. Lawyers from the Southern District of New York decided to bring a series of

test cases, including this one, after traveling on a "fact-finding mission" to Los Angeles and meeting with the Assistant United States Attorney. *Id.*

### C. Pre-Trial Proceedings

1. The bank defendants moved to dismiss the FIRREA claim against them on two separate grounds: first, that the complaint did not allege that the bank defendants' alleged fraud had "affect[ed] a federally insured financial institution," and second, that the allegations of fraud were based exclusively on breaches of contract and were therefore insufficient to state a claim for the predicate offenses of mail and wire fraud.

The district court denied the motion. *See* S.A. 12-20. As is relevant here, concerning the "affecting" element, the district court held that the complaint stated a claim by alleging that the bank defendants had "affected" themselves by selling defective loans to Fannie and Freddie, which, under the applicable contracts, exposed them to the risk of having to repurchase those loans. S.A. 13-15. Concerning the allegations of fraud, the district court held that, under *Durland* v. *United States*, 161 U.S. 306 (1896), a statutory claim of mail or wire fraud may be based exclusively on a misrepresentation amounting to a breach of contract. S.A. 19-20. The court also held that the complaint alleged facts that would trigger "one or more of the exceptions" to the common-law doctrine that a fraud claim may not be based exclusively on a breach of contract. S.A. 20.

8

2.     The district court also denied the bank defendants' motion for summary judgment on the "affecting" element.  In an opinion issued after the trial was over, the court not only explained its denial of summary judgment, but held that the government was entitled to judgment as a matter of law in its favor on that element.  S.A. 83-84.  The district court reasoned that the bank defendants necessarily "affected" themselves if they committed mail or wire fraud, because "[a]ny federally insured entity that commits these offenses automatically exposes itself to potential civil and criminal liabilities as a matter of law."  S.A. 84.

3.     Immediately before jury selection, the district court granted the government's *in limine* motion seeking to exclude defense evidence comparing the quality of HSSL and non-HSSL loans.  *See* S.A. 30-32.  The court did so in the face of the bank defendants' contention that such evidence would be relevant to multiple elements of the predicate offenses of mail and wire fraud, including intent, materiality, and the existence of a scheme to defraud. The court later clarified that it considered evidence of comparative default or defect rates to be irrelevant to any issue in the case.  J.A. 2611-2616.

The court's ruling precluded the bank defendants from presenting the bulk of their proffered expert testimony.  For example, the bank defendants had designated Dr. Christopher James, an economics professor, to testify that there was "no evidence" that HSSL loans were more likely to be defec-

tive or delinquent than non-HSSL loans. *See* J.A. 1536-1537. They had also submitted a report from Robert Glenn Hubbard, the dean of the Columbia Business School, who opined, after controlling for various characteristics, that HSSL loans have performed as well as or better than non-HSSL loans by Countrywide and comparable loans by other lenders. *See* J.A. 1445-1446.

### D.    The Liability Phase

1.    At trial, the government emphasized that the HSSL process removed quality safeguards in an effort to speed up originations. J.A. 1741-1742. As a result, the government contended, the HSSL process produced "bad mortgage loans," which Countrywide sold to Fannie and Freddie with "lies that they were quality loans." J.A. 1735-1736. The government further contended that certain individuals at Countrywide, including Ms. Mairone, knew that the loans were of low quality.

a.    Four former FSL employees testified for the government: Edward O'Donnell, Michael Thomas, John Boland, and Robert Price. The witnesses testified that, while they understood that the HSSL process was originally intended to increase efficiency in underwriting higher-quality loans, they came to view HSSL as inferior because it employed insufficient safeguards and sacrificed loan quality for speed. The witnesses further testified that they and others raised their concerns with other Countrywide employees, but that the concerns were insufficiently addressed. J.A. 2229-2230,

2238, 2242-2243, 2250-2251, 2302, 2325-2326, 3366-3369, 3486-3491.  None of the government's witnesses testified that their concerns rose to the level of fraud; indeed, Mr. O'Donnell, the government's key witness who initiated this lawsuit, specifically wrote about the HSSL process, at the time that Countrywide was ending it, that "[o]ur exposure is to manufacturing quality, *not fraud or unethical stuff.*"  J.A. 2533 (emphasis added).

The government also called several witnesses who had been employed at Fannie and Freddie during the relevant time period.  They testified that the contracts between Countrywide and Fannie and Freddie required the loans that Countrywide presented for sale to be investment quality.  J.A. 2714-2721, 2973-2977, 3124-3128, 3178-3181, 3218-3220.  At the same time, the witnesses made clear that they did not expect *every* loan to be investment quality; to the contrary, they testified that between 18% and 25% of loans sold by all lenders did not meet that standard.  J.A. 3004, 3268.  The witnesses testified that the contracts permitted Fannie and Freddie to require a lender to repurchase any loans that had not been investment quality at the time of sale, J.A. 3176-3178, and that the contracts did not dictate most aspects of the process Countrywide used to underwrite its loans:  for example, whether particular functions should be performed by underwriters, rather than loan processors.  J.A. 2752-2755, 2992-2994, 3152-3155, 3250-3251.  Notably, none of the witnesses testified that anyone at Countrywide had made a

false statement to them either about the HSSL loans or about the underwriting process for those loans.

b.     Before trial, the government proffered expert reports from a statistical sampling expert, Dr. Charles Cowan, and an underwriting expert, Ira Holt, purporting to show that many HSSL loans were "materially defective"—*i.e.*, that the loans deviated from the quality requirements of Countrywide's contracts in a way that materially increased their risk.  Dr. Cowan explained that he based his conclusions on a random sample of loans from a population of 28,882 loans that he understood to be HSSL loans.  Mr. Holt reviewed the files for a portion of the loans in that sample to determine whether the loans were investment quality at the time of sale; Dr. Cowan then extrapolated Mr. Holt's results to the entire population of 28,882 loans.  Dr. Cowan concluded that 42.81% of the loans were "materially defective" and thus should not have been sold to Fannie and Freddie under the applicable contracts.  Notably, while Dr. Cowan also took a sample of non-HSSL loans, he conspicuously did *not* express any conclusions about those loans.

After the trial began, the district court held a hearing, at which both Dr. Cowan and Mr. Holt testified, to determine whether their testimony would be admitted.  *See* J.A. 2593-2624.  Much of the questioning focused on the reason why Mr. Holt had reviewed only a portion of the loan files in the samples that Dr. Cowan had taken.  Both testified that Dr. Cowan had in-

12

structed Mr. Holt to stop his review while it was in progress.  Dr. Cowan explained that he did so because there was "no difference" in "[t]he defect rates for the [HSSL] and non-[HSSL] loans."  J.A. 2602.  And he admitted that it was possible that a review of the entire sample would have shown that non-HSSL loans actually had a significantly *higher* defect rate than HSSL loans, but that it was not possible that they had a significantly lower rate.  J.A. 2608-2611.  That is why he instructed Mr. Holt to stop his review:  the government had assigned him to look only at whether HSSL loans were worse than other loans, not whether they were better.  J.A. 2609-2610.

Upon hearing that evidence, the district court reiterated its conclusion that *all* evidence about comparative defect rates of HSSL and non-HSSL loans was irrelevant.  *See* J.A. 2611-2616.  As a result, Dr. Cowan and Mr. Holt would be permitted to testify about their findings with regard only to HSSL loans, and defendants would not be permitted to cross-examine them about non-HSSL loans.  J.A. 2616.

The government proceeded to offer Dr. Cowan and Mr. Holt as witnesses.  Before the jury, Mr. Holt testified about the material defects he found in the sample of HSSL loans he reviewed.  J.A. 2678-2819, 2833-2861.  Dr. Cowan testified that the defect rate for the entire population of HSSL loans was 42.81%.  J.A. 3080-3099.  Neither witness was permitted to say anything about the review of non-HSSL loans.

13

Remarkably, on cross-examination, Dr. Cowan testified that the reasons he had instructed Mr. Holt to stop his review were that he "thought that the remaining underwriting that would continue would not be very fruitful"; that "it wouldn't change the results much, in [his] opinion"; and that it was "getting towards the end of the time period when [he] needed to produce both the data set and a report." J.A. 3091. When defense counsel sought to confront Dr. Cowan with his earlier testimony that he had ordered Mr. Holt to stop because his results were not showing that HSSL loans were of poorer quality than non-HSSL loans, the district court prevented that cross-examination. J.A. 3100-3104.

      c.    At the close of the government's case, defendants moved for judgment as a matter of law. The district court denied defendants' motions but observed that, "because this is a circumstantial case, this motion is far from being a frivolous one." J.A. 3546.

In addition, defendants again asked the district court to permit evidence comparing HSSL and non-HSSL loans. J.A. 2826-2830. Defendants argued that the government had opened the door to such comparative evidence by affirmatively presenting it in its case-in-chief. J.A. 2826-2829. Defendants also argued that such evidence was necessary to counter the one-sided presentation by the government's experts, who testified that the HSSL process generated poor-quality loans, but could not be cross-examined to

14

show that "the HSSL loans had no more material defects than other loans." J.A. 2829-2830.   The district court summarily denied defendants' motion. J.A. 3344.

2.    In their case-in-chief, defendants emphasized that there was "no fraud" in connection with the HSSL process; instead, defendants explained, the HSSL process was a well-intentioned method of increasing efficiency as FSL moved from subprime to higher-quality loans.  J.A. 1754, 1765.

Consistent with that explanation, defendants presented evidence to show that Countrywide's management intended the HSSL process to be an appropriate means of underwriting prime loans, rather than a fraudulent means of sacrificing quality for speed.  Defendants' witnesses included Ms. Mairone and another Countrywide executive, Clifford Kitashima, who testified that they believed the HSSL process maintained proper loan-quality standards.  J.A. 3640-3642, 4159-4161.

When defendants sought to present testimony from other witnesses to the same effect, however, the district court excluded that testimony.  The court ruled that defendants could not introduce evidence about the state of mind of any individuals at Countrywide other than the three individuals (Ms. Mairone; Mr. Kitashima; and FSL division president Greg Lumsden) whom the government had identified (albeit only at the close of its case-in-chief) as allegedly having fraudulent intent.  J.A. 4014; *see* J.A. 3516.  The court so

15

ruled even though the government had been permitted to elicit testimony from its own witnesses, none of whom was alleged to have acted with fraudulent intent, about their opinions of the HSSL process. Even after the bank defendants pointed out that disparity, the district court reaffirmed its ruling excluding the testimony. *See* J.A. 4555-4564.

Defendants also presented evidence to show that HSSL loans were not low quality. As a result of the district court's earlier rulings, however, the bank defendants were unable to present evidence concerning the comparative quality of HSSL and non-HSSL loans. Defendants were left with a single non-excluded expert, Robert Broeksmit, who found numerous errors in Mr. Holt's review of the sample of HSSL loans. J.A. 4622-4677.

Finally, defendants called David Battany, a former Fannie executive who managed Fannie's relationship with Countrywide during the relevant period. J.A. 4740. Mr. Battany testified that it was commonplace in the lending industry for loan processors, rather than underwriters, to approve prime loans. J.A. 4780-4781. Accordingly, he explained, his decision whether to buy a loan from Countrywide would not have been affected if he had known that the loan was approved by a loan processor, rather than an underwriter. J.A. 4780. Mr. Battany further testified that he would still have bought loans from Countrywide if he had known about Countrywide's final quality-control results, which showed defect rates between 4.4% and 9.8% during the rele-

16

vant time period—a much lower rate than the expected rate of between 18% and 25%. J.A. 4795-4796.

At the close of the defense case, defendants again moved for judgment as a matter of law, arguing that the evidence was insufficient for a reasonable jury to find that Countrywide had made misrepresentations to Fannie or Freddie or intended to defraud them. The district court denied defendants' motions. In so doing, however, the court commented as follows: "I think this is one of the closer cases I've seen in a long time. I have really no idea at this point in time who is going to prevail. And that's very rare. I usually have a pretty good sense of who is going to prevail. I think this is one heck of a close case, and that makes it fun for me and not fun for you." J.A. 4868.

3. At the conference on jury instructions, the district court concluded that the evidence did not support an instruction permitting the jury to find that Countrywide had intentionally deceived Fannie or Freddie about the process by which HSSL loans were underwritten. Instead, the court's instruction asked the jury to determine whether Countrywide had misrepresented that HSSL loans were "of higher quality than they actually were." J.A. 5219. Thus, the jury could find a "scheme to defraud" only if it found that Countrywide had misrepresented to Fannie and Freddie the quality of HSSL loans that it sold to them.

After deliberating for 2½ hours, the jury returned a general verdict in favor of the government.  J.A. 5224.

### E.    The Penalty Phase

1.    The parties agreed before trial that the issue of penalties would be resolved by the court.  As a general rule, FIRREA authorizes a civil penalty that "shall not exceed" $1.1 million.  12 U.S.C. § 1833a(b)(1); 28 C.F.R. § 85.3(a)(6).  That rule, however, is subject to an exception for "violations creating gain or loss"; under that "[s]pecial rule," "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator," the court may award penalties up to the amount of the gain or loss.  12 U.S.C. § 1833a(b)(3).

Citing that exception, the government argued that the amount of the penalty should be measured by what it called the "gross loss" to Fannie and Freddie from buying the HSSL loans.  The government calculated the "gross loss" as the total amounts of all defaults and delinquencies in the population of 28,882 "HSSL loans," regardless of why those defaults or delinquencies occurred or whether the loans were investment quality at the time of sale, and without taking into account recoveries by Fannie and Freddie.

The bank defendants responded that the actual "loss" to Fannie and Freddie was zero, because the government had failed to present any evidence that even a single default was caused by a defect in the loan at the time

18

of sale (as opposed to, for example, the worldwide mortgage crisis). In this regard, the bank defendants offered evidence that the loans the government's experts called "defective" did not default at a higher rate than other loans. In addition, the bank defendants noted that the government's "gross" measure counted the entire unpaid balances of the loans without taking into account amounts Fannie and Freddie actually recovered. The bank defendants argued that, in the absence of demonstrated "loss," the default statutory maximum penalty of $1.1 million should apply, and that the court should exercise its discretion to award a penalty below that maximum.

At oral argument, the district court *sua sponte* raised the issue of whether, instead of the amount of "loss" to Fannie and Freddie, the penalty should be measured by the amount of "gain" to the bank defendants—an argument "the government ha[d] chosen" not to pursue. J.A. 5236-5239. In subsequent briefing, the government—which had suggested before trial that the amount of "gain" to the bank defendants was approximately $175 million—argued that the amount of "gain" was actually $2.1 billion, based on the face value of the allegedly defective HSSL loans sold to Fannie and Freddie. The bank defendants responded, among other things, that this view of "gain" was absurd because Countrywide had lent nearly that same amount to borrowers in order to generate the loans sold to Fannie and Freddie and thus could not plausibly be said to have "gained" that amount. At the hearing, the

19

district court suggested that the amount of the "gain" could be $5 billion, the face value of all the HSSL loans.  J.A. 5310-5312.

2.     The district court awarded penalties against the bank defendants in the amount of $1,267,491,770.  The court began its penalty opinion by noting that the SEC had brought claims against senior Countrywide executives—even though this case had nothing to do with those executives, or with the SEC, or with the misconduct alleged in the SEC's claims.  S.A. 86.

Turning to this case, the district court first opined that the HSSL process was "the vehicle for a brazen fraud by the defendants."  S.A. 101.  In the face of its prior comment at the close of the evidence that "this is one of the closer cases I've seen in a long time," the court explained that it had been "momentarily mesmerized by defendants' superb attorneys," S.A. 100-101, but that, upon further review, it had concluded that the evidence was actually one-sided, S.A. 100-102.

On the merits of the penalties issue, the district court concluded that "the amount of the victims' loss and the defendants' gain is identical, and consisted of the price that Fannie Mae and Freddie Mac paid to Countrywide for the fraudulently misrepresented loans."  S.A. 98.  The court calculated the total gain or loss at $2,960,737,608 (based on the sale price of all 17,611 loans the court found to have gone through the HSSL process) and then exercised its discretion to award 42.81% of that amount, corresponding to the

20

percentage of loans that the government's experts had found to be defective within the population of loans they sampled. S.A. 92-93.

3.      While this case was pending—and especially while the penalty phase was ongoing—the district judge made a series of public comments concerning the mortgage crisis. In particular, he criticized the Justice Department for failing to pursue bank executives more aggressively for their roles in the crisis. In a widely publicized article, the district judge questioned why the Justice Department had not brought prosecutions against bank executives using a theory of "willful blindness" or "conscious disregard." The Honorable Jed S. Rakoff, *The Financial Crisis: Why Have No High-Level Executives Been Prosecuted?*, N.Y. Rev. of Books, Jan. 9, 2014, at 4. Around the same time, the New York Times published an interview in which the judge explained that, "[a]s a judge, I got to see many cases that grew out of the financial crisis and to see situations that gave me pause." Adam Liptak, *Judge Raises Questions on Efforts to Prosecute Financial Executives*, N.Y. Times, Dec. 17, 2013, at A23.

The district judge also delivered numerous speeches on the same theme, with particular emphasis on the Justice Department's non-prosecution of Countrywide's chief executive officer, Angelo Mozilo. *See, e.g.*, The Honorable Jed S. Rakoff, Stanford University Speech (May 12, 2014) <tinyurl.com/stanfordlecture>. The Washington Post reported that, along

21

with the United States Attorney who brought this case, the judge was viewed as being "at the forefront of the effort" to "hold[] Wall Street accountable" for its "sins" in connection with the mortgage crisis. Danielle Douglas, *Wall Street, Beware: These 3 Mean Business*, Wash. Post, Sept. 28, 2013, at A13.

It was around the same time as these statements that the district judge termed defendants' conduct "brazen" and decided to impose an unprecedented penalty of over $1.2 billion against the bank defendants—a penalty, it bears repeating, that was far in excess of what the government itself initially sought.

### F.    Post-Trial Proceedings

Defendants filed post-trial motions for judgment as a matter of law or, in the alternative, for a new trial. The district court denied the motions, deeming defendants' argument on the insufficiency of the evidence to "border[] on the frivolous." S.A. 114. This appeal by the bank defendants, along with a separate appeal by Ms. Mairone, follows.

### SUMMARY OF ARGUMENT

This case should never have gone to trial, and the trial itself was riddled with errors at both the liability and penalty phases. Accordingly, the Court should reverse the judgment below or, in the alternative, vacate the judgment and remand for further proceedings.

I.    The district court erred by permitting the FIRREA claim against the bank defendants to proceed because the bank defendants cannot be liable for "affecting" either themselves or each other.  As is relevant here, the civil-penalties provision of FIRREA, 12 U.S.C. § 1833a(c)(2), permits liability only when a person commits mail or wire fraud "affecting a federally insured financial institution."  The most natural reading of that language is that the violator being penalized for affecting the financial institution must be a separate person from the institution being affected by the violation.  In adding the phrase "affecting a federally insured financial institution," Congress intended to restrain the scope of that provision.

Perversely, the district court held that the "affecting" element would *automatically* be satisfied whenever a financial institution engages in mail or wire fraud.  That interpretation cannot readily be reconciled with the statutory text or with its underlying purpose, which was to protect financial institutions from wrongdoing by third parties rather than to provide additional penalties for their own wrongdoing.  Nor can the Countrywide defendants be liable on the theory they "affected" Bank of America through the happenstance of a subsequent merger.

II.    The district court also erred by permitting the FIRREA claim against the bank defendants to proceed because the claimed predicate offenses of mail and wire fraud were based exclusively on breaches of preexist-

ing contracts. It is a familiar rule that a breach of contract does not constitute fraud, and that rule applies equally to statutory mail- and wire-fraud claims. At trial, the government unequivocally took the position that the only "misrepresentations" at issue were breaches of Countrywide's contractual warranties that the loans being sold would be investment quality. None of the exceptions to the rule that a breach of contract does not constitute fraud is applicable here. Because the government failed to plead or prove either that defendants engaged in actionable mail or wire fraud or that such a fraud "affect[ed] a federally insured financial institution," the judgment against the bank defendants should be reversed.

III.   Beyond its errors in permitting the FIRREA claim to proceed, the district court erred at trial by excluding evidence about the comparative quality of HSSL and non-HSSL loans. Under the government's theory of the case, defendants could be liable only if the jury found that HSSL loans were of materially worse quality than defendants represented them to be—and that defendants knew and intended that result. To rebut the government's theory, defendants were prepared to offer evidence that loans originated through the HSSL process were of no lower quality than other loans. But the district court excluded that evidence as irrelevant—even after the government opened the door with its own evidence concerning the quality of non-HSSL loans, and even after it became clear that the evidence was rele-

vant to impeach the government's experts' testimony. Because evidence about the comparative quality of the loans was not only relevant but central to defendants' case, the district court committed a prejudicial error by excluding it.

IV. The district court also erred by precluding defense witnesses from testifying that they believed the HSSL process was proper. The district court permitted the government to present substantial contrary evidence from other Countrywide employees. When defendants sought to rebut that evidence, the court changed course and excluded testimony of similarly situated Countrywide witnesses on the ground that the state of mind of anyone other than the three alleged wrongdoers was irrelevant. That ruling was plainly erroneous, because it is well settled that evidence that a witness other than a defendant had a contemporaneous belief in the propriety or impropriety of his conduct may be probative of the defendant's state of mind. As a result, the jury's only yardstick by which to measure the reasonableness of the alleged wrongdoers' stated belief that the HSSL process was proper was the testimony of the government's own witnesses that it was improper. That error, too, warrants a new trial.

V. Separate and apart from the district court's erroneous rulings, the government presented insufficient evidence to show that defendants made any material misrepresentation to Fannie or Freddie. Assuming, *ar-*

25

*guendo*, that selling loans to Fannie and Freddie that did not conform to contractual quality standards could constitute mail or wire fraud, the evidence at trial did not permit a reasonable juror to conclude that the actual quality of HSSL loans was materially worse than Fannie or Freddie could reasonably have expected—and thus that defendants engaged in a scheme to defraud. Countrywide's own quality-control results showed that HSSL loans were well within industry standards for quality and, in fact, suffered defect rates well below those expected by Fannie and Freddie for loans industrywide. Although the government attempted to cast doubt on the reliability of those results, it presented insufficient evidence to do so. Because the government failed to adduce evidence from which a reasonable juror could have concluded that HSSL loans were materially defective at a rate higher than the industry-standard rate, the judgment below should be reversed.

VI.   Finally, in addition to its numerous errors in the liability phase, the district court further erred in imposing a grossly excessive penalty of over $1.2 billion on the bank defendants under the "[s]pecial rule for violations creating gain or loss." As to "gain," the district court erroneously defined as "gain" the full sale prices of the HSSL loans, without taking into account that Countrywide actually *lent* most of those amounts to borrowers before selling the loans to Fannie and Freddie. And as to "loss," the district court erroneously defined as "loss" the entire amount Fannie and Freddie

26

paid for the HSSL loans, without taking into account the offsetting rights that Fannie and Freddie received to a stream of payments and to the collateral for the loans. In addition, the government did not, and could not, prove that the district court's penalty amount was proximately caused by the allegedly fraudulent conduct. Because there was no evidence that there was a "gain" or "loss" in excess of the default statutory maximum of $1.1 million, this Court should at a minimum vacate the penalty and remand with instructions to award penalties at or below the maximum.

## STANDARD OF REVIEW

Parts I, II, V, and VI of this brief challenge the district court's legal rulings, which this Court reviews de novo. *See*, *e.g.*, *Zeno* v. *Pine Plains Central School District*, 702 F.3d 655, 664 (2d Cir. 2012). Parts III and IV challenge the district court's evidentiary rulings, which this Court reviews for abuse of discretion; a district court abuses its discretion when it "bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Porter* v. *Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

ARGUMENT

I.  THE DISTRICT COURT ERRED BY PERMITTING THE
    FIRREA CLAIM AGAINST THE BANK DEFENDANTS TO
    PROCEED BECAUSE THE BANK DEFENDANTS CANNOT BE
    LIABLE FOR 'AFFECTING' THEMSELVES

To establish liability under the civil-penalties provision of FIRREA

based on the predicate offense of mail or wire fraud, the government was re-

quired to prove that the bank defendants committed mail or wire fraud "af-

fecting a federally insured financial institution." 12 U.S.C. § 1833a(c)(2). As

this case went to trial, the only federally insured financial institutions that

the government alleged were "affected" by mail or wire fraud were two of

the defendants themselves—Countrywide Bank, FSB, and Bank of America,

N.A. In denying the bank defendants' motion to dismiss and subsequent mo-

tions, the district court held that the "affecting" element of the statute could

be satisfied where a federally insured financial institution defendant commit-

ted a fraud that affected *itself*. S.A. 13-15.

As a matter of statutory interpretation, the district court erred in giv-

ing the "affecting" element that expansive construction. Indeed, the district

court illustrated the absurdity of that interpretation when, in a post-trial

opinion, it held that the "affecting" element is automatically satisfied when-

ever a federally insured financial institution engages in mail or wire fraud, on

the theory that the institution thereby exposes itself to potential civil and

criminal liability. S.A. 83-84. Under the district court's construction, the "af-

28

fecting" element would be surplusage in every case against a federally insured financial institution. And the district court further erred by holding that the "affecting" element could be satisfied as to the Countrywide defendants simply by virtue of Countrywide's subsequent merger with Bank of America. The district court's erroneous interpretation of FIRREA's civil-penalties provision requires reversal of the judgment below.

### A. Federally Insured Financial Institutions Cannot Be Liable Under Section 1833a(c)(2) On The Theory That They Engaged In Conduct 'Affecting' Themselves

Whether a federally insured financial institution can be both the perpetrator of the alleged fraud and the institution "affected" by the fraud for purposes of Section 1833a(c)(2) is a question of first impression in the courts of appeals. That is because the government's use of that provision against federally insured financial institutions is unprecedented. Although numerous courts have construed similar "affecting" language in other provisions of FIRREA, no court has interpreted any of those provisions to encompass a "self-affecting" theory against a defendant.

The district court here held that the "plain language" of Section 1833a(c)(2) permits liability on a "self-affecting" theory because "affect" is a "broad" term. S.A. 14. After reciting a single dictionary definition of that term, the court summarily concluded that the statute was "unambiguous" and, on that basis, declined to address any of defendants' arguments. *Id.*

The district court's cursory analysis was incorrect.  If allowed to stand, the district court's interpretation would convert a statute designed to protect federally insured financial institutions from fraud by others into a mechanism for imposing punitive fines *against* those institutions.  The statutory language, purpose, history, and context uniformly support the conclusion that Section 1833a(c)(2) does not reach conduct by a federally insured financial institution that "affects" only the institution itself.

### 1. The Text Of Section 1833a(c)(2) Does Not Permit Liability On A 'Self-Affecting' Theory

a.      Section 1833a(c)(2) imposes civil penalties on a person who commits "a violation of [the mail- or wire-fraud statutes]  .  .  .  affecting a federally insured financial institution."  The most natural reading of that language is that the violator being penalized for affecting the financial institution is a separate person from the institution being affected by the violation.  In ordinary usage, the term "affect" means "to 'make a material impression on; to act upon, influence, move, touch, or have an effect on,'  .  .  .  or perhaps more appositely to this case, 'to have a detrimental influence on.'"  *United States* v. *Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) (quoting *Oxford English Dictionary* 211 (2d ed. 1989) and *Webster's Third New International Dictionary* 35 (2002)).

In normal parlance, it would be quite strange to refer to an individual or his conduct "mak[ing] a material impression on" himself, "act[ing] upon"

30

himself, "influenc[ing]" himself, or "hav[ing] an effect on" himself. Persons are typically referred to as making impressions on, acting upon, influencing, and having an effect on other persons (or objects). And it would be particularly odd to refer to "fraud affecting" a person to mean fraud *by* that person, as the district court's interpretation would require.

  b.  Beyond the text, the statutory context further demonstrates that Section 1833a(c)(2) does not permit liability on a "self-affecting" theory. The three paragraphs of Section 1833a(c) authorize civil penalties only for violations of certain enumerated sections of the Criminal Code. The sections listed in paragraph (1) proscribe bank fraud, bribery of a bank officer or employee, embezzlement of financial-institution funds, false entries in financial-institution records, and false statements to influence a financial institution or a federal regulator of such institution; the section of the Criminal Code listed in paragraph (3) proscribes fraud against the Small Business Administration. Neither of those paragraphs includes a requirement that the predicate offense "affect" a financial institution; given the nature of the listed offenses, such a qualifier would be unnecessary. By contrast, the sections listed in paragraph (2) are not, by their terms, limited to offenses committed against (or directly concerning) financial institutions or regulators. Congress thus included the limiting language "affecting a federally insured financial institu-

tion" in paragraph (2) to ensure that it, like paragraphs (1) and (3), would be limited to offenses of that variety.

As the Supreme Court has instructed, the interpretive principle of *noscitur a sociis*—*i.e.*, that "a word is known by the company it keeps"—"is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Dolan* v. *United States Postal Service*, 546 U.S. 481, 486 (2006) (alteration and citation omitted). That principle applies with full force here. The district court's interpretation would reach *any* mail or wire fraud by a financial institution, or any false statement to the government by such an institution, regardless of whether the conduct was directed against (or directly concerned) the institution itself. Such an interpretation would cause paragraph (2) to reach conduct that would be far beyond the reach of paragraphs (1) and (3). And it cannot readily be reconciled with Congress's obvious intention, in adding a *limiting* phrase to paragraph (2), to restrain the scope of that provision.

c.    While no court of appeals has had the occasion to interpret the "affecting" language of Section 1833a(c)(2), numerous courts have construed similar language in other provisions of FIRREA. When Congress enacted FIRREA in 1989, it amended several criminal statutes to provide, among other things, higher penalties and a longer limitations period for offenses "affect[ing] a financial institution." *See*, *e.g.*, Pub. L. No. 101-73, §§ 961(i), (j), (*l*),

963(c), 103 Stat. 183, 500, 501, 504-505 (1989). Although courts interpreting those provisions have recognized that "affect" is a broad term, not one has held that a financial institution could be penalized on the theory that its own fraud "affected" itself. *See*, *e.g.*, *Mullins*, 613 F.3d at 1278-1279.

The absurdity of a "self-affecting" theory is evident in the district court's holding here that a federally insured financial institution *automatically* satisfies the "affecting" element whenever it engages in mail or wire fraud, on the theory that it exposes itself to potential civil and criminal liability. S.A. 84. Not only would that construction render the "affecting" element surplusage in every case against a federally insured financial institution, but it cannot be reconciled with the decisions of courts construing the "affecting" element in other provisions of FIRREA. Those courts have held that conduct does not "affect" a bank "within the plain meaning of that term [when] the bank suffered no actual financial loss and experienced no realistic prospect of loss." *United States* v. *Agne*, 214 F.3d 47, 53 (1st Cir. 2000); *cf. United States* v. *Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (per curiam) (explaining that the "effect" on a financial institution must be "sufficiently direct" and not "unreasonably remote" (citation omitted)).

d.    Finally with regard to the statutory text, it is a familiar canon of construction that "[p]unitive statutes, such as FIRREA [and Section 1833a(c)(2) in particular], are to be narrowly construed." *United States* v.

*Vanoosterhout*, 898 F. Supp. 25, 30 (D.D.C. 1995). That canon strongly counsels against the district court's expansive interpretation, under which any conduct by a federally insured financial institution could be considered to "affect" the institution itself. Thus, even if such an interpretation were a permissible interpretation of the text of Section 1833a(c)(2)—and, as discussed above, it is not—this Court should reject it.

> **2.  The Statutory Purpose And History Demonstrate That Section 1833a Was Not Intended To Punish Federally Insured Financial Institutions**

As one court of appeals noted in discussing a materially identical "affecting" provision elsewhere in FIRREA, "the whole purpose of [the 'affects' language] is to protect financial institutions." *United States* v. *Serpico*, 320 F.3d 691, 694 (7th Cir. 2003). Permitting liability under Section 1833a on a "self-affecting" theory would contravene that purpose.

There is no mystery about the purpose of FIRREA's penalty provisions; the statute itself states it. Section 101 provides that the purpose of those provisions is to "strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors." Pub. L. No. 101-73, § 101(10), 103 Stat. 187. The district court's interpretation of Section 1833a would convert a statute designed to shield financial institutions into a statute that can be used *against* those institutions.

The legislative history of FIRREA supports the conclusion that FIRREA's penalty provisions were designed to protect financial institutions by penalizing conduct by insiders or third parties that defrauds an institution (or otherwise directly harms it). As the House Report on FIRREA indicates, Congress intended to increase civil and criminal penalties for "crimes of fraud *against* financial institutions and depositors." H.R. Rep. No. 101-54, Pt. I, at 322 (1989) (emphasis added). The primary target of FIRREA's increased penalties was "fraud and insider abuse" committed against financial institutions. *Id.* at 300; *accord* S. Rep. No. 101-19, Pt. I, at 9 (1989).

In its deliberations over FIRREA, Congress focused on circumstances where "individuals in a position of trust in the institution or closely affiliated with it have, in general terms, breached their fiduciary duties; traded on inside information; usurped opportunities or profits; engaged in self-dealing; or otherwise used the institution for personal advantage," or where fraud was "perpetrated by outsiders, such as borrowers or by futures and options traders with whom the thrift dealt." *Prosecuting Fraud in the Thrift Industry: Hearings Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 101st Cong. 15, 18 (1989) (statement of Frederick D. Wolf, Assistant Comptroller General), *available at* 1989 WL 1178203. Statements by members of both Houses confirm that this type of misconduct by individuals against financial institutions was the primary motivation for FIRREA's pen-

alty provisions. *See, e.g.*, 135 Cong. Rec. 18,860 (1989) (statement of Sen. Chafee); 135 Cong. Rec. 11,785 (1989) (statement of Rep. Roukema); 135 Cong. Rec. 12,143 (1989) (statement of Rep. Richardson).

Section 1833a, like FIRREA's other penalty provisions, was thus intended to punish third parties whose fraudulent conduct damages federally insured financial institutions—not to inflict additional penalties on those institutions for perpetrating frauds, or on their shareholders. The government's practice in the years following FIRREA's enactment confirms that understanding. To the best of our knowledge, in the two decades since FIRREA's enactment, the Justice Department never once attempted to use Section 1833a to extract penalties from a federally insured financial institution—much less on the theory that the institution had engaged in conduct that "affected" itself for purposes of Section 1833a(c)(2).

### 3. The Broader Context Of FIRREA Further Demonstrates That Section 1833a Was Not Intended To Punish Federally Insured Financial Institutions

Permitting liability under Section 1833a on a "self-affecting" theory also cannot be reconciled with the separate scheme that Congress created elsewhere in FIRREA for the express purpose of imposing penalties against those institutions. Specifically, in another provision of FIRREA, Section 1818(i), Congress expanded the authority of federal regulators to impose penalties on federally insured financial institutions and affiliated parties if,

among other things, they "violate[] any law or regulation" or knowingly or recklessly "engage[] in an unsafe or unsound practice . . . [that] causes or is likely to cause more than a minimal loss to such depository institution." 12 U.S.C. § 1818(i)(2). Unlike Section 1833a, that provision explicitly provides for penalties against federally insured financial institutions for engaging in misconduct that redounds to their own harm.

Notably, recognizing that the imposition of penalties can itself weaken financial institutions and thus put federally insured deposits at risk, Congress built special safeguards in Section 1818(i) to balance the need for sanctions against the potential impact of those sanctions on the federal banking system. To begin with, Congress entrusted the primary responsibility for assessing and collecting these penalties to federal bank regulators, not to the Justice Department. *See* 12 U.S.C. §§ 1813(q), 1818(i)(2)(E)(i). Congress also created a detailed system of "tiers" to restrict the monetary penalties that the regulators may assess depending on the seriousness of the offense. *See* 12 U.S.C. § 1818(i)(2)(A)-(D). And Congress conditioned penalties upon factors such as "the size of financial resources . . . of the insured depository institution" and "such other matters as justice may require." 12 U.S.C. § 1818(i)(2)(G).

Extending Section 1833a to "self-affecting" conduct would disrupt that carefully crafted penalty scheme. In promulgating Section 1818(i), Congress

took great pains to craft appropriate penalties against federally insured financial institutions for conduct that exposes deposits to inappropriate risk. The statute reflects Congress's appropriate sensitivity to the health and well-being of the Nation's financial institutions, which expert regulators are in a vastly superior position to evaluate than United States Attorneys. Congress could not have intended to disrupt that balance by giving prosecutors *carte blanche* to inflict penalties on the same institutions for the same conduct under Section 1833a.

### B.  Federally Insured Financial Institutions Cannot Be Liable Under Section 1833a(c)(2) On The Theory That They 'Affected' A Corporate Successor Through A Subsequent Merger

After trial, the district court offered an alternative theory for how the "affecting" element was satisfied in this case, at least as to the Countrywide defendants:  it sought to justify its earlier decision that the "affecting" element was established as a matter of law on the ground that the fraud by the Countrywide entities necessarily "affected" Bank of America by virtue of the subsequent merger.  According to the court, the merger had "affected" Bank of America by exposing it to liability for Fannie and Freddie's claims against Countrywide.  S.A. 82-83.

The district court's alternative holding was in error, because the mere happenstance of a subsequent merger with a federally insured financial institution is far too remote a consequence to constitute an "effect" under the

38

statute. To begin with, "affecting" a subsequent merger partner or successor in interest is the same as "self-affecting," because liability is being imposed on the acquired bank only for actions that harmed, or exposed to risk, the bank itself. That the bank and its risks were later transferred to a successor bank does not transform those earlier actions into ones "affecting" a *different* federally insured financial institution.

In any event, the district court's reasoning is incorrect even on its own terms. This Court, like others, has construed another "affecting" provision in FIRREA to reach only effects that are "sufficiently direct." *Bouyea*, 152 F.3d at 195; *accord, e.g.*, *United States* v. *Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000); *Agne*, 214 F.3d at 52. In *Bouyea*, this Court held that a fraud against the wholly owned subsidiary of a financial institution caused a "sufficiently direct" effect on the institution because the subsidiary borrowed money from its parent for the fraudulent transaction and, when the subsidiary suffered loss as a result of the fraudulent scheme, the parent "was affected by this loss." 152 F.3d at 195. The Court contrasted that situation with an "unreasonably remote" effect on a financial institution, as occurs when fraud is "directed against a customer of the depository institution which was then prejudiced in its dealings with the institution." *Id.* (citation omitted).

The happenstance of a subsequent merger between an "affected" institution and a different institution, which then takes on the liabilities of the "af-

39

fected" institution, is likewise too remote to satisfy the "affecting" element. Under such a theory, the forbidden "effect" on a federally insured financial institution could occur years after the defendant's fraud and could punish the defendant for purportedly "affecting" an institution whose involvement would have been entirely unforeseeable at the time of the fraud.

As the district court acknowledged, the alleged fraud here "culminated before the merger with [Bank of America]." S.A. 83. That is sufficient to render any "effect" from the merger too remote from the fraud for purposes of the "affecting" element. Because there is no legally valid basis for concluding that the "affecting" element was satisfied, the judgment against the bank defendants should be reversed.

## II. THE DISTRICT COURT ERRED BY PERMITTING THE FIRREA CLAIM AGAINST THE BANK DEFENDANTS TO PROCEED BECAUSE THE CLAIMED PREDICATE OFFENSES OF MAIL AND WIRE FRAUD WERE BASED EXCLUSIVELY ON BREACHES OF PREEXISTING CONTRACTS

In seeking to impose liability on defendants under FIRREA, the government relied exclusively on predicate offenses of mail and wire fraud. The government's theory of fraud was that many HSSL loans sold to Fannie and Freddie were not investment quality, as the contracts between the parties required; that Countrywide knew the loans were not investment quality; and that Countrywide sold the loans to Fannie and Freddie anyway. The government pointed to no fraudulent statements or conduct by Countrywide

other than presenting loans to Fannie and Freddie that allegedly did not satisfy contractual requirements.

As a matter of law, that is insufficient to support a claim for mail or wire fraud. It is a familiar principle that a breach of contract, even an intentional one, does not constitute fraud. The district court nevertheless held that the distinction between contract and fraud claims does not apply to statutory claims of mail or wire fraud. That holding cannot be squared with a wealth of contrary authority. The district court thus erred in allowing the government's FIRREA claim against the bank defendants to proceed, and its judgment should be reversed.

## A. A Claim Of Mail Or Wire Fraud May Not Be Based Exclusively On A Breach Of Contract

1. "Breach of contract is not fraud." *Perlman* v. *Zell*, 185 F.3d 850, 853 (7th Cir. 1999). That principle was universally accepted before Congress passed the mail- and wire-fraud statutes, *see*, *e.g.*, *Burrill* v. *Stevens*, 73 Me. 395, 398 (1882); remained after Congress passed the mail- and wire-fraud statutes, *see*, *e.g.*, Restatement (First) of Torts § 530 (1938); and is still the law today, both in this Court and beyond, *see*, *e.g.*, *Bridgestone/Firestone, Inc.* v. *Recovery Credit Services, Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996); *Corley* v. *Rosewood Care Center, Inc.*, 388 F.3d 990, 1007 (7th Cir. 2004).

The general rule that a fraud claim based exclusively on a breach of contract cannot lie follows directly from the very nature of contractual rela-

41

tionships.  Because a contract is a business accommodation, there is nothing "deceptive" about a decision to breach.  *See, e.g.*, *Kehr Packages, Inc.* v. *Fidelcor, Inc.*, 926 F.2d 1406, 1417 (3d Cir. 1991); *McEvoy Travel Bureau, Inc.* v. *Heritage Travel, Inc.*, 904 F.2d 786, 791-792 (1st Cir. 1990).  Indeed, as Judge Friendly explained, "efficient" breaches of contract "should be encouraged" where it is rational for a party to incur damages rather than to adhere to a contractual obligation.  *Thyssen, Inc.* v. *S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir. 1985).  For that reason, the principle that a fraud claim based exclusively on a breach of contract ordinarily cannot lie applies to intentional and non-intentional breaches alike.  *See, e.g.*, *United States* v. *Keuylian*, 23 F. Supp. 3d 1126, 1128 (C.D. Cal. 2014).

Thus, as the Seventh Circuit put it, "[f]raud requires much more than simply not following through on contractual or other promises[;] [i]t requires a showing of deception at the time the promise is made." *Corley*, 388 F.3d at 1007.  This Court has reached the same conclusion, holding that the "failure to carry out a promise" made in a contract "does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).

2.    The district court held that the federal mail- and wire-fraud statutes do not recognize the common-law distinction between fraud and con-

42

tract. That is incorrect. When Congress uses a concept "obviously transplanted from another legal source, . . . it brings the old soil with it." *Sekhar* v. *United States*, 133 S. Ct. 2720, 2724 (2013) (citation omitted). As a result, when interpreting "terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning[s] of these terms." *Neder* v. *United States*, 527 U.S. 1, 21 (1999) (citation omitted).

"Defraud," as used in the mail- and wire-fraud statutes, is just such a word; accordingly, as the Supreme Court held in *Neder*, courts interpreting those statutes must "presume" that Congress intended to incorporate rules applicable to common-law fraud. 527 U.S. at 23 (emphasis omitted). Consistent with the foregoing principle, this Court has rejected breach-of-contract claims disguised as mail- or wire-fraud claims. *See*, *e.g.*, *United States* v. *D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994); *Mills*, 12 F.3d at 1176. Every other circuit to address the issue has reached the same result. *See*, *e.g.*, *Kolar* v. *Preferred Real Estate Investments, Inc.*, 361 Fed. Appx. 354, 363 (3d Cir. 2010); *Corley*, 388 F.3d at 1007; *McEvoy*, 904 F.2d at 791.

3. The district court's contrary conclusion rested entirely on *Durland* v. *United States*, 161 U.S. 306 (1896), which, the court asserted, stands for the proposition that "mail fraud and wire fraud are [not] subject to the same arcane limitations as common law fraud." S.A. 18. The district

43

court evidently viewed the rule that a fraud claim requires more than a breach of contract as such an "arcane limitation[]." That reading of *Durland* is incorrect.

a.    To begin with, the Supreme Court itself has rejected the district court's interpretation of *Durland*. In *Neder*, the government—like the district court, *see* S.A. 18-19—cited *Durland* to "support its argument that the fraud statutes sweep more broadly than common-law fraud." *Neder*, 527 U.S. at 24. But the Supreme Court disagreed. *Durland*, it explained, simply held that "the mail fraud statute reaches conduct that would not have constituted 'false pretenses' at common law." *Id.* "[I]t did not hold . . . that the statute encompasses more than common-law fraud." *Id.*

b.    *Durland* in fact *reaffirms* the common-law rule that a breach of contract is not fraud. In *Durland*, the Supreme Court considered whether a defendant committed mail fraud by inducing victims to purchase a bond promising returns that the defendant knew he would never pay. 161 U.S. at 309. The defendant argued that his scheme was not actionable because the mail-fraud statute reached only "the misrepresentation of an existing or a past fact, [which] cannot consist of the mere intention not to carry out a contract in the future." *Id.* at 312-313.

The Supreme Court held that the defendant's scheme was actionable as mail fraud. *Id.* at 313. Notably, the Court's reasoning was based on the

very same distinction between breach of contract and fraud that requires reversal here.  The Court explained that a person who "buy[s] goods on credit in good faith, knowing that he is unable to pay for them at the time, but believing that he will be able to pay for them at the maturity of the bill,  .  .  . is guilty of no offense, even if he be disappointed in making such payment." *Id.* (citation omitted).  If, on the other hand, "he purchases them knowing that he will not be able to pay for them, and with an intent to cheat the vendor, this is a plain fraud, and made punishable as such by statutes in many of the states."  *Id.* (citation omitted).  The key question in *Durland* was therefore the defendant's intent at the time he entered the contract.  The Court emphasized that if the defendant "had entered [into the contract] in good faith[,]  .  .  .  no conviction could be sustained, no matter how visionary might seem the scheme."  *Id.* at 314.  *Durland* thus did not reject, but instead relied upon, the common-law distinction between breach-of-contract and fraud claims.

c.     After *Durland*, Congress clarified that the requisite "scheme or artifice to defraud" could take the form of "obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  Act of Mar. 4, 1909, Pub. L. No. 60-350, § 215, 35 Stat. 1130.  Contrary to the district court's suggestion, S.A. 19, however, that amendment to the mail-fraud statute did not alter the common-law distinction between breach-of-contract

45

and fraud claims. In *McNally* v. *United States*, 483 U.S. 350 (1987), the Supreme Court explained that the amendment "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *Id.* at 359. The amendment, in other words, "worked no substantive change in the law," *Loughrin* v. *United States*, 134 S. Ct. 2384, 2391 (2014).

### B. The Principle That A Claim Of Mail Or Wire Fraud May Not Be Based Exclusively On A Breach Of Contract Applies Here

This case is controlled by the rule that a fraud claim cannot lie where it is based exclusively on a breach of contract.

1. The government's case focused solely on Countrywide's sales of non-investment-quality loans to Fannie and Freddie, in alleged breach of Countrywide's pre-existing contractual obligations. The government adduced evidence about the structure of the parties' contracts, *see*, *e.g.*, J.A. 2971-2972, 3211-3212; the reasons for that structure, *see*, *e.g.*, J.A. 2717; and the details of specific provisions, *see*, *e.g.*, J.A. 3288. The government then argued that Countrywide committed "fraud" and made "misrepresentations" by selling loans to Fannie and Freddie that did not comply with the contractual loan-quality requirements. *See*, *e.g.*, J.A. 5147.

The government unequivocally took the position that the "misrepresentations" arose from the sales of non-conforming loans. The government represented to the district court that "the particular misrepresentation that

46

we're honing in on in this case are in contracts." J.A. 4930. The government argued to the jury that Countrywide breached contractual warranties contained in Fannie and Freddie's sales guides, which were incorporated into the parties' contracts. J.A. 5006. As the government told the jury, those breaches were "the kernel of the [government's] case." J.A. 5147.

The allegedly breached contracts pre-dated the HSSL process, J.A. 5900, and the government presented no evidence suggesting that anyone at Countrywide intended not to honor the contracts when they were made. There can therefore be no doubt that this case triggers the rule that a fraud claim cannot lie where it is based exclusively on a breach of contract.

2. This case does not implicate any of the limited exceptions to the common-law rule that this Court recognized in *Bridgestone/Firestone*. There, after summarizing the rule that a fraud claim based exclusively on a breach of contract cannot lie, the Court recognized three limited exceptions. 98 F.3d at 19-20. A fraud claim may go forward if (1) the plaintiff shows that the defendant breached a legal duty separate from the duty to perform under the contract; (2) the plaintiff proves that the defendant made a misrepresentation that was collateral to, but inducement for, the contract; or (3) the plaintiff seeks special damages that were caused by the misrepresentation but unrecoverable in contract. *Id.* at 20.

47

None of those exceptions even arguably applies here. To begin with, there can be no serious suggestion that this case involves either the exception for breach of a legal duty separate from the duty to perform under the contract, since the government identified no such duty here, or the exception for special damages that are unrecoverable in an action for breach of contract, since the government identified no such damages.

That leaves the second *Bridgestone/Firestone* exception, for a "fraudulent misrepresentation collateral or extraneous to the contract." 98 F.3d at 20. In its order denying defendants' post-trial motions, the district court stated, without elaboration, that the government had satisfied that exception. *See* S.A. 115-116. But the government never even attempted to prove any extra-contractual misrepresentation concerning HSSL loans; instead, it relied exclusively on the contracts themselves. None of the many Fannie or Freddie witnesses who testified identified any such misrepresentation. *See*, *e.g.*, J.A. 2963-2964, 4743-4760, 4801-4803, 4818-4823. Nor did the government adduce evidence that any of the three Countrywide employees whom it alleged had fraudulent intent made any misstatements to Fannie or Freddie. Indeed, the record shows that Mr. Kitashima had only one contact with Fannie or Freddie, *see* J.A. 3800-3801, and Ms. Mairone had no contact at all with either entity, *see* J.A. 2764-2765, 3041, 4304-4305. And the record contains no evidence concerning any contacts with Mr. Lumsden, who did not testify at

48

trial. The absence of any collateral misrepresentations distinguishes this case from others in which courts have allowed fraud claims to proceed. *See MBIA Insurance Corp.* v. *Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 293-294 (N.Y. App. Div. 2011); *First Bank of Americas* v. *Motor Car Funding, Inc.*, 257 A.D.2d 287, 291-292 (N.Y. App. Div. 1999).

The mere fact that the contractual provisions at issue took the form of representations or warranties does not alter the analysis. To be sure, a knowingly false statement of present fact made with the intent to induce a party to enter into a contract may still be the basis for a fraud claim, even if it also happens to violate a representation or warranty. *See MBIA*, 87 A.D.3d at 294; *First Bank of Americas*, 257 A.D.2d at 291-292; *see also Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 183-184 (2d Cir. 2007). But where, as here, the "*exact* representations made . . . in the warranty" are the basis of the fraud claim, or the warranty is nothing more than a promise of future performance, the fraud claim is "wholly duplicative" of a breach-of-contract claim and cannot stand. *Kriegel* v. *Donelli*, Civ. No. 11-9160, 2014 WL 2936000, at *14 (S.D.N.Y. June 30, 2014); *accord, e.g.*, *Elsevier, Inc.* v. *Grossman*, ___ F. Supp. 3d ___, Civ. No. 12-5121, 2015 WL 72604, at *15 n.11 (S.D.N.Y. Jan. 5, 2015); *Torchlight Loan Services, LLC* v. *Column Financial, Inc.*, Civ. No. 11-7426, 2012 WL 3065929, at *9 (S.D.N.Y. July 25, 2012); *DynCorp* v. *GTE Corp.*, 215 F. Supp. 2d 308, 325-327

49

(S.D.N.Y. 2002); *Varo, Inc.* v. *Alvis PLC*, 261 A.D.2d 262, 265 (N.Y. App. Div. 1999); *J.E. Morgan Knitting Mills, Inc.* v. *Reeves Bros.*, 243 A.D.2d 422, 423 (N.Y. App. Div. 1997).

Because the only "misrepresentations" identified by the government were breaches of terms of the parties' contracts, agreed upon well before the HSSL process came into existence, and because the government offered no evidence of misrepresentations collateral or extraneous to those terms, the second *Bridgestone/Firestone* exception is inapplicable here. Accordingly, under the rule that a fraud claim cannot lie where it is based exclusively on a breach of contract, the government's predicate mail- and wire-fraud claims are invalid, and the judgment below should be reversed.

## III. THE DISTRICT COURT ERRED BY EXCLUDING EVIDENCE ABOUT THE COMPARATIVE QUALITY OF HSSL AND NON-HSSL LOANS

The government's theory at trial was that defendants "devised a scheme to induce Fannie Mae and/or Freddie Mac to purchase mortgage loans originated through [HSSL] by misrepresenting that the loans were of higher quality than they actually were." J.A. 5219. Consistent with that theory, the district court instructed the jury that defendants could be liable only if the jury found that HSSL loans were of materially worse quality than defendants represented them to be—and that defendants knew and intended that result. J.A. 5219-5220.

Defendants were prepared to rebut the government's theory by offering evidence that loans originated through the HSSL process were of no lower quality than other loans. That evidence would have given the jury a compelling basis to conclude that the sales of HSSL loans were not deceptive; that any alleged "misrepresentations" were not material; and that defendants did not possess fraudulent intent.

The district court, however, excluded evidence of non-HSSL loans as irrelevant, prohibiting defendants from making any comparisons between those loans and loans processed through HSSL. *See* S.A. 31-32. The district court compounded its error by preventing defendants from introducing that evidence even after the government opened the door to it with its own evidence concerning the quality of non-HSSL loans. The district court even went so far as to prohibit defendants from cross-examining the government's experts about their own review of non-HSSL loans.

Those rulings tied defendants' hands and distorted the record. Because evidence about the comparative quality of the loans was not only relevant but central to defendants' case, this Court should vacate the judgment below and remand for a new trial.

### A. Evidence About The Comparative Quality Of HSSL And Non-HSSL Loans Was Relevant To Several Elements Of Liability

Consider this hypothetical: A farmer contracts with a grocer to sell peaches. The contract warrants that all peaches will be "grocery grade," but

the grocer expects that 25% of peaches will be bruised.  After entering the contract, the farmer automates part of his slow hand-packing process.  The grocer sues for fraud, relying on evidence that the farmer's employees believed the new machines were more likely to bruise the peaches.  Surely, if he could, the farmer would defend by showing that peaches packed with the new machines had no more bruises than peaches packed by hand.

The district court precluded just such a defense in this case.  Like the hypothetical grocer, the government alleged that Countrywide's executives knew that the new, faster HSSL process would produce loans that were more likely to fail investment-quality standards.  The district court nevertheless determined that evidence comparing HSSL loans to other like loans was irrelevant.  But as this Court has explained, "the definition of relevance under [Federal Rule of Evidence] 401 is very broad" and encompasses evidence that has "any tendency to make a material fact more or less probable than it would be otherwise."  *United States* v. *Certified Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir. 2014).  Under that expansive standard, evidence that HSSL loans were of at least as high quality as non-HSSL loans was undeniably relevant to multiple elements of the government's claim.

1.    *Scheme to defraud.* — It is a familiar principle that mail or wire fraud "requires some element of deception."  *McLaughlin* v. *Anderson*, 962 F.2d 187, 192 (2d Cir. 1992).  Consistent with the government's theory of the

52

case, the district court instructed the jury that it could find a scheme to de-
fraud only if defendants misrepresented the quality of HSSL loans to Fannie
or Freddie.  Evidence that HSSL loans were of at least as high quality as
other loans was directly on point because it would have shown that there was
nothing deceptive about the quality of the loans:  Fannie and Freddie re-
ceived exactly what they bargained for.

In its contracts with Fannie and Freddie, Countrywide promised that
the loans it would sell would be "investment quality."  Both the government
and the defendants agreed, however, that this did not mean that *every* loan
presented for sale had to be investment quality.  Instead, the contracts con-
templated that some percentage of loans would not be investment quality,
and they gave Fannie and Freddie the right to require Countrywide to re-
purchase any non-conforming loans.  Witnesses from Fannie and Freddie
testified, without contradiction, that they expected between 18% and 25% of
loans sold by all lenders to be defective.  J.A. 3004, 3268.

The key question before the jury on this element, then, was not wheth-
er the pools of HSSL loans sold to Fannie and Freddie contained *some* loans
that were not investment quality.  Instead, it was whether HSSL loans were
of *lower* quality than other, comparable loans, such that Fannie and Freddie
could reasonably have been deceived about the quality of those loans.  De-

fendants' evidence would have spoken to that precise issue—and, as such, it was relevant to whether defendants engaged in a scheme to defraud.

2.   *Materiality.* — Mail or wire fraud requires not only that the defendants engaged in a scheme to defraud, but also that the scheme was "of some independent value or  .  .  .  [bore] on the ultimate value of the transaction."  *United States* v. *Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).  The district court instructed the jury that "[a] statement is 'material' if it relates to a fact that a reasonably prudent person would consider important in making a decision."  J.A. 5219.  Here, if a comparable non-HSSL loan pool would have contained an equal or greater number of defective loans than the HSSL loan pools, a reasonable purchaser in Fannie's and Freddie's position would not have found it important that the HSSL loan pools included defective loans.

3.   *Fraudulent intent.* — "Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent."  *United States* v. *Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  To prove fraudulent intent here, the government was required to show that defendants (through Ms. Mairone, Mr. Kitashima, or Mr. Lumsden) intended to harm Fannie and Freddie by knowingly selling them low-quality loans originated through the HSSL process.  *See* J.A. 5219-5220.

Defendants argued that the HSSL process was intended to generate high-quality loans to borrowers who presented relatively low default risk. Evidence that HSSL loans were actually of no different quality from other loans was relevant to show that defendants did not intend for the HSSL loans to be of deceptively low quality. The government seemingly recognized as much below, arguing that "proof of actual harm befalling the victim as a result of the scheme . . . may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm." J.A. 1431. The inverse is equally true: proof that *no* harm befell the victim is relevant to show the *absence* of fraudulent intent. *See D'Amato*, 39 F.3d at 1257. Evidence about the comparative quality of HSSL and non-HSSL loans was therefore relevant to the intent element of the government's claim.

## B. Defendants' Evidence About The Comparative Quality Of HSSL And Non-HSSL Loans Was Also Relevant To Rebut The Government's Contrary Evidence

Notwithstanding its *in limine* ruling concerning evidence about the quality of non-HSSL loans, the district court allowed the government to present a substantial amount of such evidence. Indeed, the government's *entire theory* of fraud was comparative in nature: it claimed that Countrywide moved from its prior (non-HSSL) process, which produced "good" loans, to the HSSL process, which produced "bad" loans.

Thus, in its opening statement, the government emphasized that Countrywide, through the HSSL process, "suddenly sped up the rate at which it was making loans . . . [a]nd at the same time, they gutted the quality safeguards," so that "almost immediately after the Hustle began, quality began to decline." J.A. 1740, 1744. The government's first witness, Michael Thomas, compared the quality of loans processed through the HSSL process to a pre-HSSL process, suggesting that Countrywide never should have switched to HSSL. J.A. 1834, 1836-1841, 1931-1932. Mr. Thomas also testified that defect rates from FSL were "more than twice" as high as defect rates from Countrywide's other divisions during the relevant time period. J.A. 1910. Another government witness, Edward O'Donnell, similarly compared the quality of HSSL and non-HSSL loans, testifying that Countrywide's quality-assurance reviews showed a "significantly higher" number of adverse findings for HSSL loans than they had historically shown for other loans. J.A. 2248. And in its closing argument, the government drove home the point, emphasizing that Countrywide's pre-HSSL process "involved underwriters" and "produced quality loans" and that "we never really heard anything wrong with this work flow." J.A. 5011.

The government's theory and its evidence put the quality of non-HSSL loans squarely at issue. Defendants should have been entitled to rebut that evidence under the familiar principle that, "[w]hen one party introduces fa-

56

vorable evidence, he may be estopped from denying his opponent the oppor-tunity to rebut that evidence"—even if the evidence would not otherwise have been admissible. *Sussman* v. *New York City Health & Hospitals Corp.*, 47 Fed. Appx. 19, 22 (2d Cir. 2002). The district court nevertheless denied defendants the opportunity to present their evidence even after defendants argued that the government had opened the door to that evidence. J.A. 3344.

### C. The District Court Further Erred By Preventing Defendants From Cross-Examining The Government's Experts Concerning Non-HSSL Loans

1. The district court compounded its errors when it cut off critical cross-examination of the government's experts concerning non-HSSL loans. The government's experts, Dr. Cowan and Mr. Holt, testified that 42.81% of HSSL loans were "materially defective" and thus should not have been sold to Fannie and Freddie under the applicable contracts. The experts told the jury that Dr. Cowan had selected a sample of what were purportedly HSSL loans; that Mr. Holt had reviewed the loans in that sample; and that Dr. Cowan had extrapolated Mr. Holt's results to the entire loan population to arrive at the 42.81% figure. *See* p. 13, *supra*.

But the jury never heard the whole story of how the government's ex-perts came to their conclusions. In fact, Mr. Holt reviewed samples of both HSSL and non-HSSL loans. In his expert report, Dr. Cowan extrapolated Mr. Holt's results for the HSSL loans, but did not do so for the non-HSSL

loans. Defendants were not permitted to cross-examine Dr. Cowan or Mr. Holt about whether HSSL loans had more material defects than non-HSSL loans—even though, if defendants had been allowed to do so, they would have been able to establish that non-HSSL loans fared no better than HSSL loans in Mr. Holt's review. *See* pp. 12-13, *supra*.

If that were not bad enough, the district court also excluded evidence that would have demonstrated Dr. Cowan's bias. At the hearing on the government's experts, Dr. Cowan testified that he had instructed Mr. Holt to stop his review while it was in progress because the data would "never be able to demonstrate that the [HSSL] [defect rate] was larger than the [non-HSSL], which was the claim being made by the government." J.A. 2608-2611. Dr. Cowan also conceded that it was possible that a review of the entire sample would have shown that non-HSSL loans actually had a significantly higher defect rate than HSSL loans, but that it was not possible that they had a significantly lower rate. *Id.*

Dr. Cowan then told a completely different story in front of the jury. He claimed that he had instructed Mr. Holt to stop his review because he "thought that the remaining underwriting that would continue would not be very fruitful"; that "it wouldn't change the results much, in [his] opinion"; and that it was "getting towards the end of the time period when [he] needed to produce both the data set and a report." J.A. 3091. When defense counsel

sought to confront Dr. Cowan with his earlier testimony that he had ordered Mr. Holt to stop because his results were not showing that HSSL loans were of poorer quality than non-HSSL loans, the district court prevented even that cross-examination.  J.A. 3100-3104.

2.    The district court's rulings concerning cross-examination were erroneous.  It is axiomatic that, like the exclusion of expert testimony itself, "unduly harsh limitation on cross-examination of a key expert witness can amount to prejudicial error."  *N.V. Maatschappij Voor Industriele Waarden* v. *A.O. Smith Corp.*, 590 F.2d 415, 421 (2d Cir. 1978).  That is because an attorney cross-examining an expert is entitled to "challenge an expert's methodology, her conclusions, and the bases for her conclusions."  *Howard* v. *Walker*, 406 F.3d 114, 127 (2d Cir. 2005).

Here, defense counsel should have been permitted to use the experts' earlier testimony for at least two reasons.  *First*, the testimony was relevant to prove bias.  As this Court has explained, "[t]he motivation of a witness [for] testifying, including her possible self-interest and any bias  .  .  .  is one of the principal subjects for cross-examination."  *Henry* v. *Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994).  The ability to present evidence of an expert witness's bias is especially important because "[t]estimony emanating from the depth and scope of specialized knowledge is very impressive to a jury."  *Ake* v. *Oklahoma*, 470 U.S. 68, 81 n.7 (1985) (citation omitted).

The excluded testimony would have shown that Dr. Cowan ordered Mr. Holt to stop reviewing loans once he realized that the results would not support the government. J.A. 2608-2611. That testimony is directly relevant to Dr. Cowan's bias in favor of the government. It suggests that Dr. Cowan's analysis was so one-sided that he refused even to consider facts that would not support the claim that the government was trying to make. But the jury did not hear that testimony. Instead, it heard a different, more innocuous explanation for why Dr. Cowan stopped the review process: further review would not have changed the results. The district court's refusal to permit the introduction of evidence of Dr. Cowan's bias was erroneous. *See, e.g., Adams* v. *Fuqua Industries, Inc.*, 820 F.2d 271, 276 (8th Cir. 1987).

*Second*, Dr. Cowan's earlier testimony should have been admitted as a prior inconsistent statement to impeach his trial testimony under Federal Rule of Evidence 801(d)(1)(A). *See, e.g., United States* v. *Strother*, 49 F.3d 869, 874-875 (2d Cir. 1995). "[S]tatements need not be diametrically opposed to be inconsistent." *United States* v. *Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988) (citation omitted). Instead, the test is whether there is some variance in the testimony that has a reasonable bearing on credibility—or, put differently, whether a reasonable jury could conclude that a witness who believed the facts that were the subject of the trial testimony would not make a

statement like the prior statement. *United States* v. *Trzaska*, 111 F.3d 1019, 1025 (2d Cir. 1997).

Dr. Cowan's testimony easily meets that standard. His trial testimony, that he halted the review process because further analysis would not have changed the results, directly contradicted his earlier testimony that he halted the review process because further review would not have supported "the claim being made by the government," but could only have shown that non-HSSL loans actually had a significantly higher defect rate than HSSL loans. J.A. 2608-2611. At best, Dr. Cowan's in-court explanations were half-true; at worst, they were outright lies. And either way, the jury was left with less than a full picture of Dr. Cowan's credibility. The district court's refusal to allow defendants to impeach Dr. Cowan was erroneous.

### D. The District Court's Exclusion Of Evidence About The Comparative Quality Of HSSL And Non-HSSL Loans Was Highly Prejudicial

The exclusion of evidence requires a new trial unless it is "highly probable that the error did not affect the verdict." *United States* v. *Vayner*, 769 F.3d 125, 133 (2d Cir. 2014) (internal quotation marks and citation omitted). To determine whether an evidentiary error is harmless, this Court considers such factors as the centrality of the error; the cumulativeness of the excluded evidence; and the strength of the nonmovant's case. *See id.* Given the importance of the excluded evidence and the concededly circumstantial nature

61

of the government's case, there can be no serious argument for harmless error here.

1.     Most importantly, evidence that HSSL loans performed at least as well as other loans would have gone to the heart of the government's theory of the case: that the quality of the HSSL loans was substandard and was materially misrepresented to Fannie and Freddie. It would also have permitted defendants to argue that they did not intend for the HSSL process to generate poor-quality loans, because in fact it did not. The exclusion of evidence on such a central issue cannot be harmless. *See, e.g.*, *Vayner*, 769 F.3d at 133-134; *Malek* v. *Federal Insurance Co.*, 994 F.2d 49, 55 (2d Cir. 1993).

Perhaps the most dramatic effect of the district court's error was the one-sided presentation of expert testimony at trial. The government effectively had the field to itself, presenting its experts' testimony that HSSL loans had a high defect rate. That testimony was an essential part of the government's case, featuring prominently in the government's closing argument. *See* J.A. 5008. If the district court had correctly admitted defendants' evidence, defendants would have presented experts of their own to testify that the quality of HSSL loans was no different from that of other loans. Instead, the district court's rulings left the jury hearing only one side of the story, with defendants unable even to cross-examine the government's witnesses on their bias and inconsistent testimony.

62

2.    In addition, because the district court excluded defendants' evidence about the quality and performance of non-HSSL loans from the outset of the case, such evidence would not have been cumulative. Quite to the contrary, the only evidence in the record on that subject was evidence that the government elicited but defendants were not permitted to rebut.

3.    Finally, the government's case was weak. There was no "smoking gun" document or admission, and the government's evidence consisted primarily of its witnesses disagreeing with the business judgments of defendants' witnesses. Even the district court observed at the close of the evidence that "this is one of the closer cases I've seen in a long time." J.A. 4868. Where a party's case rests on circumstantial evidence, the risk of prejudice to the other party from the exclusion of evidence is particularly acute. *See, e.g., Malek*, 994 F.2d at 55.

In short, because the quality of HSSL loans was at the heart of the government's case, evidence showing that those loans were of the same quality as, or higher quality than, non-HSSL loans was precisely "the sort of evidence that might well sway a jury." *Vayner*, 769 F.3d at 134. The judgment should be vacated and the case remanded for a new trial at which defendants are permitted to present their evidence about the comparative quality of HSSL and non-HSSL loans.

63

## IV. THE DISTRICT COURT ERRED BY PRECLUDING DEFENSE WITNESSES FROM TESTIFYING THAT THEY BELIEVED THE HSSL PROCESS WAS PROPER

One of the central issues at trial was fraudulent intent. To find the bank defendants liable, the jury had to conclude that "one of three managerial persons—Rebecca Mairone, Clifford Kitashima, or Greg Lumsden"—participated in a "scheme to defraud, with knowledge of its fraudulent nature and with a specific intent to defraud." J.A. 5219-5220. On that issue, the government's evidence was concededly circumstantial. Much of its evidence came from four former Countrywide employees—Mr. Thomas, Mr. O'Donnell, Mr. Boland, and Mr. Price—who testified that they and others at Countrywide believed that the HSSL process would and did produce poor-quality loans.

Defendants responded that Ms. Mairone, Mr. Kitashima, and Mr. Lumsden acted in good faith: they believed that the HSSL process would produce investment-quality loans while improving underwriting efficiency. At trial, Ms. Mairone and Mr. Kitashima testified that the HSSL process was intended to, and in fact did, produce investment-quality loans.

Recognizing that the jury might be hesitant to credit the alleged wrongdoers' own testimony, defendants also sought to introduce testimony from other individuals involved in the design and implementation of the HSSL process, who would have testified that they too believed, based on the

same information known to the alleged wrongdoers, that HSSL loans were investment quality and that the HSSL process was consistent with industry standards for quality control. Even though the government had been permitted to introduce exactly this type of evidence, the district court excluded that evidence in the defense case, on the ground that the state of mind of anyone other than the three alleged wrongdoers was irrelevant.

In excluding that evidence, the district court erred. It is well settled that evidence that a witness other than a defendant had a contemporaneous belief in the propriety or impropriety of his conduct may be probative of the state of mind of the defendant, when the witness was a participant in the same conduct and had knowledge of the same facts. And the district court's error here was highly prejudicial, particularly because the court permitted the government to present substantial contrary evidence from other Countrywide employees. As a result, the jury's only yardstick by which to measure the reasonableness of the alleged wrongdoers' stated belief that the HSSL process was proper was the testimony of the government's witnesses that it was improper.

## A.    The District Court Excluded Testimony From Defense Witnesses That The HSSL Process Was Intended To Produce Investment-Quality Loans

Lacking any "smoking gun" evidence that Ms. Mairone, Mr. Kitashima, or Mr. Lumsden intended to defraud Fannie or Freddie, the government in-

troduced testimony from other Countrywide employees about their impressions about the HSSL process; their reactions to Countrywide's quality-assurance results; and their conversations with other Countrywide employees. Some of that testimony related to communications with Ms. Mairone, Mr. Kitashima, and Mr. Lumsden, but much of it did not. Specifically:

- Mr. Thomas testified that he had concerns about the HSSL process, including concerns about the elimination of separate reporting from the underwriting and processing components. He said that he voiced those concerns, though he did not say that he voiced them to Ms. Mairone, Mr. Kitashima, or Mr. Lumsden. He also testified that he had concerns about the high rate of defects, though he did not testify that he raised those concerns to anyone else. J.A. 1841, 1865, 1899, 1937, 1939, 2124-2125.

- Mr. O'Donnell testified that he did not agree with the decision to roll out the HSSL process, nor did he support expanding the process to include additional categories of loans. He said that he had concerns about the QA results. He also testified that other Countrywide employees who reported to him expressed similar concerns. J.A. 2238-2240, 2250-2252, 2255, 2294.

- Mr. Boland testified that he personally believed, based on his review of loan files and quality reports, that the HSSL process led to a decline in loan quality. He also testified that there was widespread concern among his subordinates about the HSSL process and that he raised his concerns and those of his subordinates to his superiors (though not to any of the three alleged wrongdoers). J.A. 3366, 3371-3373.

- Mr. Price gave similar testimony that he expressed concerns, and heard others express concerns, within Countrywide, but not in the presence of the accused wrongdoers. J.A. 3486-3491.

The foregoing testimony was not introduced to prove that the alleged wrongdoers heard these particular concerns from these particular employees; there was no evidence that they ever did. Instead, it was introduced to permit the jury to infer that the alleged wrongdoers drew the same conclusions as the government's witnesses about the HSSL process.

In their case-in-chief, defendants sought to rebut this evidence by eliciting contrary testimony from other witnesses who were at least as knowledgeable about the HSSL process as the government's witnesses, but viewed the process very differently. For example:

- Mark Barnett, a process-design engineer, designed and monitored the HSSL process. Defendants sought to question Mr. Barnett about his conclusions regarding the quality of HSSL loans in light of internal reports that, according to the government, should have led the alleged wrongdoers to conclude that HSSL loans were of fraudulently low quality. Defendants also sought to question Mr. Barnett about whether he personally supported compensation incentives for FSL employees—incentives that, according to the government, were intended to encourage employees to approve loans regardless of their quality. J.A. 4013-4014, 4016, 4019-4020.

- Ron Gillet supervised employees who participated in the HSSL process and reviewed HSSL loan files to evaluate the quality of the underwriting. Defendants sought to question Mr. Gillet about whether he had drawn any conclusions about the quality of the loans. Defendants also sought to question Mr. Gillet about whether the quality-assurance results raised any concerns about the HSSL process. J.A. 4552, 4554-4566, 4579.

The district court excluded those witnesses' testimony, concluding that their beliefs and understandings about the HSSL process were irrelevant to the

state of mind of the alleged wrongdoers.  *See* J.A. 4014.  The district court adhered to its ruling even after defendants pointed out that the government's witnesses had given the same type of testimony.  *See* J.A. 4445-4449, 4555-4564.

### B. The Defense Witnesses' Testimony Was Relevant And Should Not Have Been Excluded

This Court and others have long recognized that a witness's testimony about his own state of mind can be relevant circumstantial evidence of the defendant's state of mind.  *See*, *e.g.*, *United States* v. *Kozeny*, 667 F.3d 122, 134-135 (2d Cir. 2011); *United States* v. *Schultz*, 333 F.3d 393, 415-416 (2d Cir. 2003); *Vaknin* v. *United States*, Civ. No. 08-2420, 2010 WL 3394659, at *7 (E.D.N.Y. Aug. 23, 2010).  That type of evidence is relevant because, when a witness reaches a conclusion based on particular facts available to him at the time, the jury may find it more likely that the alleged wrongdoer, exposed to the same facts, viewed those facts the same way and reached the same conclusion.  *See*, *e.g.*, *United States* v. *Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990).

Here, defendants' evidence, which the district court excluded, was precisely that type of relevant testimony.  The defense witnesses were directly responsible for designing, implementing, and monitoring the HSSL process. Each reported directly or indirectly to Ms. Mairone, and each received the same information about the HSSL process as she and Mr. Kitashima did.

*Compare* J.A. 3699 (Kitashima) *and* J.A. 4258 (Mairone) *with* J.A. 4020, 4107 (Barnett) *and* J.A. 4574, 4578 (Gillet).  From that information, the defense witnesses reached the same conclusions that Ms. Mairone and Mr. Kitashima said they did:  that the HSSL process produced investment-quality loans; that it was a good-faith, industry-standard method for underwriting prime loans; and that it was not designed to foist poor quality loans on Fannie and Freddie.

The excluded testimony was highly relevant because it supported an inference that the alleged wrongdoers engaged in the same reasoning as the witnesses and honestly came to the same conclusion:  that the HSSL process was a legitimate effort to produce loans of suitable quality.  *See Kozeny*, 667 F.3d at 135; *United States* v. *Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007); *Giovannetti*, 919 F.2d at 1226.  Because the testimony was relevant, its exclusion was erroneous.  *See Malek*, 994 F.2d at 53.

## C.    The District Court's Exclusion Of The Defense Witnesses' Testimony Was Highly Prejudicial

As discussed above, *see* pp. 61-63, *supra*, erroneous exclusion of evidence requires a new trial unless it is "highly probable that the error did not affect the verdict."  *Vayner*, 769 F.3d at 133 (internal quotation marks and citation omitted).  To determine whether an evidentiary error is harmless, this Court considers such factors as the centrality of the error; the cumula-

tiveness of the excluded evidence; and the strength of the nonmovant's case. *See id.*

The excluded testimony in this case went directly to the essential element of fraudulent intent, perhaps the most hotly disputed element at trial. The trial focused on whether the alleged wrongdoers believed that the HSSL process would not sacrifice the quality of the loans sold to Fannie and Freddie. To persuade the jury, defendants needed to introduce testimony from other credible individuals, who knew the same facts about HSSL, that they reached the same conclusions that the alleged wrongdoers did.

Of particular concern for harmless-error purposes, the government offered precisely the same type of evidence, at great length, but defendants were not allowed to counter it. Mr. Thomas, Mr. O'Donnell, Mr. Boland, and Mr. Price testified freely about their own concerns, and the purported concerns of others, that the HSSL process led to poor-quality loans. Because of the district court's ruling, defendants could offer no witnesses, other than the accused wrongdoers themselves, to express the contrary view.

The government then urged the jurors to disregard the defendants' own testimony as self-serving. In closing argument, the government brushed aside Mr. Kitashima's testimony that the quality-assurance results were not a cause for concern. The government argued that Mr. Kitashima ignored indications of poor loan quality because he was just biding his time, waiting to

retire.  J.A. 5035-5036.  As for Ms. Mairone, the government asserted that her testimony "concerning her focus on quality was completely ridiculous." J.A. 5028.

Given the centrality of the issue of fraudulent intent, the district court's error would have been prejudicial regardless of the other evidence in the case.  The prejudice was particularly grave, however, in what the district court conceded was "one of the closer cases I've seen in a long time."  J.A. 4868.  Because the deck was stacked in the government's favor on the critical element of fraudulent intent, this Court should vacate the judgment below and remand for a new trial.

## V.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO SHOW THAT DEFENDANTS MADE ANY MATERIAL MISREPRESENTATION TO FANNIE OR FREDDIE

The district court instructed the jury that it could find defendants liable only if they had misrepresented that HSSL loans were "of higher quality than they actually were."  J.A. 5219.  In addition, the district court instructed the jury that it could find defendants liable only if any misrepresentation was material:  that is, if "a reasonably prudent person participating in the decision of whether to purchase mortgage loans at Fannie Mae or Freddie Mac would have considered the true facts important in deciding whether to purchase or how to price the loans."  J.A. 5219-5220.

71

As discussed above, *see* pp. 40-50, *supra*, selling loans to Fannie and Freddie that did not conform to contractual quality standards was not an actionable "misrepresentation" in a mail- or wire-fraud claim as a matter of law. But even if it were otherwise, the evidence at trial did not permit a reasonable juror to conclude that the actual quality of HSSL loans was materially worse than Fannie or Freddie could reasonably have expected—and thus that defendants engaged in a scheme to defraud. For that additional reason, this Court should reverse the judgment below.

### A. It Was Undisputed That Fannie And Freddie Reasonably Expected That A Significant Percentage Of The Loans Sold To Them Would Not Be Investment Quality

In the applicable contracts, Countrywide made representations to the effect that the loans it would sell would be "investment quality." At trial, however, witnesses from Fannie and Freddie agreed that, despite those industry-standard contractual representations, Fannie and Freddie knew and reasonably expected that a significant percentage of the loans sold to them would not be investment quality at the time of sale. J.A. 3004, 3268, 4830-4831. It was for that reason that the contracts gave Fannie and Freddie the right to require Countrywide to repurchase any non-conforming loans. J.A. 2761, 2994, 4747.

The government never disputed any of this. In fact, in its opening statement, the government contended that the evidence would show that

72

Fannie and Freddie expected the rate of material defects to conform with the industry-standard rate of between 4% and 5%. J.A. 1747. But the evidence at trial revealed that the real industry-standard rate was far higher: Freddie expected that approximately 18% to 20% of the loans it purchased would not be investment quality, J.A. 3004, and Fannie expected the rate to be approximately 25%, J.A. 3268. Fannie and Freddie nevertheless continued to purchase loans under their contracts with Countrywide and other lenders, subject to their right of repurchase. J.A. 4746-4747, 4831.

Fannie's and Freddie's reasonable expectations naturally set the baseline for determining whether Countrywide made a material misrepresentation when it represented that the loans it would sell would be "investment quality." *See, e.g.*, *United States* v. *Bank of New York Mellon*, 941 F. Supp. 2d 438, 466-467 (S.D.N.Y. 2013). A reasonably prudent person deciding whether to buy the HSSL loans could have been deceived about their quality only if at least 18% to 20% (if not 25%) of the loans were materially defective. As we will now explain, the evidence did not show that HSSL loans had a defect rate anywhere near that high.

**B.    The Government Presented Insufficient Evidence To Show That HSSL Loans Were Of A Lower Quality Than Fannie And Freddie Expected**

***1.    Countrywide's Quality Control Results Showed That HSSL Loans Were Well Within Industry Standards For Quality***

The jury heard unrebutted evidence that the loans Countrywide's FSL division sold to Fannie and Freddie were materially defective at a rate far better than the industry average.  That evidence came from the findings of Countrywide's "Quality Control" group, a separate and independent division from the FSL division that implemented HSSL.  J.A. 1901.  That group reviewed the investment quality of loans *after* they were funded and sold to Fannie and Freddie, as of the date of the sale.  J.A. 1901, 3586.  Countrywide executives considered the findings of the Quality Control group to be the definitive internal measure of whether the loans Countrywide sold were investment quality.  J.A. 3589, 3779.  Indeed, Mr. O'Donnell, the government's lead witness, praised the findings of the Quality Control group and viewed FSL's results as indicative of the managers' commitment to quality.  J.A. 2390-2398, 6389.  And notably, there was no suggestion at trial that anyone in the Quality Control group was party to any fraud or was even involved in the HSSL process.

According to the Quality Control group, the final failure rate for loans sold by FSL while the HSSL process was in operation ranged from 4.4% to

9.8%. J.A. 3588-3589, 4301, 5469. (The district court's reference to a 30% rate, *see* S.A. 113, was simply wrong: it is based on a document showing *initial* findings for a *small subset* of FSL loans.) The Quality Control group's final figures were consistent with, indeed better than, Fannie's and Freddie's expected rates of material defects—which may explain why David Battany, a former Fannie executive who managed Fannie's relationship with Countrywide during the relevant period, testified that he would have continued purchasing loans from Countrywide if he had known about the final Quality Control results. J.A. 4795-4796.

To prove that defendants had materially misrepresented the quality of HSSL loans, therefore, the government had to show that those concededly non-fraudulent findings were completely incorrect and that HSSL loans failed investment-quality standards at over twice the rate shown by the findings. The government attempted to do this, first, by impugning the Quality Control process itself, and, second, by introducing other evidence purporting to measure the quality of HSSL loans. In both respects, the government's evidence was insufficient.

### 2. The Government Offered Insufficient Evidence To Cast Doubt On The Reliability Of Countrywide's Quality Control Results

The government repeatedly implied that Countrywide's Quality Control results were tainted. *See* J.A. 1918, 2313, 5038. The government's actual

evidence, however, provided no reason to question the reliability of those results.

To be sure, the trial testimony showed that the Quality Control process included a "rebuttal" component, whereby the division responsible for underwriting a loan that the Quality Control group had preliminarily designated as materially defective could seek to rebut that finding by explaining to the Quality Control group why the loan in fact met quality standards. But that "rebuttal" process was not unique to FSL or to HSSL loans; in fact, the Quality Control group had used a rebuttal process since long before the HSSL process was developed.

Perhaps for that reason, the government did not contend that the rebuttal process was itself improper. Instead, it complained that the results of that process were somehow tainted by a temporary program termed the "Sprint Incentive," which provided bonuses to FSL employees who successfully rebutted negative findings from the Quality Control group. J.A. 2313. Critically, however, the government did not allege that any bonus was paid to the reviewers in the Quality Control group who made the final decisions about whether to grade loans as defective. *See* J.A. 3589-3590.

Not a single witness suggested that the Sprint Incentive was intended to, or in fact did, result in unreliable Quality Control findings. To the contrary, the Sprint Incentive was actually championed by Thomas and O'Donnell,

the government's chief witnesses. J.A. 2313. The evidence was unequivocal: the Sprint Incentive, and the rebuttal process more generally, were efforts to ensure that the final quality figures were *accurate*. J.A. 2312. In fact, the government's witnesses conceded that the Sprint Incentive did not negatively affect the reliability of Quality Control findings. J.A. 1918, 1921, 1975.

### 3. *FSL's Quality Assurance Results Did Not Show That HSSL Loans Were Below Industry Standards For Quality*

In an effort to distract from Countrywide's Quality Control findings, the government pointed instead to FSL's internal "Quality Assurance" process. That process, however, served the very different function of evaluating whether employees had performed the required steps in underwriting the loans. Unlike the Quality Control process, the Quality Assurance process tested the loans *before* they were funded or sold. J.A. 2247. Because that process did not measure the quality of actual, funded loans, it did not provide evidence from which the jury could have concluded that the loans Fannie and Freddie bought were of poor quality, nor did it provide any basis for the jury to conclude that the Quality Control findings—which *did* measure the quality of actual, funded loans—were inaccurate.

Although the government emphasized that the Quality Assurance findings showed very high "failure" rates, it offered no evidence that those findings translated to low-quality loans at the time of sale. In fact, David

Battany, the former Fannie executive who managed Fannie's relationship with Countrywide during the relevant period, testified that the "very high error rates" identified by the Quality Assurance process would not have affected his decision to buy HSSL loans from Countrywide, because it was typical in the industry for internal, pre-funding reviews to show much higher failure rates than post-funding reviews. J.A. 4788. In sum, because the Quality Assurance process did not purport to measure whether HSSL loans were investment quality at the time of sale, the results of that process are insufficient to establish that defendants made any material misrepresentation to Fannie or Freddie.

### 4. The Government's Experts' Testimony Did Not Show That HSSL Loans Were Below Industry Standards For Quality

The government's experts, Dr. Cowan and Mr. Holt, testified that the HSSL loans were "materially defective" at the jaw-dropping rate of 43%. To reach that conclusion, Dr. Cowan extrapolated Mr. Holt's results for 343 loans to a total "HSSL loan" population of 28,882. J.A. 2777-2778, 3093.

The experts' opinions—which were based on *post hoc* analyses conducted for purposes of this litigation—say nothing about the quality of HSSL loans, because the experts examined the wrong population of loans. The evidence conclusively demonstrated that at least 40% of the loans that Dr. Cowan treated as HSSL loans were not HSSL loans. The experts' sample was

based on a population of 28,882 loans meeting criteria specified by the government. That population, however, was indisputably overstated by at least 11,000 loans, because it included all of the loans processed at five processing centers, regardless of whether those loans were originated by branches that used the HSSL process or those that did not. J.A. 2026, 3922-3929.

Notably, the district court effectively recognized as much. In calculating the number of HSSL loans for purposes of its penalty determination, the district court found that the proof at trial did not support the government's contention that the loans originated by certain branches were HSSL loans—and, as a result, excluded those loans in calculating the appropriate penalty. S.A. 94. The district court therefore based its penalty on a smaller population of 17,611 loans. *Id.*

The erroneous loan population does not merely go to the appropriate penalty; it renders the experts' analysis utterly insufficient to prove a material misrepresentation concerning loan quality. The government's experts conceded that their sampling process could be effective only if the sample were randomly selected from the correct population. J.A. 3081-3082. Because it was not, however, it was as if the experts were sampling the entire population of New England and then opining as to the views of Massachusetts residents. Because the population included non-HSSL loans as well as HSSL loans, the experts' ultimate conclusion that 43% of the 28,882 loans

79

were "materially defective" does not mean that 43% of HSSL loans were materially defective; instead, it says nothing at all about the defect rate for HSSL loans.

As Dr. Cowan himself admitted, that error was fatal to the experts' conclusions. Dr. Cowan testified that, if "only two thirds of those [28,882] loans were HSSL loans," he could not be confident in his results without conducting further analysis to determine "whether the new definition [of HSSL loans] changes in some way the inclusion or exclusion of the loans in a way that's correlated with what we're trying to measure." J.A. 3110. That further analysis was never conducted.

As a result, the only valid evidence presented at trial concerning loan quality was the unrebutted evidence from Countrywide's Quality Control process, which demonstrated that the loans sold by FSL to Fannie and Freddie were materially defective at a rate far lower than what Fannie and Freddie could reasonably have expected. Because the government adduced no evidence from which a reasonable juror could have concluded that HSSL loans were materially defective at a rate higher than the industry-standard rate, there was insufficient evidence of a material misrepresentation to sustain the jury's verdict. For that reason as well, the judgment below should be reversed.

## VI. THE DISTRICT COURT ERRED IN IMPOSING A PENALTY OF OVER $1.2 BILLION ON THE BANK DEFENDANTS

Finally, in addition to committing numerous errors during the liability phase, the district court further erred in imposing a grossly excessive penalty on the bank defendants. As a general rule, FIRREA authorizes a civil penalty that "shall not exceed" $1.1 million. 12 U.S.C. § 1833a(b)(1); 28 U.S.C. § 2461 note; 28 C.F.R. § 85.3(a)(6). That rule, however, is subject to a "[s]pecial rule" for "violations creating gain or loss"; under that exception, "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator," the court may award penalties up to the amount of the gain or loss. 12 U.S.C. § 1833a(b)(3).

Applying that exception, the district court calculated identical "gain" and "loss" amounts of nearly $3 billion, measured by the total amount that Fannie and Freddie paid to Countrywide for the HSSL loans—an amount roughly equal to the principal that Countrywide had lent to borrowers when it originated the loans. The district court then exercised its discretion to award a penalty in the amount of $1,267,491,770, measured by the total price paid for the percentage of loans that the government's experts had found to be defective. S.A. 99-102.

In its opinion on penalties, the district court hardly even attempted to analyze the meaning of the statutory terms "gain" and "loss." Instead, after noting that the statute "does not provide an adjective to modify either gain or

81

loss other than 'pecuniary,'" the district court concluded that the statute should be construed to "serve punitive and deterrent purposes" and thus that "both gain and loss should be viewed simply in terms of how much money the defendants fraudulently induced the victims to pay to them." S.A. 94-97.

That blunt interpretation bears no relationship either to the ordinary meaning of the statutory terms or to the basic economics of the underlying transactions. It also contradicts the principle that any ambiguity in punitive statutes should be resolved in the defendant's favor. Because the government presented no valid evidence of a gain or loss in excess of the statutory maximum, the district court should not have awarded penalties above that maximum. In the event this Court were to uphold the district court's judgment on liability, therefore, it should vacate the award of over $1.2 billion against the bank defendants.

## A.     The District Court's Interpretation Of 'Gain' Is Invalid

The district court held that defendants' "gain" from the fraud "consists of the price that Fannie Mae and Freddie Mac paid to Countrywide" for the loans. S.A. 98. That interpretation is incorrect as a matter of ordinary meaning and economic reality.

### 1.     The Ordinary Meaning Of 'Gain' Is Profit

The exception to the statutory maximum in Section 1833a authorizes a penalty up to the amount of the "pecuniary gain from the violation."   12

82

U.S.C. § 1833a(b)(3).  The ordinary meaning of "gain" is "an increase in or addition to what is of profit, advantage, or benefit: resources or advantage acquired or increased: PROFIT."  *Webster's Third New International Dictionary* 928 (2002).  *Black's Law Dictionary* confirms that "gain" means "[a]n increase in amount, degree, or value"—specifically, an "[e]xcess of receipts over expenditures or of sale price over cost[;] [s]ee PROFIT"—and it further defines a "pecuniary gain" as "[a] gain of money or of something having monetary value."  *Black's Law Dictionary* 792 (10th ed. 2014).  In accordance with the ordinary meaning, this Court, like others in a host of different contexts, has long recognized that "pecuniary gain" and "profit" are interchangeable.  *See Feine* v. *McGowan*, 188 F.2d 738, 740 (2d Cir. 1951); *Heli-Coil Corp.* v. *Webster*, 352 F.2d 156, 167 n.15 (3d Cir. 1965); *Bogoni* v. *Gomez*, 847 F. Supp. 2d 519, 525 (S.D.N.Y. 2012); *see also* U.S.S.G. § 8A1.2 app. note 3(H) (defining "pecuniary gain" as "the additional before-tax profit to the defendant resulting from the relevant conduct of the offense").

The district court here entirely ignored the ordinary meaning of the term "gain."  While the court focused on the absence of a modifier like "gross" or "net," *see* S.A. 94-96, it failed to recognize that the word "gain" necessarily means the excess above cost.

83

### 2. Under Any Definition, 'Gain' Cannot Include The Principal Amounts That Countrywide Initially Lent To Borrowers

As discussed above, the district court calculated as "gain" the full sale price of the HSSL loans, even though Countrywide actually *lent* nearly that entire amount to borrowers to generate the loans. That conception of "gain" simply defies reality.

In calculating "gain," the district court failed to consider the loan transactions as a whole. In generating the loan, Countrywide incurred considerable costs—principally, the amount it lent to the borrower. When Countrywide sold those loans to Fannie and Freddie, moreover, it gave up its rights to the loans, which were valuable obligations supported by collateral. Countrywide's "gain" in the transaction was either the difference between the amount Countrywide paid to generate the loan and what it received from Fannie or Freddie, or the difference between the value of the loan and the amount paid to purchase it.

To take a simple example, if Countrywide had lent $200,000 to a borrower and sold the same loan to Fannie Mae for $220,000, Countrywide's "gain" from that transaction would be $20,000 (less any other costs the bank incurred). By no stretch of the imagination could the "gain" be measured at $220,000—yet that is how the district court measured it.

84

In short, including the principal amounts of the loans as "gain" is wrong as a matter not just of law, but of economics and common sense. It also contravenes the cardinal principle, discussed above, that punitive statutes are to be construed strictly. *See* pp. 33-34, *supra*. The district court erred by giving the term "gain" in Section 1833a such an expansive interpretation.

## B. The District Court's Interpretation Of 'Loss' Is Also Invalid

The district court held that the victims' loss, like the bank defendants' gain, "consists of the price that Fannie Mae and Freddie Mac paid to Countrywide for the fraudulently misrepresented loans." S.A. 98. That simplistic interpretation entirely ignores the other side of the transaction: when Fannie and Freddie paid money to Countrywide, they received loans that had value and were collateralized. Even a loan that the borrower repaid in full would be a "loss" under the district court's ruling. The district court also disregarded the statutory requirement that any "loss" must have been proximately caused by the fraud and not by other factors (such as the mortgage crisis more generally). The district court's interpretation of "loss," like its interpretation of "gain," is erroneous.

### 1. *Fannie And Freddie Did Not Lose The Entire Amounts They Paid For The HSSL Loans*

The exception to the statutory maximum in Section 1833a authorizes a penalty up to the amount of the "pecuniary loss" that "results" from the violation. 12 U.S.C. § 1833a(b)(3)(A).

85

Contrary to the district court's conclusion, Fannie and Freddie did not lose the entire amounts they paid for the HSSL loans. Their actual losses are a matter of record and are a small fraction of the face value of the loans. *See* J.A. 1246, 1250, 1252. To be sure, if a borrower defaulted, Fannie or Freddie might suffer some "loss." But that occurred on only a portion of the loans—and, when it did, Fannie or Freddie did not lose the entire balance of the loan as they received the proceeds from the collateral upon foreclosure.

For example, if Fannie purchased a mortgage from Countrywide for $170,000, and later foreclosed on the property and sold it for $150,000, the "loss" would be no more than $20,000. It would be absurd to claim that Fannie had lost the entire $170,000 it paid to purchase the loan. The district court even went a step further, treating loans that were paid in full as total losses. That result is unjustifiable.

Fannie and Freddie themselves recognized as much as they recorded as their "losses" the net amounts, not the entire amounts of the loans they purchased. *See* J.A. 1246, 1269. By failing to view the loan transactions as a whole and to deduct the value of the payment stream and the collateral in calculating the "loss," the district court erred as a matter of law.

### 2. *The Ordinary Meaning Of 'Loss' Takes Into Account The Amount That The Victim Actually Received*

Remedial principles in both the civil and the criminal context support a measure of "loss" that deducts amounts that the victim received (and thus

86

did not actually lose). *See, e.g.*, *United States* v. *Anchor Mortgage Corp.*, 711 F.3d 745, 749 (7th Cir. 2013) (noting that "[b]asing damages on net loss is the norm in civil litigation"); U.S.S.G. § 2B1.1 app. note 3(E) (explaining that, in calculating loss resulting from fraud at criminal sentencing, the court should reduce the loss by the amount returned to, or recovered by, the victim). This Court has recognized that rule on multiple occasions. *See, e.g.*, *United States ex rel. Feldman* v. *Van Gorp*, 697 F.3d 78, 87-88 (2d Cir. 2012); *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994).

Whether considered a matter of compensation, as in civil cases, or a matter of punishment, as in criminal cases, the court should take into account that a victim actually received something of value as part of the allegedly fraudulent transaction when calculating the "loss" for which the defendant is responsible. Thus, while the district court found that the "loss" was $2.9 billion, the net loss recorded by Fannie and Freddie (on the same population of loans used by the district court) was $151 million, and only $82 million as to the portion that the government contended was defective. *See* J.A. 1259; S.A. 94. The district court erred in adopting its expansive interpretation of "loss."

### 3. *Under Section 1833a, A 'Loss' Must Be Proximately Caused By The Violation*

The district court also erred by ignoring the causation requirement of Section 1833a in calculating loss. The court thus improperly awarded a pen-

87

alty based on a "loss" that the government did not, and could not, prove was proximately caused by the violation.

The exception to the statutory maximum in Section 1833a permits a greater penalty if "the violation results in pecuniary loss." While no court has interpreted that language in Section 1833a, courts interpreting materially identical language in the Alternative Fines Act, 18 U.S.C. § 3571(d), have held that it requires proof that "a given monetary amount (either a gain or a loss) was proximately caused by the conduct of the charged offense." *United States* v. *Sanford Ltd.*, 878 F. Supp. 2d 137, 152 (D.D.C. 2012); *United States* v. *BP Products North America Inc.*, 610 F. Supp. 2d 655, 688 (S.D. Tex. 2009). Indeed, in one of those cases, the government affirmatively argued that the relevant language should be interpreted to require proximate causation. *See BP Products*, 610 F. Supp. 2d at 687. A proximate-causation requirement is presumed when a violation requires not only conduct but, as here, a particular result of that conduct. *See Burrage* v. *United States*, 134 S. Ct. 881, 887 (2014).

The district court's penalty analysis entirely ignored the statute's proximate-causation requirement and swept in all manner of supposed losses that were not attributable to the alleged fraud. The district court asserted, without citing any evidence, that Fannie and Freddie "would never have purchased any of the loans" if they had known about the alleged fraud. S.A. 99.

But even if that were true—and the evidence suggests otherwise—proximate causation requires more than mere "but for" causation. *See McLaughlin* v. *American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008). In addition to "showing that but for the defendant's misrepresentations the transaction would not have come about," there must be proof that "the misstatements were the reason the transaction turned out to be a losing one." *First Nationwide Bank*, 27 F.3d at 769.

The district court did not identify any such proof in this case, and there was none. The government's only evidence of loss was the analysis conducted by its penalties expert, who candidly admitted that his loss calculations "did not consider" causation issues. J.A. 239-240. The government's expert therefore did not use any method, such as a regression analysis, to isolate the losses attributable to the fraud alleged by the government; instead, he simply purported to calculate losses on HSSL loans, regardless of why those losses may have occurred. *See* J.A. 236. The government's expert therefore did not consider the effect of the mortgage crisis, which obviously caused many mortgages to default that otherwise would not have. Nor did he consider any of the multitude of other reasons a particular loan might default, such as a borrower losing his job after the loan is funded. *See* J.A. 236, 239-240.

When other causal factors are taken into account, the evidence showed that loans with material defects, *i.e.*, allegedly fraudulent loans, performed

89

no differently than those without them. J.A. 1571. In other words, misrepresentations about loan quality were not the cause of any losses to Fannie and Freddie.

Because the government introduced no evidence that there was a "gain" or "loss," as properly understood, in excess of the statutory maximum, and because the government bore the burden of proof, the district court erred when it awarded penalties under the exception for "violations creating gain or loss."

*       *       *       *       *

Should the Court remand this case to the district court for any reason, the bank defendants respectfully request that the case be reassigned to a new district judge. Reassignment is appropriate where the facts "might reasonably cause an objective observer to question [the judge's] impartiality." *Pescatore* v. *Pan American World Airways, Inc.*, 97 F.3d 1, 21 (2d Cir. 1996) (citation omitted). As discussed above, the district judge made many public statements, in multiple forums, urging prosecution of bank executives for their alleged roles in the mortgage crisis. The judge did so at the same time he was presiding over this case—pressing the government to seek greater penalties, under theories the government had decided not to pursue, and then awarding an amount far greater than the government had initially re-

quested or the law permits.  Under those circumstances, the bank defendants respectfully submit that reassignment is warranted.

## CONCLUSION

The judgment of the district court should be reversed.  In the alternative, the judgment should be vacated and the case remanded for a new trial.  At a minimum, the damages award should be vacated and the case remanded with instructions to award penalties no higher than the statutory maximum of $1.1 million.

Respectfully submitted,

/s/ Brendan V. Sullivan, Jr.

RICHARD M. STRASSBERG
WILLIAM J. HARRINGTON
GOODWIN PROCTER LLP
 *620 Eighth Avenue*
 *New York, NY 10018*

 *Counsel for Countrywide Bank, FSB, and Countrywide Home Loans, Inc.*

BRENDAN V. SULLIVAN, JR.
ENU A. MAINIGI
CRAIG D. SINGER
KANNON K. SHANMUGAM
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *(202) 434-5000*

 *Counsel for Bank of America, N.A.*

APRIL 22, 2015

91

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for defendant-appellant Bank of America, N.A., and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Defendants-Appellants Bank of America, N.A., et al., is proportionately spaced, has a typeface of 14 points or more, and contains 20,900 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

APRIL 22, 2015

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for defendant-appellant Bank of America, N.A., and a member of the Bar of this Court, certify that, on April 22, 2015, a copy of the attached Brief of Defendants-Appellants Bank of America, N.A., et al., was filed with the Clerk through the Court's electronic filing system. In addition, I certify that copies of the Brief of Defendants-Appellants, the Joint Appendix, and the Special Appendix were sent, via third-party commercial carrier for delivery overnight, to the Clerk and to the following counsel:

> Pierre G. Armand, Esq.
> Assistant United States Attorney
> United States Attorney's Office
> 86 Chambers Street, Third Floor
> New York, NY 10007
>
> David G. Wasinger, Esq.
> Wasinger Daming, L.C.
> 1401 South Brentwood Boulevard, Suite 875
> St. Louis, MO 63144
>
> E. Joshua Rosenkranz, Esq.
> Orrick, Herrington & Sutcliffe LLP
> 51 West 52nd Street
> New York, NY 10019

I certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM