# 15-496-cv(L)

## 15-499-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA; EDWARD O'DONNELL,

*Plaintiffs-Appellees,*

—against—

REBECCA MAIRONE; COUNTRYWIDE BANK, FSB;
COUNTRYWIDE HOME LOANS, INC.; BANK OF AMERICA, N.A.,

*Defendants-Appellants,*

—and—

BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE
FINANCIAL CORPORATION and FULL SPECTRUM LENDING;
COUNTRYWIDE FINANCIAL CORPORATION,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT REBECCA MAIRONE

MARC L. MUKASEY
MICHAEL C. HEFTER
RYAN M. PHILP
SETH M. COHEN
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 508-6100

ROBERT M. LOEB
KELSI BROWN CORKRAN
ORRICK, HERRINGTON
 & SUTCLIFFE LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

E. JOSHUA ROSENKRANZ
ALEC E. ORENSTEIN
ORRICK, HERRINGTON
 & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Attorneys for Defendant-Appellant Rebecca Mairone*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ....................................... 5

STATEMENT OF THE ISSUES ............................................ 5

STATEMENT OF THE CASE ................................................. 7

    *FSL Leadership Enlists A Large Team To Transition From Subprime To Prime Loans.* ........................... 7

    *The Transition To Prime Loans Proceeds With Constant And Careful Monitoring, Debate, And Tweaks.* ............................. 16

    *The Government Alleges Fraud.* ........................................ 23

    *The District Court Guts The Defense Case, Yielding A Verdict For The Government.* .................................. 30

SUMMARY OF ARGUMENT ................................................. 33

STANDARD OF REVIEW ....................................................... 37

ARGUMENT ................................................................................ 37

    I.   Ms. Mairone's Actions Did Not "Affect" A Federally Insured Financial Institution. .................................. 38

        A.   The district court's automatic self-affecting theory is a misapplication of § 1833a(c)(2). ................................... 41

        B.   Ms. Mairone cannot be liable under FIRREA because the fraud she allegedly committed did not "affect" a federally insured financial institution. ............ 47

    II.   The Government Proved At Most A Breach Of Contract, Not A Fraud. ................................................... 49

    III.   The District Court Erred By Preventing Defense Witnesses From Testifying That They Believed The HSSL Process Yielded Quality Loans. ................................ 57

CONCLUSION ........................................................................... 61

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*American International Group, Inc. v. Bank of America Corp.*,
712 F.3d 775 (2d Cir. 2013) ............................................... 37

*Anemone v. Metropolitan Transportation Authority*,
410 F. Supp. 2d 255 (S.D.N.Y. 2006) ................................. 48

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005) ...................................................... 51-52

*Blount Financial Services, Inc. v. Walter E. Heller & Co.*,
819 F.2d 151 (6th Cir. 1987) .............................................. 50

*Bond v. United States*,
134 S. Ct. 2077 (2014) ....................................................... 53

*Braswell v. United States*,
487 U.S. 99 (1988) ............................................................. 47

*Busic v. United States*,
446 U.S. 398 (1980) ........................................................... 46

*Carr v. Tillery*,
591 F.3d 909 (7th Cir. 2010) .............................................. 52

*Corley v. Rosewood Care Center, Inc. of Peoria*,
388 F.3d 990 (7th Cir. 2004) ....................................... 49, 50

*Durland v. United States*,
161 U.S. 306 (1896) ..................................................... 35, 49

*Hemi Group, LLC v. City of New York*,
559 U.S. 1 (2010) ......................................................... 42-43

*Ikea North American Services, Inc. v. Northeast Graphics, Inc.*,
56 F. Supp. 2d 340 (S.D.N.Y. 1999) ............................... 54-55

*Kolar v. Preferred Real Estate Investments, Inc.*,
  361 F. App'x 354 (3d Cir. 2010) ........................................................ 50

*Loughrin v. United States*,
  134 S. Ct. 2384 (2014) ................................................................. 52-53

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
  904 F.2d 786 (1st Cir. 1990) ............................................................ 50

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992) ............................................................ 50

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ......................................................... 49-50

*Patton v. Mid-Continent Systems, Inc.*,
  841 F.2d 742 (7th Cir. 1988) ........................................................... 55

*Reuben H. Donnelly Corp. v. Mark I Marketing Corp.*,
  893 F. Supp. 285 (S.D.N.Y. 1995) .................................................... 54

*Sims v. Blot*,
  534 F.3d 117 (2d Cir. 2008) ............................................................ 37

*Skilling v. United States*,
  561 U.S. 358 (2010) ........................................................................ 52

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) .............................................................. 47

*United States v. Agne*,
  214 F.3d 47 (1st Cir. 2000) ............................................. 33, 43, 44-45

*United States v. Bank of New York Mellon*,
  941 F. Supp. 2d 438 (S.D.N.Y. 2013) .............................................. 44

*United States v. Benson*,
  79 F. App'x 813 (6th Cir. 2003) ....................................................... 42

*United States v. Bouyea*,
  152 F.3d 192 (2d Cir. 1998) ...................................................... 33, 42

*United States v. Carollo*,
    No. 10-654, 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) ............ 34, 44

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) ................................................... 35, 49, 53

*United States v. Esterman*,
    135 F. Supp. 2d 917 (N.D. Ill. 2001) .................................................. 43

*United States v. Margiotta*,
    688 F.2d 108 (2d Cir. 1982) .............................................................. 51

*United States v. Paccione*,
    949 F.2d 1183 (2d Cir. 1991) ...................................................... 35, 49

*United States v. Pelullo*,
    964 F.2d 193 (3d Cir. 1992) ........................................................ 42, 43

*United States v. Szur*,
    289 F.3d 200 (2d Cir. 2002) ............................................................. 37

*United States v. Vanoosterhout*,
    898 F. Supp. 25 (D.D.C. 1995) ........................................................ 46

*United States v. Wells Fargo Bank, N.A.*,
    972 F. Supp. 2d 593 (S.D.N.Y. 2013) ............................................... 44

*Whitman v. United States*,
    135 S. Ct. 352 (2014) ....................................................................... 52

*Yates v. United States*,
    135 S. Ct. 1074 (2015) ..................................................................... 52

**Federal Statutes**

12 U.S.C. § 1833a ...................... 5, 7, 24, 33, 34, 38, 41, 42, 44, 45, 46, 47

18 U.S.C. § 287 ..................................................................................... 46

18 U.S.C. § 1001 ................................................................................... 46

18 U.S.C. § 1341 ............................................................................ 24, 41

18 U.S.C. § 1343 ............................................................................ 24, 41

28 U.S.C. § 1291 ................................................................................. 5

28 U.S.C. § 1331 ................................................................................. 5

28 U.S.C. § 1345 ................................................................................. 5

31 U.S.C. § 3729 ............................................................................... 23

**Rules**

Federal Rule of Evidence 404................................................................ 57

**Other Authorities**

H.R. Rep. No. 101-54(I) (1989), *reprinted in* 1989 U.S.C.C.A.N. 86 ...... 48

Matthew Goldstein, *Whistle-Blower on Countrywide Mortgage Misdeeds to Get $57 Million*, N.Y. Times (Dec. 18, 2014), *available at* http://dealbook.nytimes.com/2014/12/17/countrywide-whistle-blower-to-receive-more-than-57-million............................................. 33

# INTRODUCTION[1]

This case is about the Government's effort to criminalize the legitimate business decisions of a bank as it transitioned from selling one product to selling an entirely different one.  For many years, the Full Spectrum Lending Division ("FSL") of Countrywide had been in the business of originating "subprime" mortgage loans—i.e., loans to higher-risk borrowers.  As the market for subprime loans contracted, and ultimately collapsed, FSL changed its focus to "prime" loans.  Because "prime" borrowers were more credit-worthy, and thus generally presented less risk, FSL recalibrated its lending and underwriting (i.e., risk-assessment) process to confront the new market reality, while reducing unnecessary delays and inefficiencies.  These are the kind of legitimate and necessary decisions that businesses make every day to balance customer expectations, speed, efficiency, and quality control.

---

[1] In this brief and our reply, we refer to the two Countrywide Appellants—Countrywide Bank, FSB and Countrywide Home Loans, Inc.—collectively as "Countrywide."  Bank of America Corporation acquired Countrywide on July 1, 2008, subsequent to the events underlying the Government's lawsuit.  We refer to all the institutional defendants together as "the Banks."  The Special Appendix and Joint Appendix are cited as "SA" and "JA," respectively.  The Banks' Opening Brief is cited as "Banks' Br.," the Banks' Reply Brief is cited as "Banks' Reply," and this brief is cited as "Opening Br."

1

A large group of FSL executives participated in, and agreed upon, this process refinement. One of them was Defendant-Appellant Rebecca Mairone, a systems and process engineer who had recently joined FSL. She had no authority to make changes to the underwriting process without the approval of FSL's senior management in charge of risk, credit, and compliance.

Years later, one of those senior officers, a disgruntled former employee who blamed Ms. Mairone for denying him a promotion, filed a qui tam action against Countrywide. The Government intervened, alleging that the process refinement amounted to federal mail and wire fraud, punishable by civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). The Government's theory was that Countrywide had contractually promised that the loans it sold to investors would be "investment quality," but the loans originated through its adapted process fell short of that imprecise standard.

From inception, two problems plagued the Government's case. First, the Government cannot seek civil penalties under FIRREA unless the targeted conduct—here, selling these supposedly lower-quality loans— "affect[ed]" a federally insured bank. But the "victims" of the purported

2

fraud were not banks at all (much less federally insured banks)—and the federally insured banks that sold these loans suffered no loss. Nevertheless, the court, inventing a theory the Government had never contemplated, reasoned that FIRREA's "affecting" requirement is automatically satisfied whenever a federally insured bank commits mail or wire fraud, because the bank "affects" *itself* by running the risk of incurring a lawsuit like this one. This bootstrap cannot be squared with FIRREA's text or purpose.

Second, this was no fraud. The Government accused Countrywide and Ms. Mairone of knowingly selling loans that violated contractual representations and warranties that Countrywide undertook long before Ms. Mairone started working at FSL. The Government never suggested Countrywide was lying when it entered into the contractual arrangements at issue—and could not even conceivably level such an accusation against Ms. Mairone, who was not employed at FSL at those times. Under blackletter law, a mere breach of contract—even a knowing one, as the Government alleged here—is not mail or wire fraud.

For these two reasons, the district court should never have allowed the Government's case to proceed to trial. Regardless, the trial that did

ensue was unfair.  The Government presented no direct evidence that Ms. Mairone—or anyone else at Countrywide—intended to deceive the purchasers of the loans.  Not one witness even suggested that the executives who designed the new process intended it to yield lower quality loans.  Instead, the Government's case hinged on proving that Countrywide sold an unacceptably high percentage of loans that were not "investment quality," in breach of contractual representations and warranties to purchasers that its loans would be "investment quality"—and that Ms. Mairone and others at FSL knew this.  But the district court excluded Defendants' most powerful evidence to rebut that accusation:  proof that the prime loans originated through the new process were at least as sound as loans originated with the prior process.  The district court compounded this error by excluding testimony from defense witnesses that Ms. Mairone had good reason to believe that the new process was producing quality loans, even after allowing the Government to elicit testimony from its witnesses supporting the opposite inference.  In a case that the district court described as "one of the closer cases I've seen in a long time," this highly relevant evidence would have changed the outcome.

This Court should reverse the judgment below, or at a minimum vacate and remand for a new trial.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345. The district court entered final judgment on July 31, 2014, SA105, and denied Defendants' post-trial motions on February 3, 2014, SA107-21. Ms. Mairone timely filed a notice of appeal on February 20, 2015. JA5368. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Ms. Mairone joins the Banks with regard to Points I-V in their Opening Brief. She files this separate brief to present supplemental arguments addressing the following:

1.      To bring an action under FIRREA, 12 U.S.C. § 1833a, the Government must prove the defendant committed mail or wire fraud "affecting a federally insured financial institution." The only "effect" the Government asserts here is the risk of future criminal or civil liability stemming from the very mail or wire fraud at issue. Must the judgment be reversed?

5

2.    A breach of a preexisting contract, entered into in good faith, cannot on its own form the basis of a federal mail or wire fraud action. The Government's theory here is that Defendants intentionally breached contractual warranties that Countrywide indisputably undertook in good faith long before Ms. Mairone entered the picture. Must the judgment be reversed?

3.    Did the district court err in excluding testimony from defense witnesses that they believed the loan origination process was proper and produced quality loans, even after allowing the Government to elicit almost identical testimony from its witnesses supporting the opposite conclusion?

## STATEMENT OF THE CASE

Defendant-Appellant Rebecca Mairone appeals from a jury verdict finding her liable under 12 U.S.C. § 1833a for mail and wire fraud affecting a federally insured financial institution. The district court's (Rakoff, J.) principal orders in this case are reported at 961 F. Supp. 2d 598 (2013) (denying motion to dismiss); 996 F. Supp. 2d 247 (2014) (holding that "affecting" element was established as a matter of law); and ___ F. Supp. 3d. ___, 2015 WL 424428 (Feb. 3, 2015) (denying post-trial motions).

### *FSL Leadership Enlists A Large Team To Transition From Subprime To Prime Loans.*

FSL originated mortgage loans, meaning that it made mortgage loans to consumers, which Countrywide then sold in bundles to institutional purchasers. The purchasers relevant here are the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie")—also called "Government Sponsored Entities" or "GSEs." This case is about the process by which FSL originated loans during the eight-month period from August 2007 to May 2008.

FSL was one of several Countrywide divisions in the business of originating and selling mortgages. As a mortgage originator, FSL balanced

the need to generate mortgage originations against the need to manage the risk of loan defaults. FSL's organizational structure ensured the proper balance between sales and loan quality for a particular population of borrowers. FSL had an underwriting, risk, and compliance group separate from the FSL sales force. That group had a head of underwriting, risk, and compliance with executive authority independent of, and at the same level as, the head of sales. *See* JA5773. Ms. Mairone never held either position; her role primarily involved operations. JA4169-70.

FSL historically had focused on originating and selling subprime loans, i.e., loans to borrowers with impaired credit histories, low credit scores and income, and other attributes that created a higher risk of default. JA2169, 5727-28. FSL's process for originating subprime loans involved a detailed "work flow" through which a loan application proceeded in sequential steps from opening the loan file to underwriting review to loan approval and funding. Because subprime borrowers presented higher risks, FSL's origination process involved multiple layers of review, hand-offs from employee to employee, repeated checkpoints, and layers of underwriter review before FSL decided whether to make the loan. JA2173-75.

This case is not about subprime loans, but about prime loans. In early 2006, the market for subprime loans began to dry up. JA2169, 5727-28. FSL adapted to the new marketplace by shifting its focus to making prime loans. JA3624-25. As prime loans increasingly became the focus of FSL's business, senior officers within FSL—including the relator who initiated this suit—urged modifications to the subprime work flow to eliminate unnecessary redundancies for prime borrowers. JA6508. They knew that prime loans are dramatically different from—and less risky than—subprime loans. JA3626-27. Unlike subprime borrowers, prime borrowers have favorable credit characteristics like higher income, stable employment, and good payment histories. JA1796-97, 1808-09. For prime loans, FSL could satisfy its underwriting criteria with fewer redundancies and checkpoints. JA5728.

Being more attractive to lenders, prime borrowers were also more impatient and demanded speed in loan processing. FSL executives knew the bank would suffer a competitive disadvantage with prime borrowers if they retained unnecessary handoffs and delays. JA5493, 6508. And because the interest rates for prime loans were lower, these loans had lower profit margins, putting a premium on increased efficiency in

9

processing. JA5728. Accordingly, FSL executives determined that the work flow for prime loans needed modifications to shed some of the steps that had been necessary for riskier subprime loans. *Id.*; JA6508.

At the time, FSL had approximately 8000 employees across five call centers and hundreds of local branches. JA4169. Senior Managing Director Greg Lumsden headed FSL and was ultimately responsible for all aspects of the business. JA5773. Mr. Lumsden delegated responsibility over four areas, each overseen by an FSL manager:

- Chief Credit/Compliance Officer: Cliff Kitashima

- Production, Sales, and Marketing: Lloyd Sargeant

- Chief Financial Officer: Pete Kucma

- Chief Operating Officer: Rebecca Mairone.

JA4173-74, 5773.

Ms. Mairone had arrived at FSL in February 2006, JA4167, around the time the subprime market began to contract, JA2169, 5728. A chemical engineer by training, Ms. Mairone had spent the previous two decades developing an expertise in process and project engineering. JA4162-63. Ms. Mairone was not in charge of compliance, credit assessment, or finances—those were Mr. Kitashima's responsibilities. JA3629. She was

10

not responsible for sales and marketing, JA4304-05; that was Mr. Sargeant's responsibility, JA3631.  Her role was operational:  "supporting" the other units and implementing their judgments on risk, quality, and sales.  JA4169-70, 4173-74.  In that role, she had no contact with the purchasers of FSL's loans.  JA3041, 3145, 4304-05, 4797.

One of the grand ironies of this case is that the most cogent contemporaneous justification for FSL's need to recalibrate its origination processes for prime loans came from Edward O'Donnell, the FSL employee who, years later, initiated this qui tam action.  In March 2006, just days after Ms. Mairone arrived at FSL, Mr. O'Donnell wrote an email explaining that FSL could, and should, scale back underwriter involvement for prime lending.  He declared categorically, "Prime deals are *never* touched by an [underwriter]."  JA5727 (emphasis added).  He explained:  "[R]evenue on Prime loans is significantly less than Subprime, as is the credit risk. Therefore it makes sense to increase the Management of the role change to reduce [underwriter] involvement in [certain prime loans]."  JA5728.  He repeated that theme frequently and eloquently, most notably in a May 2007 presentation to over 100 FSL employees explaining the need for a new loan origination process:  "Prime loans need low touch, low cost processing,"

11

and "[p]rime borrowers require faster [turn time] to keep them from going elsewhere." JA5493; *see* JA2535-36. Thus, Mr. O'Donnell was one of the early proponents of quicker loan processing with fewer safeguards.

To design this new process, FSL formed a nine-member "Steering Committee," which included division leader Greg Lumsden; three of his direct reports (Mr. Kitashima, Mr. Sargeant, and Ms. Mairone); and five of their subordinates, including relator and redesign-cheerleader Edward O'Donnell. JA2208, 3722. Each of the various departments that would be involved in the design or implementation of the new process, including risk, credit, and sales, was represented on the Steering Committee. JA3722-23. Over the ensuing months, the Steering Committee met (along with an "Operations Design Group" consisting of other FSL employees, JA1835) to discuss the redesign. *E.g.*, JA5738. No one person was in charge of the Steering Committee. JA3722-24. Rather, the various division representatives had to approve any decision that affected their respective divisions. *Id.* For example, no changes regarding the process for making underwriting decisions or the criteria for assessing credit risk could be made without the approval of Chief Credit/Compliance Officer Kitashima. *Id.* The Steering Committee's goal, as dictated by FSL's leader, Mr.

12

Lumsden, JA3723, was to "design[] the process to minimize handoffs and potential for back and forth that breeds delays and miscommunications," JA5604. Again, Mr. O'Donnell put it best in an email at the time of the transition:

> Let's face it. Loans take too long to fund here, cost too much to move through our process and require far too many conversations, hand offs and systems. We have many steps in our work flow that were built for another time, different products or periods when margins were much more robust.

JA5372.

FSL modeled its new approach on the process that other Countrywide divisions used to originate prime loans. JA3639. The key design feature was to channel into a streamlined work flow only low-risk loans that satisfied a battery of specific criteria. Those carefully selected loans did not need to be "hand[ed] off[]" for an additional layer of review before the loan could be funded. JA4054; *accord* JA5604. Rather, if the loan satisfied all criteria for inclusion in the new process, loan specialists (also called "loan processors," JA1825-26) had more responsibility. Loan specialists—many of whom were former underwriters, *see* JA3675—would act as the customer's sole point of contact and could authorize the closing of a loan without the delay engendered by a "handoff[]" to another

13

underwriter less familiar with the customer's bona fides.  JA5382-83; *see*

*generally* JA5497, 5523, 5526.

The Steering Committee called the new process the "High-Speed

Swim Lane," or "HSSL."  "Swim lane" is a common process engineering

term used to describe a work flow or operational steps.  JA3973.  FSL

implemented this new process on August 13, 2007, as a pilot program in

two processing centers.  JA4223.  The pilot ran for six weeks, until

September 30.  *Id.*  It involved 12 loan specialists who processed about 350

loans.  *Id.*  Those processors reported to Mr. Sargeant in Production, Sales,

and Marketing.  JA2092.

In October 2007, FSL underwent a reorganization called "Central

Fulfillment" to centralize loan processing functions.  JA5441-44.  Before

Central Fulfillment, employees within FSL's call centers were organized by

job description:  "[U]nderwriters all sat together, processors all sat

together, and funders all sat together."  JA4232.  In addition, these groups

of employees "were in different locations, they were in different buildings,

they might be on different floors of the building."  *Id.*  Central Fulfillment

centralized these processing employees within FSL's call centers and

organized them into processing teams: an opening team and a loan

14

fulfillment team.  JA5441-44.  The HSSL was one process or swim lane within Central Fulfillment, and was used only for low-risk prime loans. JA3677.  Under Central Fulfillment, if a loan met the eligibility criteria, the borrower's loan file was processed using the HSSL work flow; higher risk loans continued to go through other more rigorous processes designed for those types of loans.  *Id.*; JA4024-25, 4104, 5427, 5613.

As FSL's Chief Operating Officer, Ms. Mairone was responsible for implementing this reorganization.  JA4231.  Mssrs. Kitashima and O'Donnell retained full responsibility for credit, compliance, and lending risk decisions.  JA4239, 5623-24.  Ms. Mairone was involved in selecting the person to run Central Fulfillment.  JA4241-42.  The leading candidates were Mr. O'Donnell and an employee named Wade Comeaux.  JA2254, 4241.  Ultimately, Mr. Comeaux got the job.  Mr. O'Donnell blamed Ms. Mairone.  JA2656-57.  From that point on, Mr. O'Donnell mounted a slur campaign against her, JA5815, at one point confiding to a colleague, "[S]he's got rubber bullets in her gun and we are going nuclear," JA5715.

Despite his grudge against Ms. Mairone, Mr. O'Donnell testified consistently with every witness involved in designing the HSSL—including the Government's other witnesses—that it was a valid design, motivated

15

purely by the desire to increase efficiency in originating loans, not to generate low quality loans, much less to defraud purchasers about loan quality. JA1943, 1952-53, 2239-40, 2447, 3313.

### *The Transition To Prime Loans Proceeds With Constant And Careful Monitoring, Debate, And Tweaks.*

FSL's shift from subprime to prime loans was a vast undertaking. Many of the division's 8000 employees, accustomed to the process for originating subprime loans, now had to learn a new process for originating prime loans. FSL's management contemplated that procedural mistakes were inevitable. Because of that, they devised a special metric—called "Quality Assurance" reports or "QA"—to monitor for those sorts of mistakes. The QA metric was very different from a pre-existing metric called "Quality Control" reports or "QC." As explained more fully below, because the two different metrics measured different things, and had different purposes, they told a very different story: QA numbers revealed that, as expected, loan specialists did, indeed, make procedural errors as they were learning the new system. QC numbers, on the other hand, demonstrated that the quality of the HSSL loans was higher than what the GSEs expected of loans they purchased. FSL employees debated the significance of both metrics throughout HSSL's short lifespan.

16

***Quality Assurance Reports.*** Until FSL unfurled the HSSL pilot, there was no such thing as QA. FSL management devised this new metric to monitor how well the loan specialists were adapting to the new HSSL process. JA3697-98, 3701, 4015-16, 4257-58, 5708. And because FSL management devised the metric for its own edification, they were responsible for administering it. JA4015. QA tracked loan specialists' strict compliance with the process steps before funding, and a loan specialist's failure to follow any process step would result in a QA "finding[]." JA1888-89; *accord* JA3690-91, 3779, 4788, 5791. For example, QA findings would result from process errors as trivial as "a missed check[] box" in a checklist, even if the underlying task had been completed. JA5655. The overwhelming majority of QA findings were simple clerical errors, such as neglecting to take documents in the paper loan file and upload them into a virtual (i.e., electronic) loan file, or saving a document in the wrong place in the file, JA3702-03, 5690—the sorts of mistakes employees make when learning any new process.

Considerable debate brewed within FSL regarding the significance of the QA findings. Some worried that a high number of QA findings could be symptomatic of declining loan quality. *E.g.*, JA2245-46. But a vocal group

17

of FSL managers were confident that the QA findings had "nothing to do with" the final quality of the loans. JA3780. They believed that QA numbers measured only strict adherence to process steps, not defects that had any bearing on whether the applicant qualified for the loan. *E.g.*, JA3701, 4015, 4266-70, 4577, 5452. As late as March 2008, Mr. O'Donnell himself observed: "The QA reviews, to date, have been heavily focused on process steps. I believe it's tough to draw conclusions directly from those …." JA5694. Even David Battany, the former Fannie Mae executive who managed Fannie Mae's relationship with Countrywide, testified that the QA numbers involved "factors that were not relevant to Fannie Mae" and that those numbers would not impact the salability of the loans. JA4788.

FSL management also debated whether and how to distribute individual QA findings within FSL. FSL management always received the QA reports, but they also initially shared them with loan specialists in real time. JA4265, 4577. Loan specialists received a separate email for each individual finding, JA4265, so that if the specialist had missed more than one process step on the same loan, he or she would receive a separate email for each error. JA2147, 4265. These multiple, rapid-fire QA emails caused

consternation among the loan specialists and their managers, culminating in a November 15, 2007, "town hall meeting" where loan specialists complained that they were "getting pounded by Quality Assurance audits." JA5799. Specifically, loan specialists and their managers complained about the "miniscule levels of data (a missed checked box) being flagged by [the QA] group," indicating that they had become "scared straight they will make a mistake and are therefore triple and quadruple checking everything." *Id.* As one FSL employee wrote at the time, "This is adding major lag time!" *Id.*

In response, FSL leadership convened to decide how to address the shortcomings of the QA process. FSL's leadership agreed on what to do. JA3733, 6082. They decided it was necessary to temporarily suspend the distribution of QA reports to the rank-and-file loan specialists for 90 days while the QA process was refined. JA6082 (Mairone writes that FSL will "revise the QA process to focus solely on SUS [credit quality] items, not process or SOPs [standard operating procedures]" and that she will "meet with the compliance and quality groups" to "work through the process, reporting and communication plan"); JA5657-58; JA5660 (noting that the QA process was "being revised" to "focus more on Risk/SUS issues instead

19

of process/workflow issues"). While this was indisputably a joint decision, Ms. Mairone was the one to announce it to the key constituencies within FSL—in a November 29 email that became the centerpiece of the Government's case against her. JA6082-83.

While FSL management suspended the individual emails to loan specialists during this 90-day period, a wide range of FSL leaders still received QA reports, including those responsible for credit quality. JA2566, 2572, 5801, 5805-07. During this period, Ms. Mairone spearheaded efforts to revise the QA process to align it with issues related to credit quality rather than strict adherence to trivial process steps, and to revise the communication of QA findings to loan specialists. JA3732-33, 4283, 4297, 5660. To accomplish these goals, she instituted weekly meetings with risk management, JA5801, and investigated the most common problems that the QA reports turned up, JA5664, 5809, 5811, 5813.

***Quality Control.*** QC reports were different from QA, in almost every way:

- QC scores were designed to measure the quality of the loans *after* funding, not compliance with sometimes trivial process steps en route to the funding decision. JA3591.

- Accordingly, these scores measured underwriting and credit defects in the loan, not simply whether loan specialists were

20

putting documents in the correct place in the file. JA3779
(Kitashima testimony: "[T]he only measure of quality was
corporate QC."); JA3586 (Schakett testimony noting that QC
audits were performed by underwriters).

- Unlike QA scores, which FSL created and administered
specifically for HSSL, QC scores were calculated based on
quarterly audits performed by a separate group in Countrywide's
corporate offices (not within FSL), a process that existed long
before the HSSL process. JA1902, 1908, 2306-07.

- Fannie Mae required originators to conduct post-funding quality
control audits like QC, but did not require pre-funding audits like
QA. JA4788; *cf.* JA3698-99.

FSL traditionally based employee compensation in part on these
scores through a process known as "Quality of Grade" or "QOG." JA2221.
In connection with the organizational and process changes being
considered at the time, FSL temporarily suspended QOG. The QOG
suspension was intended to allow employees to adjust to new roles and
processes without fear that making a mistake during the learning process
would harm their compensation. JA4207, 5377. Everyone at FSL,
including Mr. O'Donnell, agreed with this decision. JA2407-08, 4207.

QC was a two-stage process. First, QC auditors employed by
Countrywide corporate—outside FSL—would grade a sample of loans
along a continuum, with Severely Unsatisfactory ("SUS") signifying a
defective loan. JA1902-03. Then, "whoever had processed the loan" was

21

entitled to rebut any SUS finding and try to persuade the external grader

why the grade was wrong.  JA1898.

FSL's QC numbers confirmed that FSL's loans conformed to the

GSEs' expectations during the time period in question.  Numerous GSE

witnesses testified that they expected defect rates as high as 18-25%.

JA3004, 3268.  FSL's final division-wide QC SUS rate for the Fourth

Quarter of 2007 (the first quarter of Central Fulfillment) was 5.4%,

JA5469, which Mr. Kitashima considered acceptable given the new HSSL

process, JA3679.  The next quarter the final SUS rate rose to 9.8%—well

below the GSEs' expected defect rate—but it promptly plummeted back

down to 4.4% in the following quarter.  JA5469.  Mr. Kitashima monitored

the SUS rates and believed they reflected that the HSSL process had

yielded loans of acceptable quality.  JA3679-82.  Proving the point, Fannie

Mae's Mr. Battany testified that even if he had known those final QC

numbers, he still would have purchased the HSSL loans from Countrywide.

JA4795-96.

*FSL's improvements.*  FSL strove to continue to improve loan

quality by continuously tweaking its loan origination process.  On March

17, 2008, FSL inserted underwriters back into the process for certain loans

22

known as "stated-income" loans, loans (widely accepted in the industry) for which a borrower was not required to prove his or her income. JA1996-97, 2001, 5454-57.

Over the next couple of months, FSL reinstated underwriter review for all loans. First, on April 28, 2008, FSL began requiring underwriters to review all items on the "clear-to-close checklist" before funding. JA3683-84, 5458-59. Then, on May 21, 2008, FSL further refined the clear-to-close process by introducing additional requirements before a loan could be cleared for funding. JA2018-19, 5460-68. The Government later decided that was the date on which the purported fraud ended, JA2777, 3397, even though Central Fulfillment continued beyond that date, JA4304.

### *The Government Alleges Fraud.*

More than four years after the HSSL pilot project began, on February 24, 2012, Mr. O'Donnell filed a qui tam action. He sued Countrywide as well as Bank of America Corporation, which had acquired Countrywide, alleging violations of the False Claims Act, 31 U.S.C. § 3729(a)(1). Compl., Dkt. 6. The Government intervened, filing its own Complaint on October 24, 2012. Compl.-in-Intervention of the United States of America, Dkt. 8. Like the relator, the Government brought suit under the False Claims Act,

but the Government also added a claim for civil penalties under FIRREA, 12 U.S.C. § 1833a, alleging violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343. *Id.* ¶183. The FIRREA claim was the only claim to survive motions to dismiss. SA5.

The Government originally sued only the Banks, but later amended its Complaint to assert claims against Ms. Mairone. Am. Compl. of the United States of America, Dkt. 40. The Government never explained why it chose to single out Ms. Mairone among all the executives who were responsible for designing, implementing, and overseeing the HSSL process, to the exclusion of Senior Managing Director Lumsden who headed FSL; the various executives whose job titles bespoke responsibility for "Credit" judgments, "Compliance," "Production" of the loans, "Sales and Marketing" to institutional buyers, and "Finance"; and the other participants in the Steering Committee or the Operations Design Group.

The Government's broad theory was that Countrywide committed fraud in selling the HSSL loans to Fannie Mae and Freddie Mac. The Government's theory of fraud ricocheted from one idea to another. *See, e.g.*, Compl.-in-Intervention of the United States of America, Dkt. 8., ¶ 90 (alleging that Countrywide "concealed its bonus incentive from the GSEs");

24

*id.* ¶¶ 91-125 (alleging that loans sold to the GSEs were fraudulent because the borrowers lied on their applications); *id.* ¶¶ 126-29 (alleging that defendants refused to repurchase loans pursuant to the GSE selling contracts); Am. Compl. of the United States of America, Dkt. 40, ¶ 7 (alleging that the HSSL process "continued through 2009"); *id.* ¶¶ 91-96 (alleging that Countrywide manipulated data about its automatic underwriting system). The Government's ultimate theory ended up being no more than a breach of contract—that Countrywide had represented to Fannie and Freddie that these loans were of "investment quality," when in fact they were not. The representation appeared in contracts that Countrywide had entered into as far back as 1982.[2] Specifically, the contract between Countrywide and Freddie Mac stated: "The seller warrants that all Mortgages sold to Freddie Mac have the characteristics of an investment quality Mortgage." JA6368. And the contract between Countrywide and Fannie Mae provided:

---

[2] Countrywide first entered into the master agreement with Fannie in November 1982. JA5929. There was no evidence at trial as to when Countrywide first entered into a master agreement with Freddie.

> The Lender knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to … cause private institutional investors to regard the mortgage as an unacceptable investment ….

JA5938.

Neither contract defined "investment quality." The definition that emerged from the testimony was muddled. Fannie and Freddie executives variously testified that the term meant that an investor would "want [the loan] in a portfolio of loans that [it] purchase[d]," JA2721; that it was simply a "generic term that means loans originated and sold to Fannie Mae will perform," JA3219-20; and that (circularly) "if a loan did not meet the selling warranties, it would not be considered investment quality by Fannie Mae," JA2724.

What was clear was that the representation and warranty that loans were "investment quality" did not mean that Fannie and Freddie expected every loan that was sold to them to be investment quality. JA4830-31. As explained above (at 22), approximately 25% of all loans that Fannie Mae purchased were defective. JA3268. The number for Freddie Mac was 18-20%. JA3004. Precisely because of this inevitability, the contracts contained a repurchase provision: Countrywide promised to buy back any non-conforming loans from the GSE for a full refund. JA2761, 2994, 4747.

26

The Government contended that, despite these contractual provisions, certain FSL executives knew that the HSSL process was flawed and produced loans that were not investment quality; those executives knew that the loans were being sold to Fannie Mae and Freddie Mac with the representation that they were investment quality; and the knowing breach of the representations and warranties in the contracts constituted mail and wire fraud.

To make out its claim, the Government had to prove that those FSL executives intended to carry out a scheme to defraud and intended to harm Fannie and Freddie. Apart from naming Ms. Mairone in its amended complaint, the Government never identified who exactly at FSL was alleged to have acted fraudulently until after it presented its case in chief. Only when the district court pressed the point did the Government finally identify three perpetrators: Ms. Mairone, Mr. Kitashima, and Mr. Lumsden, though only Ms. Mairone was named as a defendant in this action. JA3516.

The Government's choice of these three reflected the Government's shift in its theory of fraud. At first, the Government's case was focused on HSSL's design: The Government tried to assert that Countrywide—and

27

Ms. Mairone in particular—misled the GSEs as to the nature of the quality safeguards built into the HSSL process. JA4911, 4913. But the district court refused to charge the jury on that theory because there was no evidence that anyone at Countrywide made any untrue statement to either Fannie or Freddie regarding how the HSSL process worked. JA4915-17. After that ruling, the Government's sole theory reduced to the claim that the HSSL loans Countrywide sold to Fannie and Freddie breached a contractual representation and warranty relating to loan quality and that this breach amounted to fraud. Of course, the alleged perpetrators of that "scheme" had no involvement in the sale of the loans to the GSEs or the contractual arrangements governing those sales. Ms. Mairone, in fact, never had any dealings or contact with anyone at Fannie or Freddie. JA3041, 3145, 4304-05, 4797.

The Government invoked three basic categories of evidence in an effort to prove that these employees intended to engage in a scheme to defraud. The first category included evidence that the Government depicted as proof that the HSSL process produced low-quality loans, particularly:

- The QA scores, JA5007, 5150-51; *see, e.g*, JA5449-53, 6716-22, 7002-05;

28

- The QC scores, JA5151; *see, e.g.*, JA6355; and

- Expert testimony that "more than 43 percent of the loans sold to Fannie Mae and Freddie Mac were materially defective," JA5008; *accord* JA5042-43; *see, e.g.*, JA 2794, 2803, 3097.

The second category included evidence that the executives knew that

HSSL loans were of lower quality, most notably:

- Evidence that Ms. Mairone, Mr. Kitashima, and Mr. Lumsden were aware of the supposedly troubling QA and QC results, *e.g.*, JA5026; *see, e.g.*, JA5805, 6505-06;

- Evidence that certain FSL employees believed that the HSSL process was leading to lower quality loans, *e.g.*, JA5012, 5018-19, 5021-24, 5035; *see, e.g.*, JA1859, 1865, 2124, 3366, 6052, 6356-57; and

- Evidence of a prior process that, while unrelated to the HSSL process, JA4185, was alleged to have had a similar emphasis on speed and that had allegedly led to lower quality loans, JA5013; *see, e.g.*, JA2176-78, 7366.

The third category was a hodgepodge of innuendo intended to convey

that Ms. Mairone and her two supposed co-conspirators sacrificed quality

for speed, JA5014; *see, e.g.*, JA6055. This included:

- The decision to suspend temporarily distribution of the QA reports to loan specialists and the decision to suspend temporarily QOG (with which Mr. O'Donnell agreed), JA5025-27, 5029, 5149, 5154; *see, e.g.*, JA6082-83;

- Ms. Mairone's alleged role in instituting "funding contests" to incentivize loan specialists to decrease turn time, JA5032; *see, e.g.*, JA6000-03, 6107, 7434-37;

29

- The selection of Mr. Comeaux—a "sales guy"—to run Central Fulfillment over Mr. O'Donnell, who was more involved with the risk and underwriting side of the business, JA5021; *see, e.g.*, JA4245;

- Speculation that Mr. Kitashima did not care about quality because "[h]e was biding his time, waiting to retire in a few months," JA5035-36; and

- Testimony that Ms. Mairone asked Mr. O'Donnell to remove some slides regarding the quality of HSSL loans from a presentation he was giving to a Countrywide executive, JA5037; *see, e.g.*, JA2317.

As the district court noted, the Government's case was entirely circumstantial. JA3546. There was no evidence of a single email, letter, or conversation in which Ms. Mairone or any other accused individual expressed a belief that HSSL was producing low-quality loans, much less an intention to defraud the GSEs. Upon hearing all the evidence, the district court described the case as "one of the closer cases I've seen in a long time." JA4868.

### *The District Court Guts The Defense Case, Yielding A Verdict For The Government.*

The case would not have been close but for two improper evidentiary rulings that gutted Ms. Mairone's case. First, the defense case was built largely around evidence that loans originated through the HSSL process in fact performed no worse than loans originated outside the HSSL process,

thus rebutting the core premise of the Government's theory: that the quality of the HSSL loans was lower than Freddie and Fannie would have expected based on industry standards. The district court, however, "preclude[d] defendants from presenting evidence or argument that non-[HSSL] loans outperformed [HSSL] loans with respect to delinquency defect rate," reasoning that this evidence was irrelevant to determining the quality of the HSSL loans. JA1694-95. Yet despite this ruling, the Government was allowed to present evidence comparing HSSL to non-HSSL loans. *E.g.*, JA1910, 2248.

Second, the court allowed the Government to elicit testimony from former FSL employees that they thought certain HSSL processes would undermine loan quality, and that they believed the QA and QC numbers bore that out. *E.g.*, JA2124, 2242-43, 2255. To rebut that, Defendants sought to introduce testimony from various former FSL employees that they thought the HSSL process would yield high-quality loans and that the QA and QC numbers did not mean the loans fell short of "investment quality." *E.g.*, JA4016, 4579. Defendants also sought to introduce evidence that employees supported the temporary Quality of Grade suspension—i.e., the decision to temporarily suspend hits to employee compensation based

31

on mistakes. *E.g.*, JA4013. The district court precluded that evidence, holding that the only evidence of a person's internal "state of mind" that would be relevant would be the state of mind of the three alleged participants in the fraud—Ms. Mairone, Mr. Kitashima, and Mr. Lumsden—or anything that employees said to those three. JA4014.

On the first day of deliberations, the jury returned a note that asked, "Why are three people named as managerial [in] the instructions and only one person is charged?" JA5177. The court responded, "the short answer is it's none of your business. But the longer answer is … [y]ou need to decide this matter based on the evidence before you and not be concerned with speculating about matters that are not in evidence." JA5180-81. The jury returned a verdict finding both the Banks and Ms. Mairone liable under FIRREA. JA5188.

The district court awarded penalties against the Banks in the amount of over $1.2 billion and against Ms. Mairone in the amount of $1 million. SA86-104. Despite testifying that he understood that he was only entitled to a $1.6 million award in connection with his testimony, JA2328, Mr. O'Donnell, one of the architects of the HSSL process, ultimately walked away with more than $57 million in connection with this

case and a subsequent related complaint.  Matthew Goldstein, *Whistle-*

*Blower on Countrywide Mortgage Misdeeds to Get $57 Million*, N.Y. Times

at B4 (Dec. 18, 2014), *available at*

http://dealbook.nytimes.com/2014/12/17/countrywide-whistle-blower-to-

receive-more-than-57-million.  The district court denied the Banks' and Ms.

Mairone's post-trial motions, SA107-21, and this appeal followed.

## SUMMARY OF ARGUMENT

**I. A.**  Not every mail or wire fraud gives rise to civil liability under

FIRREA.  The Government may seek civil penalties under FIRREA for

mail or wire fraud only when the "violation … affect[s] a federally insured

financial institution …."  12 U.S.C. § 1833a(c)(2).  This Court has held

under a similarly worded provision of FIRREA that the effect of the

violation on the federally insured bank must be "sufficiently direct," *United*

*States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998), and other courts

interpreting that provision have required the Government to prove that the

violation of the mail or wire fraud statute caused the bank to suffer "actual

financial loss" or a "realistic prospect of loss," *United States v. Agne*, 214

F.3d 47, 53 (1st Cir. 2000).  The district court erred when it held that

FIRREA is satisfied as a matter of law any time a federally insured bank

33

violates the mail or wire fraud statute because such violation exposes the bank to the risk of criminal or civil prosecution for the violation. This reading ignores the statute's plain language that the "violation" must affect the federally insured bank, not the decision of a federal prosecutor years later. *See United States v. Carollo*, No. 10-654, 2011 WL 3875322, at *2 (S.D.N.Y. Aug. 25, 2011) (interpreting a similar FIRREA provision as requiring the Government to prove that the "illegal activity caused" the bank to suffer "actual loss").

**B.** Properly read, § 1833a does not apply here. The violation of the mail or wire fraud statutes—if there was one—did not lead to actual financial loss (or a realistic prospect of loss). It would be the epitome of bootstrapping to allow the Government's decision to prosecute under FIRREA to be the "effect" required by FIRREA. Moreover, the result is the same under the Banks' slightly different textual argument—that a bank cannot "affect" itself. A bank can act only through its employees, and Ms. Mairone was at all times acting within the scope of her duties. A reading of the statute that held her liable but not the bank for which she was working would be incongruous. This Court should reverse for failure to satisfy FIRREA's threshold requirement.

34

**II.** "A breach of contract does not amount to mail fraud." *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994). Even if intentional, "[f]ailure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract." *Id.* (citing *United States v. Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991)). Contrary to the district court's erroneous reading, *Durland v. United States*, 161 U.S. 306 (1896), did not override the common law distinction; it embraced it. The Government in this case alleged nothing more than a knowing breach of representations and warranties— representations and warranties that existed long before Ms. Mairone ever showed up at FSL. There was no evidence in this case that Ms. Mairone had any contact with Fannie Mae or Freddie Mac, or was personally involved in the sale of the loans to Fannie Mae and Freddie Mac. Rather, the Government's theory hinged entirely on the notion that Ms. Mairone knew the HSSL loans were not investment quality, and also knew that Fannie Mae and Freddie Mac purchased only investment quality loans. Such evidence might be relevant to a breach of contract claim against Countrywide by Fannie or Freddie, but without evidence that Defendants *entered* into the contracts with Fannie and Freddie intending to breach

them, it is not mail or wire fraud.  The Government's complaint therefore should have been dismissed at the outset.

**III.**  The district court gutted the defense case in another crucial way. After allowing the Government to elicit evidence from its witnesses regarding their internal thoughts about the QA and QC numbers and various decisions that FSL made at the time, the court suddenly changed tacks and denied Defendants the same opportunity.  In a case without any direct proof of intent, the Government witnesses' testimony about the conclusions they drew from the HSSL process and the loans it was producing was very powerful.  Defendants should have had the opportunity to elicit testimony from witnesses who drew the opposite conclusion at the time from the same information: that quality was *not* suffering.  Such testimony would be equally powerful evidence that Ms. Mairone came to a reasonable conclusion that the HSSL process did not produce lower quality loans.  This Court should remand for a new trial to allow the jury to consider evidence regarding the state of mind of witnesses who worked at FSL at the time.

## STANDARD OF REVIEW

Parts I and II of this Brief seek review of the district court's rulings involving pure questions of law; this Court reviews legal rulings de novo. *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 778 (2d Cir. 2013). Part III seeks review of the district court's evidentiary ruling, which this Court reviews for abuse of discretion. *United States v. Szur*, 289 F.3d 200, 217 (2d Cir. 2002). A district court abuses its discretion when it "render[s] a decision that cannot be located within the range of permissible decisions." *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted).

## ARGUMENT

We join those arguments in the Banks' Brief that relate to liability (Points I-V in the Banks' Brief). We write separately on several of the points to offer variations on the Banks' arguments, particularly as they relate to Ms. Mairone. Our bottom line is the same. This Court should reverse the district court's judgment for three independent reasons: (1) the Government has not demonstrated, as FIRREA requires, that the conduct underlying the violation "affected" a federally insured financial institution; (2) a mere breach of contract is insufficient to prove a scheme to defraud

37

under the federal mail and wire fraud statutes; and (3) the Government failed to introduce sufficient evidence to prove that Ms. Mairone violated the federal mail or wire fraud statutes. Alternatively, this Court should vacate in light of the district court's erroneous evidentiary rulings and remand to allow Ms. Mairone to put on her full defense unconstrained by those errors.

## I. Ms. Mairone's Actions Did Not "Affect" A Federally Insured Financial Institution.

This case should have been dismissed on the pleadings because the fraud the Government alleges did not "affect[] a federally insured financial institution …." 12 U.S.C. § 1833a(c)(2). The Government lurched from theory to theory as to how the purported violation here satisfies that element—and it never settled upon a valid theory. At first, the Government alleged that the fraud "has affected numerous federally insured financial institutions that held preferred stock in the GSEs …." Compl.-in-Intervention of the United States of America, Dkt. 8, ¶ 185. The Government's argument was that Countrywide helped push the GSEs into conservatorship, which in turn caused the GSEs' investors to lose value, and some federally insured financial institutions were among those investors. *Id.* ¶¶ 130-36.

The Government withdrew that theory for lack of proof, and amended its complaint so that the operative version (the Second Amended Complaint) now alleges that the fraud "affect[ed]" the only two Defendants in this case that are federally insured—Bank of America, N.A. and Countrywide Bank—because:

> Defendants' fraudulent conduct has resulted in significant liabilities [of those two banks] to the GSEs for, among other things, repurchase claims. To date, [Bank of America, N.A.] and/or Countrywide Bank has directly or indirectly paid billions to settle repurchase demands from the GSEs on defective loans, including HSSL loans.

Second Am. Compl. of the United States of America, Dkt. 154, ¶ 141.

Defendants were prepared to demonstrate that these allegations are indisputably wrong as a factual matter: Neither bank suffered a penny of loss from those repurchase demands or in any way incurred "liabilities to the GSEs" because Bank of America Corporation (which is not federally insured) indemnified them for any liability to the GSEs. JA3361; Rule 56.1 Statement of Undisputed Facts in Supp. of the Entity Defs.' Mot. for Summary J., Dkt. 129, ¶¶188-95; Bank Defs.' Memo. of Law in Opp'n to Government's Omnibus Mot. in Limine to Exclude Certain Evidence, Dkt. 222, at 11-12.

The district court excluded evidence of the indemnification agreements, JA1695, and conjured up a theory that the Government itself had never considered and, indeed, that never made its way into the operative complaint. The court held that "if a bank engages in violations of the mail fraud or wire fraud statute, that as a matter of law, … affects the bank." JA4957. The court elaborated on this in an opinion it issued after trial:

> [T]he underlying predicates in this case, as found by the jury, were mail fraud and wire fraud. Any federally insured entity that commits these offenses automatically exposes itself to potential civil and criminal liabilities as a matter of law. Such potential liability is enough to satisfy FIRREA, since even the threat of criminal liability (let alone, as here, the actuality of civil liabilities) is bound to affect any federally insured entity in material fashion.

SA84 (citation omitted).

This has all the strength of a silk thread. The Banks explain why any theory under which a federally insured bank can "affect[]" itself is inconsistent with FIRREA's text, structure, purpose, history, and context. We offer additional reasons to reject the district court's reading. *Infra* I.A. All these arguments apply with equal force to Ms. Mairone—who was acting throughout as Countrywide's agent. *Infra* I.B.

40

## A. The district court's automatic self-affecting theory is a misapplication of § 1833a(c)(2).

Beyond the Banks' analysis regarding the "self-affecting" theory, there are two additional reasons to reject the district court's theory.

First is a textual point. Stripped to its relevant essence, § 1833a(c)(2) reads as follows: "This section applies to a violation of … section … 1341 or 1343 of title 18 [mail and wire fraud] affecting a federally insured financial institution …." That means the Government has no case under FIRREA unless it can show that the "*violation* … affect[s] a federally insured financial institution …." The "violation" here is the accused conduct: selling loans that did not meet the representations and warranties in the GSE contracts.

The district court's theory is not that this alleged *violation* adversely affected Countrywide. The theory is that the alleged violation could yield a lawsuit like this one, and "even the threat" of such a lawsuit "is bound to affect any federally insured entity in material fashion." The "effect," then, does not inhere in the accused conduct itself. Nor does it flow naturally from that conduct. Instead, whether there was any "effect" depended entirely on whether the Government decided to seek penalties under FIRREA. In other words, under the district court's view, the "effect"

41

required by FIRREA is the effect of FIRREA itself. It is the ultimate bootstrap.

That cannot be what Congress meant. If Congress meant for § 1833a(c)(2) to apply anytime a federally insured bank commits one of the listed offenses, it had any number of simpler ways of conveying the point. It could have said: "This section applies to a violation of [the enumerated statutes] *committed by or* affecting a federally insured financial institution" or "to a violation affecting a federally insured financial institution, whether directly or through liability for its own conduct."

Instead, Congress used language that has more limited reach. As this Court has cautioned (in the context of a similarly worded provision of FIRREA), the effect on the financial institution must be "sufficiently direct." *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (citing *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992) (cautioning against effects that are "unreasonably remote")). This standard is not satisfied when the effect depends on "the voluntary actions of a non-conspirator." *United States v. Benson*, 79 F. App'x 813, 829 (6th Cir. 2003); *cf. Hemi Group, LLC v. City of New York*, 559 U.S. 1, 15 (2010) (rejecting a theory of civil RICO liability where "[m]ultiple steps … separate[d] the

42

alleged fraud from the asserted injury"). There is nothing at all "direct," much less "sufficiently direct," about an effect that depends entirely on the voluntary decision of Government lawyers—who were not involved in the accused conduct, not affected by it, and not even involved in the stream of commerce.

Other courts have also recognized that the mere fact that a financial institution was somehow involved in the fraud does not satisfy the "affecting" prong. *See United States v. Agne*, 214 F.3d 47, 52-53 (1st Cir. 2000); *Pelullo*, 964 F.2d at 216 (recognizing that this prong is not satisfied if the "conduct was unreasonably remote"); *United States v. Esterman*, 135 F. Supp. 2d 917, 919 (N.D. Ill. 2001) (following *Agne*). Most notable is the First Circuit's decision holding that a fraud that might have tarnished a bank's reputation did not trigger the same FIRREA provision at issue in *Bouyea*. *See Agne*, 214 F.3d at 52-53. As the First Circuit explained, the Government must prove that the bank suffered "actual financial loss" or a "realistic prospect of loss *because of*" the conduct that violated the wire fraud statute. *Id.* at 53 (emphasis added). Of course, any time a bank violates the mail or wire fraud statute, there will be collateral consequences stemming from the fact that it has violated a federal statute. But FIRREA

43

demands more—that the "*illegal activity* caused" the bank to suffer "actual loss" (or a "risk of loss" that is more than "*de minimis*"). *United States v. Carollo*, No. 10-654, 2011 WL 3875322, at *2 (S.D.N.Y. Aug. 25, 2011) (emphasis added) (relying on *Agne* and *Bouyea* to dismiss wire fraud count that did not "affect" a financial institution).[3]

It is not clear whether the district court really meant that the effect could arise from the mere "threat of criminal liability" or the "potential civil and criminal liabilities." SA84. But if so, that, too, is wrong, as the above-quoted language from the First Circuit confirms. A bank is not "affected … within the plain meaning of that term" unless

---

[3] This is one way in which this case differs from the recent district court cases, *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013), and *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013). While the *Bank of New York Mellon* court held that the risk of liability could qualify as an "effect" for the purpose of § 1833a(c)(2), the liability at issue in that case stemmed from a multitude of suits filed by former customers of the bank who had been defrauded. 941 F. Supp. 2d at 449. And the *Wells Fargo* court cited the fact that the bank had to indemnify the Department of Housing and Urban Development for hundreds of nonconforming loans. 972 F. Supp. 2d at 630-31; *see id.* at 631 n.26 ("The negative effect the Government alleges is not this lawsuit per se, but rather Wells Fargo's exposure to potential legal liability more generally."). Here, there are no other suits that might affect the federally insured banks, and indeed there could not be, because of the indemnification mentioned above (at 39).

the bank suffers "actual financial loss" or "experience[s] … [a] realistic prospect of loss." *Agne*, 214 F.3d at 53.

Second, the district court's reading of § 1833a is breathtaking in scope. Section 1833a authorizes the Government to take a series of criminal offenses that it must prove beyond a reasonable doubt and convert them to civil claims that need only be proved by preponderance. Though the burden of proof is suppressed, the civil penalties can be just as crushing as criminal penalties—as this case illustrates, where the court threw the book at both Ms. Mairone and the Banks. Thus, in assessing the competing interpretations of the statute, it is reasonable to expect that Congress exhibited some semblance of rationality in determining which offenses are subject to these especially harsh consequences and which are not.

Our reading draws a sensible line. The district court's reading, in contrast, drastically expands the scope of the small slice of FIRREA found in § 1833a(c)(2). If "[a]ny federally insured entity that commits these offenses automatically" subjects itself to FIRREA's crushing penalties, then every single claim of fraud—whether by a consumer or a competitor—falls within FIRREA. Any such act that the "federally insured entity … commits"—or that anyone alleges it committed—"exposes [the bank] to

45

potential civil … liabilities."  And § 1833a(c)(2) is not limited to mail and

wire fraud.  By the district court's theory, FIRREA jurisdiction attaches

whenever a rogue bank employee is accused of "mak[ing]" a "false" "claim"

to "any [federal] agency," 18 U.S.C. § 287, or "conceal[ing] … a material

fact" or "makes … any false writing" "in any matter within the jurisdiction

of the executive, legislative, or judicial branch of … the United States," *id.*

§ 1001(a).  The penalties attach to insured banks, even if the violation itself

has no financial consequences for the bank—and, indeed, when the conduct

benefited the bank, as the Government alleged it did here.  Government's

Supp. Memo. of Law in Supp. of Imposition of Civil Penalties, Dkt. 325, at

8-9.  If Congress had intended to empower the Government to seek drastic

civil penalties from financial institutions every time an employee is alleged

to have committed one of these predicate offenses, it would have been more

explicit.  The district court's attempt to achieve that result through an

expansive and unnatural reading of the word "affecting" cannot be squared

with the canon that "[p]unitive statutes, such as FIRREA, are to be

narrowly construed."  *United States v. Vanoosterhout*, 898 F. Supp. 25, 30

(D.D.C. 1995) (citing *Busic v. United States*, 446 U.S. 398, 406 (1980)).

**B.    Ms. Mairone cannot be liable under FIRREA because the fraud she allegedly committed did not "affect" a federally insured financial institution.**

Since the "effect" under § 1833a(c)(2) must come from the conduct itself, not from the Government's decision to punish it, this Court must dismiss the case against Ms. Mairone.  The Government never adduced evidence that the accused conduct had any effect on any federally insured bank—apart from the Government's decision to punish it.

The same result obtains under the Banks' slightly different textual argument—that the word "affect" refers to conduct by someone other than the bank itself, so an accused bank cannot "affect" itself.  The only way a bank can ever act is through the conduct of employees, like Ms. Mairone. *See Braswell v. United States*, 487 U.S. 99, 110 (1988); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). Everything Ms. Mairone did was within the scope of her duties as an FSL employee and in collaboration with her immediate supervisor, Mr. Lumsden, *e.g.*, JA1884, 7176, her colleagues, and the Steering Committee, *e.g.*, JA1858, 1884.  Even the government admitted that there was no evidence that Ms. Mairone personally profited from her role with the HSSL.  Government's Reply Mem. in Further Supp. of FIRREA Civil

47

Penalties, Dkt. 319, at 10. For FIRREA purposes, when Ms. Mairone was acting for the bank, she *was* the bank. If the Government cannot sue the Banks under this reading, then it cannot sue Ms. Mairone either. *See, e.g.*, H.R. Rep. No. 101-54(I), at 118 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 118 (noting that FIRREA was intended to increase civil and criminal penalties for "crimes of fraud *against* financial institutions and depositors" (emphasis added)).

Any other conclusion would be incongruous. A Congress that believed that a bank falls beyond FIRREA's reach when its employees are accused of performing acts that merely affect the bank could not have intended to apply a different rule to the employees who acted for the banks. Just as there is no such thing as an "intracorporate conspiracy" (in which the only "co-conspirators" are employees of the same corporation acting on the corporation's behalf), *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 271 (S.D.N.Y. 2006), there is no such thing as an intracorporate FIRREA claim, where the bank escapes all penalties and the hammer falls exclusively on the employee who acted on the bank's behalf with full authorization and knowledge.

48

## II.   The Government Proved At Most A Breach Of Contract, Not A Fraud.

This case must be dismissed for a second, independent reason: Even accepting all of the Government's allegations and evidence as true, the challenged conduct amounts at most to a breach of contract.

As the Banks explain in their brief, "[f]raud requires much more than simply not following through on contractual or other promises.  It requires a showing of deception at the time the promise is made." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004); *see also* Banks' Br. 41-46 (discussing, inter alia, *Durland* v. *United States*, 161 U.S. 306 (1896)).  Federal courts—and this Court in particular—have consistently applied this rule to mail and wire fraud prosecutions.  This Court said it practically on *Durland*'s 100-year anniversary:  "A breach of contract does not amount to mail fraud." *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994).  Even if intentional, "[f]ailure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract." *Id.* (citing *United States v. Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991)); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (for purposes of both securities fraud and mail and wire fraud, "[i]t does not constitute

49

fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform"); *accord McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992).

Every circuit to address the issue agrees: A plaintiff "*must provide some evidence* that … would tend to show that at the time [the defendant] made [its] representation, [the defendant] had no intention of honoring it." *Corley*, 388 F.3d at 1007 (emphasis added); *see id.* ("The fact that [the defendant] subsequently broke a promise is not evidence that it never intended to keep the promise when made. At most this is evidence of breach of contract, not fraud."); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) ("Nor does a breach of contract in itself constitute a scheme to defraud."); *Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010); *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152-53 (6th Cir. 1987).

Applying the federal mail and wire fraud statutes to conduct that consists of no more than a breach of contract would widen the scope of federal crimes and the powers of prosecutors far beyond what Congress intended or the Constitution allows. Even as things now stand, there is

a "potential for abuse through selective prosecution and the degree of raw political power the freeswinging club of mail fraud affords federal prosecutors." *United States v. Margiotta*, 688 F.2d 108, 143 (2d Cir. 1982) (Winter, J., dissenting). That potential for mischief multiplies the moment federal prosecutors are liberated to bring federal criminal charges against individuals and businesses that did no more than breach a contractual commitment. And to further compound the mischief, once a contract breach becomes a crime, it also becomes a predicate for a civil RICO suit brought by angry counterparties and rivals.

Apart from the strong presumption against reading a statute to abrogate the common law, *see* Banks' Br. 42-43, two additional canons weigh against such an expansive reading of the fraud statutes. The first is the rule of lenity. Federal courts "have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703

(2005) (internal quotation marks omitted); *see Yates v. United States*, 135 S. Ct. 1074, 1088 (2015) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (internal quotation marks omitted)); *Skilling v. United States*, 561 U.S. 358, 410 (2010) (same). The mail and wire fraud statutes being interpreted here are criminal statutes. That they happen to be used here as predicates for a civil action does not change the fact that any interpretation here will apply with equal force to criminal cases. *See Whitman v. United States*, 135 S. Ct. 352, 353-54 (2014) (Scalia, J., respecting denial of certiorari) (listing the "many cases … holding that, if a law has both criminal and civil applications, the rule of lenity governs its interpretation in both settings").

The second is federalism. If any contract claim could be "transmogrified" into a federal criminal charge by the "facile device of charging that the breach was fraudulent," there would be "a wholesale migration of breach of contract suits into the federal courts." *Carr v. Tillery*, 591 F.3d 909, 918 (7th Cir. 2010) (Posner, J.). As the Supreme Court recently admonished, courts should read federal criminal statutes to avoid outcomes that would effect such "a significant change in the

52

sensitive relation between federal and state criminal jurisdiction." *Loughrin v. United States*, 134 S. Ct. 2384, 2392 (2014) (quoting *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014)) (internal quotation marks omitted).

This case falls squarely within the rule that "[f]ailure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract." *D'Amato*, 39 F.3d at 1261 n.8. The evidence at trial proved nothing more than a breach of contractual promises that existed long before Ms. Mairone showed up at FSL. *See* JA4930 ("[T]he particular misrepresentation[s] that we're honing in on in this case are in contracts."). The Government elicited heaps of testimony regarding the contracts and their terms. *E.g.*, JA2714, 2724, 3211-12, 4324. And it offered (disputed) evidence that Ms. Mairone knew the loans that the HSSL process produced were not investment quality. *E.g.*, JA2255, 2302.

But that was all. Ms. Mairone never made a single statement to Fannie or Freddie. JA3041, 3145, 4304-05, 4797. The only evidence of her knowledge of the contracts was a single line of testimony that she knew that the contracts required the loans to be investment quality.

53

JA4324.  And she certainly was not around when Countrywide first entered into its relationship with the GSEs.  *See* JA2747-48.  The contract provisions covered the sale of hundreds of thousands—if not millions—of loans dating back decades, only a small fraction of which were alleged in this case to have been fraudulent.[4]

The Government's theory hinged largely on the assertion that this was a *knowing* breach of the promises contained in the contracts, in that Ms. Mairone was aware that loan quality was suffering under the HSSL process.  *E.g.*, JA2255, 2302.  And at closing argument, the government focused on the fact that Ms. Mairone did not take it upon herself to inform Fannie or Freddie about this possible breach.  JA5041.  But as a matter of law, even "alleged concealment of a breach is insufficient to transform what would normally be a breach of contract action into one for fraud."  *Reuben H. Donnelly Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 290 (S.D.N.Y. 1995); *see Ikea N. Am. Servs., Inc. v. Ne. Graphics, Inc.*, 56 F. Supp. 2d 340 (S.D.N.Y. 1999)

---

[4] The fact that the Fannie contract was renewed in December 2007 and January 2008 due to "a change in the name of the legal entity," JA2748, is irrelevant both because there was no evidence of a substantive change to the contracts and because there was no evidence that Ms. Mairone was aware of those renewals.

54

(Rakoff, J.) ("[E]ven intentionally misleading statements by a defendant falsely indicating an intent to perform under a contract and/or concealing a breach of the contract do not give rise to an action for fraud."). Nor is it fraudulent to breach a contract intentionally. *See Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750-51 (7th Cir. 1988) (Posner, J.) (explaining the concept of efficient breach, which, by its very nature, is intentional).

The folly of the Government's contrary reading of the mail and wire fraud statutes is readily apparent. Imagine that Ms. Mairone had rented an apartment when she moved to California to begin working at FSL. The term of the lease was for one year, and the lease contained a continuing representation and warranty that, at the time of every rent payment, Ms. Mairone was employed. If Ms. Mairone lost her job after the eighth month, but continued to mail her rent payment until the lease terminated without notifying her landlord of her unemployment, that would be an intentional breach of the lease agreement's representation and warranty. But under the Government's theory, that would also violate the federal mail fraud statute and make her subject to up to 20 years in prison. Congress could not possibly have intended,

55

nor do federalism principles allow, such a result. Instead, applying the longstanding distinction between breach of contract and fraud, she would not be guilty of federal mail fraud because she did not enter into the lease agreement intending to violate it. She breached the representation and warranty in the pre-existing contract, which she executed in good faith, but she did not commit fraud.

That is no different than what happened here. When Countrywide first entered into its agreements with Fannie and Freddie, it promised to sell investment quality loans. The Government alleges that years later (almost 30 years in the case of the Fannie contract), FSL produced loans that were not investment quality for sale to the GSEs. If the Government's allegations are true, then Defendants may have breached their contracts with the GSEs, and the GSEs were entitled to exercise their repurchase rights under the contracts, or to bring suit themselves against Defendants for breach of contract. The Government's characterization of this conduct as mail or wire fraud subject to federal criminal prosecution, however, goes much too far.

## III. The District Court Erred By Preventing Defense Witnesses From Testifying That They Believed The HSSL Process Yielded Quality Loans.

The Banks cogently explain (in Point IV) how the district court further gutted the defense by precluding defense witnesses from describing their contemporaneous views that the HSSL process was unobjectionable and did not undermine loan quality. We supplement here with a bit more detail on how the district court's rulings evolved into an unfair, and highly prejudicial, double standard.

The district court's initial rulings about the limits on witness testimony were unobjectionable. The Government had moved "to preclude Defendants from presenting evidence or argument concerning the character for truthfulness or honesty of any individual" as inadmissible character evidence under Rule 404. Mem. of Law in Supp. of the United States of America's Omnibus Motion in Limine to Exclude Certain Evidence, Dkt. 162, at 6. Similarly, the Government moved to exclude "lay witnesses' opinions consisting of legal conclusions including, e.g., opinions regarding the fraudulent intent of Bank Defendant employees or whether certain conduct constitutes fraud." *Id.*

57

at 9.  The district court granted both motions without comment or
argument.  JA1695.

The first half of the trial proceeded accordingly.  The Government
avoided questions about character or legal conclusions.  But, as the Banks
discuss (at 66), the Government elicited extensive testimony from its
witnesses regarding concerns they had about the HSSL process.  When it
came to the defense case, everything changed.  During the direct
examination of a process engineer named Mark Barnett (who was
integrally involved in the design of the HSSL, JA3965, 3970), defense
counsel asked whether he supported the Quality of Grade suspension.
JA4013.  The Government objected, and the court drastically altered the
scope of its prior rulings.  It held that Mr. Barnett's opinion of the
suspension would be inadmissible unless he expressed it to Mr. Lumsden,
Mr. Kitashima, or Ms. Mairone.  JA4014.  The court explained:

> Where I've been drawing the line, I hope consistently, is to the state
> of mind of those persons who the government identified as the
> persons on whom they would hang corporate civil liability [Mr.
> Lumsden, Mr. Kitashima, and Ms. Mairone].  You can inquire into
> their states of mind.  But other people's states of mind are not
> relevant, except under unusual circumstances.

JA4014.  Of course, the court was *not* drawing the line consistently.  As the
Banks explain (at 66), the Government had elicited reams of testimony

58

regarding the "states of mind" of various FSL employees—any concern about the HSSL process or any other decision that Ms. Mairone or other FSL leadership made. The district court admitted the testimony whether or not the witness had expressed that view to Mr. Lumsden, Mr. Kitashima, or Ms. Mairone. In fact, it would have been *impossible* to "draw[] the line … consistently" because the Government never identified the three "persons on whom they would hang corporate civil liability" until *after* the Government rested. JA3516.

As the Banks explain (at 67-69), this expansion of the court's earlier ruling prevented Defendants from putting on some of their most potent evidence to rebut the Government's allegations of an intent to harm the GSEs. This testimony would have been highly probative for reasons the Banks offer—but especially so for Ms. Mairone. The Government's case revolved around the allegation that Ms. Mairone knew that the HSSL loans were of poor quality, in large part based on QA and QC numbers. *E.g.*, JA5012, 5018-19, 5021-24, 5028, 5035. And the Government repeatedly hammered the Quality of Grade suspension and the decision to suspend circulation of QA reports to loan specialists as evidence that Ms. Mairone did not care about loan quality. *E.g.*, JA5025-29, 5149, 5154.

59

Indeed, the Government singled out Ms. Mairone repeatedly at summation, criticizing her conclusions regarding the import of the QA numbers and the Quality of Grade suspension. *E.g.*, JA5028 (calling Ms. Mairone's testimony regarding her focus on quality "completely ridiculous"); *see also* JA5027 ("Ms. Mairone was not worried about loan quality, she was concerned about speed and production."). Clearly the Government thought it was relevant when Michael Thomas and Mr. O'Donnell testified again and again that they disagreed with the HSSL process and were concerned about the QA and QC numbers. Ms. Mairone should have had the same opportunity to present contrary evidence that FSL employees who had access to the same information as Mr. Thomas and Mr. O'Donnell came to different conclusions about the quality of the HSSL loans. Especially in a case like this one, where Ms. Mairone did not have a single contemporaneous conversation or send a single email indicating that she believed the loans would be of lower quality or that she intended to trick the purchasers, this evidence could easily have persuaded the jury that Ms. Mairone was honestly and legally engaging in an intricate balancing act to administer a massive shift in business focus, with no intention of deceiving anyone.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in the Banks' Brief, this Court should reverse the judgment against Ms. Mairone because the Government did not allege a proper violation of FIRREA's "affecting" prong, because the Government alleged no more than a mere breach of contract, and because the Government presented insufficient evidence of a material misrepresentation. At a minimum, this Court should vacate the judgment and remand for a new trial in light of the erroneous evidentiary rulings that prevented Defendants from mounting an effective defense. If this Court chooses to remand for a new trial, Ms. Mairone joins the Banks' request that the case be reassigned to a new district court judge for the reasons the Banks explain at pages 90-91 of their Brief.

Dated:  April 22, 2015

Respectfully Submitted,

*/s/ E. Joshua Rosenkranz*

Marc L. Mukasey                E. Joshua Rosenkranz
Michael C. Hefter              Alec E. Orenstein
Ryan M. Philp                  ORRICK, HERRINGTON
Seth M. Cohen                   & SUTCLIFFE LLP
BRACEWELL & GIULIANI LLP        51 West 52nd Street
1251 Avenue of the Americas    New York, NY  10019
New York, NY  10020            (212) 506-5000
(212) 508-6100

                               Robert M. Loeb
                               Kelsi Brown Corkran
                               ORRICK, HERRINGTON
                                & SUTCLIFFE LLP
                               Columbia Center
                               1152 15th Street, NW
                               Washington, DC  20005
                               (202) 339-8400

*Attorneys for Defendant-Appellant Rebecca Mairone*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure Rule 32(a)(7)(B) because it contains 12,314 words, based on the "Word Count" feature of Microsoft Word 2010, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using 14-point Century Schoolbook font.

Dated: April 22, 2015

*/s/ E. Joshua Rosenkranz*

E. Joshua Rosenkranz

ORRICK, HERRINGTON & SUTCLIFFE LLP

*Attorney for Defendant-Appellant*
*Rebecca Mairone*