# 15-496(L)

## 15-499(CON)

*To Be Argued By*:
PIERRE G. ARMAND

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket Nos. 15-496(L), 15-499(CON)

UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,

*Plaintiff-Appellee,*

—v.—

REBECCA MAIRONE, COUNTRYWIDE BANK, FSB, COUNTRY-
WIDE HOME LOANS, INC., BANK OF AMERICA, N.A.,

*Defendants-Appellants,*

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for Plaintiff-Appellee.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2724

PIERRE G. ARMAND,
JOSEPH N. CORDARO,
CARINA H. SCHOENBERGER,
BENJAMIN H. TORRANCE,
   *Assistant United States Attorneys,*
      *Of Counsel.*

BANK OF AMERICA CORPORATION, successor to Countrywide
Financial Corporation, and FULL SPECTRUM LENDING,
COUNTRYWIDE FINANCIAL CORPORATION,

*Defendants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . .  4

Questions Presented  . . . . . . . . . . . . . . . . . . . . . . .  4

Statement of the Case . . . . . . . . . . . . . . . . . . . . . .  5

    A.   Procedural History . . . . . . . . . . . . . . . . . . . .  5

    B.   Facts Proved at Trial . . . . . . . . . . . . . . . . . .  7

        1.   Countrywide's Representations to the GSEs Regarding the Loans It Sold . . . . . . . . . . . . . . . . . . . . . . . . .  7

        2.   The 2007 Subprime Market Collapse Intensifies Focus on Quality . . . . . . . . .  8

        3.   FSL Devises the HSSL Loan Origination Process to Boost Revenues. . . . . . . . . . . . . . . . . . . . . . . .  9

        4.   Defendants Knew That the HSSL Would Produce Defective Loans . . . . .  12

        5.   Defendants Roll Out and Expand the HSSL Despite Knowledge of Poor Loan Quality . . . . . . . . . . . . . . . .  13

        6.   Defendants Continued to Ignore Poor Quality and Pushed for More Production . . . . . . . . . . . . . . . . . . . . . .  15

ii

PAGE

7. Quality Control Reviews Find
Elevated Defect Rates . . . . . . . . . . . .   16

8. FSL Tried to Create Appearance of
Quality with the "Sprint Incentive"
and "Poker Run" . . . . . . . . . . . . . . . . .   18

9. Expert Evidence Confirmed the
Poor Quality of HSSL Loans Sold
to the GSEs. . . . . . . . . . . . . . . . . . . . .   18

10. Throughout the HSSL, Countrywide
Misrepresented Facts to the GSEs . . .   19

C. Civil Penalties. . . . . . . . . . . . . . . . . . . . . . .   20

Summary of Argument  . . . . . . . . . . . . . . . . . . . . . .   21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . .   25

POINT I—The Bank May Be Held Liable
Under FIRREA for Committing Fraud
Affecting Itself . . . . . . . . . . . . . . . . . . . . . . . . . .   26

A. FIRREA Civil Penalties Apply to
Financial Institutions' Conduct
Affecting Themselves . . . . . . . . . . . . . . . . .   26

1. The Plain Text of § 1833a Imposes
Liability on Financial Institutions for
Violations "Affecting" the Institutions
Themselves. . . . . . . . . . . . . . . . . . . . . .   26

iii

PAGE

2. FIRREA's Structure Confirms That Financial Institutions May Be Liable for Frauds That Affect Themselves . .   30

3. FIRREA's Administrative Penalty Provisions Do Not Exempt Financial Institutions from Further Liability . .   33

4. FIRREA's Legislative Purpose and History Establish That Congress Intended Financial Institutions to Be Liable for Frauds Putting Their Own Deposits at Risk . . . . . . . . . . . . . . . . . .   35

B. The Fraud Proved at Trial Affected the Bank . . . . . . . . . . . . . . . . . . . . . . . . . .   39

C. The District Court Correctly Held That Bank of America Was Affected Within the Meaning of FIRREA . . . . . . . . . . . . . .   42

POINT II— The Bank's Contractual Relationship with the GSEs Does Not Immunize Defendants from Liability for Mail or Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

POINT III— The District Court Properly Excluded Evidence That Non-HSSL Loans Were of Comparably Poor Quality to HSSL Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

A. Evidence That Countrywide Sold Equally Defective Non-HSSL Loans to the GSEs Was Not Relevant . . . . . . . . .   52

iv

PAGE

B. The Government Did Not Open the Door to the Excluded Evidence of Comparative Quality . . . . . . . . . . . . . . . . . 55

C. The Court Properly Prohibited Cross-Examination of the Government's Experts Concerning Non-HSSL Loans . . . 57

D. If the Trial Court Erred in Excluding Evidence Comparing the Quality of HSSL and Non-HSSL Loans, the Error Was Harmless . . . . . . . . . . . . . . . . . . . . . . . 59

POINT IV— There Was Ample Evidence That Defendants' Misrepresentations Were Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

A. Defendants' Claim That the GSEs Should Have Known They Were Buying Bad Loans and That HSSL Loans Were Good Was Unsupported By the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 61

B. Defendants' Claim That Countrywide's "Final" Quality Control Reports Proved That HSSL Loans Were Good Was Unsupported by the Evidence . . . . . . . . . . 63

C. Defendants' Argument That Quality Assurance Reports Had Nothing to Do with Quality Was Unsupported by the Evidence . . . . . . . . . . . . . . . . . . . . . . . . 66

v

PAGE

    D.  The Government's Expert Testimony
        Concerning the Poor Quality of HSSL
        Loans Was Reliable . . . . . . . . . . . . . . . . . .  67

POINT V— The District Court Appropriately
        Excluded Opinion Testimony from Defense
        Witnesses That They Believed the HSSL
        Process Was "Proper" . . . . . . . . . . . . . . . . . . . .  70

POINT VI— The District Court Did Not Abuse Its
        Discretion in Determining Civil Penalties
        Against the Bank. . . . . . . . . . . . . . . . . . . . . . . .  74

    A.  The Court Correctly Applied a Gross
        Measurement of "Pecuniary Gain" and
        "Pecuniary Loss" for Purposes of
        Determining the Maximum
        Civil Penalty . . . . . . . . . . . . . . . . . . . . . . . .  75

        1.  The Terms "Pecuniary Gain" and
            "Pecuniary Loss" Are Broad Terms
            That Encompass Gross Gain and
            Loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

        2.  Limiting Pecuniary Gain or Loss to
            Net Gain or Loss Would Subvert
            FIRREA's Punitive and Deterrent
            Purposes . . . . . . . . . . . . . . . . . . . . . . . .  77

    B.  The Fraud Proximately Caused the
        Pecuniary Loss . . . . . . . . . . . . . . . . . . . . . . .  83

vi

PAGE

POINT VII— The Bank's Request for
Reassignment to a New District Judge
Should Be Rejected . . . . . . . . . . . . . . . . . . . . . . .  87

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89

vii

## TABLE OF AUTHORITIES

*Cases*:

*Advance Pharmaceutical, Inc. v. United States*,
   391 F.3d 377 (2d Cir. 2004) . . . . . . . . . . . . . . . . 79

*Apple v. Jewish Hospital & Medical Ctr.*,
   829 F.2d 326 (2d Cir. 1987) . . . . . . . . . . . . . . . . 88

*Blank v. Baronowski*,
   959 F. Supp. 172 (S.D.N.Y. 1997) . . . . . . . . . 49, 50

*Bogle-Assegai v. Connecticut*,
   470 F.3d 498 (2d Cir. 2006) . . . . . . . . . . . . . . . . 83

*Bogoni v. Gomez*,
   847 F. Supp. 2d 519 (S.D.N.Y. 2012) . . . . . . . . . . 76

*Boyle v. United States*,
   556 U.S. 938 (2009). . . . . . . . . . . . . . . . . . . . . . 30, 35

*Brick v. Cohn-Hall-Marx Co.*,
   276 N.Y. 259 (1937) . . . . . . . . . . . . . . . . . . . . 49, 50

*Bridgestone/Firestone Inc. v. Recovery Credit
   Services, Inc.*,
   98 F.3d 13 (2d Cir. 1996) . . . . . . . . . . . . . . . . 46, 50

*Cameron v. City of New York*,
   598 F.3d 50 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 25

*Carr v. Thompson*,
   87 N.Y. 160 (1881). . . . . . . . . . . . . . . . . . . . . . . . 49

*Corley v. Rosewood Care Ctr., Inc.*,
   388 F.3d 990 (7th Cir. 2004) . . . . . . . . . . . . . . . . 44

viii

PAGE

*Durland v. United States,*
    161 U.S. 306 (1896) . . . . . . . . . . . . . . . . . . . . . . . 47

*Feine v. McGowan,*
    188 F.2d 738 (2d Cir. 1951) . . . . . . . . . . . . . . . . 76

*First Bank of the Americas v. Motor Car Funding,*
    257 A.D.2d 287 (N.Y. App. Div.
    1st Dep't 1999) . . . . . . . . . . . . . . . . . . . . . . . . 45, 51

*FTC v. Bronson Partners, LLC,*
    654 F.3d 359 (2d Cir. 2011) . . . . . . . . . . . . . . . . 79

*FTC v. Verity International, Ltd.,*
    443 F.3d 48 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 79

*Grynberg v. Citation Oil & Gas Corp.,*
    573 N.W.2d 493 (S.D. 1997) . . . . . . . . . . . . . 48, 49

*Heli-Coil Corp. v. Webster,*
    352 F.2d 156 (3d Cir. 1965) . . . . . . . . . . . . . . . . 76

*Hudson v. United States,*
    522 U.S. 93 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 78

*Hugo Boss Fashions, Inc. v. Federal Ins. Co.,*
    252 F.3d 608 (2d Cir. 2001) . . . . . . . . . . . . . . . . 25

*Hynes v. Coughlin,*
    79 F.3d 285 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 59

*Jones v. Kelly,*
    280 P. 942 (Cal. 1929) . . . . . . . . . . . . . . . . . . . . . 48

*Kaye v. Grossman,*
    202 F.3d 611 (2d Cir. 2000) . . . . . . . . . . . . . . . . 25

ix

PAGE

*Kirsch v. Fleet Street, Ltd.*,
  148 F.3d 149 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 25

*Lerner v. Fleet Bank, N.A.*,
  318 F.3d 113 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 87

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 89

*Liteky v. United States*,
  510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . . . . . . . 88

*Malek v. Federal Ins. Co.*,
  994 F.2d 49 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 59

*Maracich v. Spears*,
  133 S. Ct. 2191 (2013) . . . . . . . . . . . . . . . . . . . . . 30

*MBIA Insurance Corp. v. Countrywide
  Home Loans, Inc.*,
  87 A.D.3d 287 (N.Y. App. Div. 1st Dep't 2011) . . 51

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 44

*Mobile Life Insurance Co. v. Randall*,
  74 Ala. 170 (1883) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Neder v. United States*,
  527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . *passim*

*Paroline v. United States*,
  134 S. Ct. 1710 (2014) . . . . . . . . . . . . . . . . . . 83, 84

*Pennsylvania Dep't of Corrections v. Yeskey*,
  524 U.S. 206 (1998) . . . . . . . . . . . . . . . . . . . . . . . 32

x

PAGE

*Pescatore v. Pan American World Airways, Inc.*,
   97 F.3d 1 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . 88

*In re Refco Inc. Securities Litigation*,
   826 F. Supp. 2d 478 (S.D.N.Y. 2011) . . . . . . . . . 46

*Rich v. New York Central & Hudson River
   Railroad Co.*,
   87 N.Y. 382 (1882). . . . . . . . . . . . . . . . . . . . . 47, 48

*Robinson Helicopter Co. v. Dana Corp.*,
   102 P.3d 268 (Cal. 2004). . . . . . . . . . . . . . . . 48, 49

*SEC v. DiBella*,
   587 F.3d 553 (2d Cir. 2009) . . . . . . . . . . . . . . . 79

*SEC v. Monterosso*,
   756 F.3d 1326 (11th Cir. 2014) . . . . . . . . . . . . 77

*SEC v. Pentagon Capital Management PLC*,
   725 F.3d 279 (2d Cir. 2013) . . . . . . . . . . . . . . . 26

*SEC v. Sargent*,
   329 F.3d 34 (1st Cir. 2003). . . . . . . . . . . . . . . . 78

*Smith v. Weber*,
   16 N.W.2d 537 (S.D. 1944) . . . . . . . . . . . . . . . 48

*Stampf v. Long Island Railroad Co.*,
   761 F.3d 192 (2d Cir. 2014) . . . . . . . . . . . . . . . 26

*Stock v. City of Boston*,
   149 Mass. 410 (1889) . . . . . . . . . . . . . . . . . . . . 48

*Sullivan v. Stroop*,
   496 U.S. 478 (1990). . . . . . . . . . . . . . . . . . . . . 29

PAGE

*Taylor v. Vermont Dep't of Education,*
   313 F.3d 768 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 88

*Tiara Condominium Ass'n, Inc. v. Marsh &*
   *McLennan Cos.,*
   110 So. 3d 399 (Fla. 2013) . . . . . . . . . . . . . . . . . . 49

*Tull v. United States,*
   481 U.S. 412 (1987). . . . . . . . . . . . . . . . . . . . . . . . 79

*United States ex rel. Onnen v. Sioux Falls*
   *Independent School District,*
   688 F.3d 410 (8th Cir. 2012) . . . . . . . . . . . . . . . . 35

*United States v. A&P Trucking Co.,*
   358 U.S. 121 (1958). . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Agne,*
   214 F.3d 47 (1st Cir. 2000). . . . . . . . . . . . . . . . . . 39

*United States v. Aumais,*
   656 F.3d 147 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 84

*United States v. Autuori,*
   212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 52

*United States v. Awadallah,*
   436 F.3d 125 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 87

*United States v. Bank of New York Mellon,*
   941 F. Supp. 2d 438 (S.D.N.Y. 2013) . . . . . . *passim*

*United States v. Bouyea,*
   152 F.3d 192 (2d Cir. 1998) . . . . . . . . . . . . . 28, 42

*United States v. Collins,*
   361 F.3d 343 (7th Cir. 2004) . . . . . . . . . . . . . . . . 29

xii

PAGE

*United States v. Corsey,*
  723 F.3d 366 (2d Cir. 2013) . . . . . . . . . . . . . . 55, 63

*United States v. Countrywide Financial Corp.,*
  961 F. Supp. 2d 598 (S.D.N.Y. 2013) . . . . . . . . . 27

*United States v. D'Amato,*
  39 F.3d 1249 (2d Cir. 1994) . . . . . . . . . . . . . . 49, 50

*United States v. Frank,*
  156 F.3d 332 (2d Cir. 1998) . . . . . . . . . . . . . . . . 44

*United States v. Ghavami,*
  10 Cr. 1217, 2012 WL 2878126
  (S.D.N.Y. July 13, 2012) . . . . . . . . . . . . . . . . . 39, 77

*United States v. Giovannetti,*
  919 F.2d 1223 (7th Cir. 1990) . . . . . . . . . . . . . . . 73

*United States v. Goldstein,*
  442 F.3d 777 (2d Cir. 2006) . . . . . . . . . . . . . . . . 80

*United States v. Gotti,*
  459 F.3d 296 (2d Cir. 2006) . . . . . . . . . . . . . . . . 63

*United States v. Haynes,*
  729 F.3d 178 (2d Cir. 2013) . . . . . . . . . . . . . . 74, 75

*United States v. Heinz,*
  ___ F.3d ___, No. 13-3119,
  2015 WL 3498664 (2d Cir. Jun. 4, 2015)  . . *passim*

*United States v. Hoffecker,*
  530 F.3d 137 (3d Cir. 2008) . . . . . . . . . . . . . . . . 29

*United States v. Johnson,*
  130 F.3d 1352 (9th Cir. 1997) . . . . . . . . . . . . . . . 41

xiii

PAGE

*United States v. Kaplan,*
 490 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 73

*United States v. Kozemy,*
 667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 73

*United States v. Kumar,*
 617 F.3d 612 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 82

*United States v. Lane,*
 194 F. Supp. 2d 758 (N.D. Ill. 2002) . . . . . . . . . . 80

*United States v. Lizza Industries,*
 775 F.2d 492 (2d Cir. 1985) . . . . . . . . . . 78, 79, 82

*United States v. Millar,*
 79 F.3d 338 (2d Cir. 1996) . . . . . . . . . . . . . . . 41, 80

*United States v. Mullins,*
 613 F.3d 1273 (10th Cir. 2010) . . . . . . . . . . . . . . 39

*United States v. Naiman,*
 211 F.3d 40 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . 44

*United States v. Patrisso,*
 262 F.2d 194 (2d Cir. 1958) . . . . . . . . . . . . . . . . . 73

*United States v. Pelullo,*
 964 F.2d 193 (3d Cir. 1992) . . . . . . . . . . . . . . . . . 28

*United States v. Rea,*
 958 F.2d 1206 (2d Cir. 1992) . . . . . . . . . . . . . . . . 72

*United States v. Rowe,*
 56 F.2d 747 (2d Cir. 1932) . . . . . . . . . . . 41, 50, 79

*United States v. Schultz,*
 333 F.3d 393 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 73

xiv

PAGE

*United States v. Serpico*,
   320 F.3d 691 (7th Cir. 2003) . . . . . . . . . . . . . 28, 39

*United States v. Turk*,
   626 F.3d 743 (2d Cir. 2010) . . . . . . . . . 84, 86, 87

*United States v. Uddin*,
   551 F.3d 176 (2d Cir. 2009) . . . . . . . . . . . . . . . 82

*United States v. Van Brocklin*,
   115 F.3d 587 (8th Cir. 1997) . . . . . . . . . . . . . . 32

*United States v. Wells Fargo Bank, N.A.*,
   972 F. Supp. 2d 593
   (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . 27, 30, 32, 39

*United States v. Yu-Leung*,
   51 F.3d 1116 (2d Cir. 1995) . . . . . . . . . . . . . . . 88

*Vernon Fire & Casualty Insurance Co. v. Sharp*,
   349 N.E.2d 173 (Ind. 1976) . . . . . . . . . . . . . . . 48

*Statutes*:

12 U.S.C § 1833a . . . . . . . . . . . . . . . . . . . . . . . *passim*

12 U.S.C. § 1818 . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

15 U.S.C. § 645 . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

18 U.S.C. § 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

18 U.S.C. § 1005 . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 1014 . . . . . . . . . . . . . . . . . . . . . . . . . . 32

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . 27, 44

xv

PAGE

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 44

18 U.S.C. § 3293(2) . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 U.S.C. § 3729(a) . . . . . . . . . . . . . . . . . . . . . . . . 81

*Rules and Guidelines*:

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Fed. R. Civ. P. 50(b) . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . 80, 84

*Legislative History*:

H.R. Rep. No. 101-54(I) (1989),
    1989 U.S.C.C.A.N. 86 . . . . . . . . . . . . . . . 36, 37, 38

H.R. Rep. No. 101-54(V) (1989),
    1989 U.S.C.C.A.N. 397 . . . . . . . . . . . . . . . . . . . . 34

H.R. Rep. No. 100-1088 (1989) . . . . . . . . . . . . . . . . 37

S. Rep. No. 101-19 (1989) . . . . . . . . . . . . . . . . . . . . 36

101st Cong. 13 (1989) . . . . . . . . . . . . . . . . . . . . . . . 37

135 Cong. Rec. S3993-01
    (daily ed. Apr. 17, 1989) . . . . . . . . . . . . . . . . . . . 37

xvi

PAGE

Remarks by President Bush Upon Signing
H.R. 1248 into Law, 1989 WL 1178375
(Aug. 9, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 15-496(L), 15-499(Con)

———————

UNITED STATES OF AMERICA *EX REL.*
EDWARD O'DONNELL,

*Plaintiff-Appellee,*

—v.—

REBECCA MAIRONE, COUNTRYWIDE BANK, FSB,
COUNTRYWIDE HOME LOANS, INC.,
BANK OF AMERICA, N.A.,

*Defendants-Appellants,*

BANK OF AMERICA CORPORATION, SUCCESSOR TO
COUNTRYWIDE FINANCIAL CORPORATION, AND
FULL SPECTRUM LENDING,
COUNTRYWIDE FINANCIAL CORPORATION,

*Defendants.*

———————

## BRIEF FOR PLAINTIFF-APPELLEE

———————

### Preliminary Statement

In 2007, as the mortgage industry was imploding and the financial system as a whole was on the precipice of the worst economic crisis since the Great Depression, Countrywide Home Loans, Inc., and Coun-

trywide Bank, FSB, engaged in a profit-driven scheme to defraud government-sponsored enterprises, Fannie Mae and Freddie Mac (the "GSEs")—knowingly selling the GSEs thousands of defective and risky residential mortgage loans by misrepresenting them as quality investments.

The government established at trial that Countrywide's Full Spectrum Lending Division ("FSL") rolled out a new mortgage loan-origination process, called the High Speed Swim Lane (the "HSSL" or "Hustle"), that caused a precipitous drop in the quality of its loans. The HSSL dramatically increased the speed at which Countrywide issued loans to borrowers by removing the safeguards that ensured that the loans could be repaid. In particular, defendants eliminated underwriters, the skilled personnel who evaluated whether borrowers could repay loans, and replaced them with unskilled and undertrained clerks. Countrywide then encouraged these clerks to fund as many loans as possible, as quickly as possible, without regard to the quality of the loans.

The HSSL, championed and managed by FSL Chief Operating Officer Rebecca Mairone, began in August 2007. Countrywide knew from the beginning that the HSSL would generate high levels of bad loans and that the loans would be sold to the GSEs, but continued to represent that the defective loans were investment quality, as required by the contract between the GSEs and Countrywide. Countrywide and Mairone persisted because they wanted to hit their funding goals. Multiple FSL employees objected to the HSSL process and repeatedly warned FSL

3

management, including Mairone, that it would increase the number of bad loans. Their views were dismissed. Internal quality reviews immediately showed high loan defect rates month after month. But Countrywide ignored the defect rates, and expanded the HSSL to more funding centers and more risky types of loans. By the time the HSSL was shut down in May 2008, Countrywide had sold tens of thousands of materially defective loans to the GSEs with false representations about their quality.

The government brought a civil fraud action against defendants pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which authorizes the government to seek civil penalties from whoever violates certain criminal fraud statutes in a way that affects financial institutions. As the evidence showed, Countrywide and Mairone committed just such frauds. Accordingly, the jury found the defendants liable, and the district court imposed FIRREA's penalties.

On appeal, defendants seek to escape that liability, but none of their arguments have merit. Their frauds clearly affected a financial institution— Countrywide itself—satisfying the plain terms of the statutory text. And as long as the elements of fraud have been proven, the fact that the misrepresentations at issue were also a breach of the contracts between Countrywide and the GSEs is immaterial. Nor is a comparison of HSSL loans to non-HSSL loans, or various former employees' beliefs about the quality of the loan-origination process, relevant to whether Countrywide committed fraud. Finally, the district

4

court properly calculated the $1.27 billion civil penalty based on the gross amount the GSEs paid to Countrywide in connection with the fraud.

In short, defendants have failed to demonstrate that the jury's finding of fraud or the civil penalties imposed by the district court should be disturbed. The Court should affirm.

## Jurisdictional Statement

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345. The district court entered final judgment on July 31, 2014. (Special Appendix ("SPA") 105-106). Defendants filed timely motions under Federal Rules of Civil Procedure 50(b) and 59 on August 28, 2014, which were denied on February 3, 2015 (SPA 107-121). Defendants then filed timely notices of appeal on February 20, 2015. (SPA 122-125). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Questions Presented

1. Whether FIRREA, which authorizes the government to seek civil penalties from "[w]hoever violates" the mail and wire fraud statutes in a manner "affecting a federally insured financial institution," 12 U.S.C. § 1833a(a), (c)(2), makes federally insured financial institutions liable for committing frauds affecting themselves.

2. Whether a defendant is liable for committing mail and wire fraud where the government has proven all of the elements of fraud, including fraudulent intent, but the defendant's misrepresentations also

breach a contract between the defendant and the victim.

3. Whether the district court acted within its discretion in excluding evidence that defendants contemporaneously created other loans of similarly poor quality to the defective loans at issue in this case.

4. Whether the district court correctly concluded that the government presented sufficient evidence that defendants' misrepresentations were material.

5. Whether the district court acted within its discretion in excluding testimony from former Countrywide employees whose mental states were not at issue, opining about the propriety of HSSL processes and their results.

6. Whether the district court acted within its discretion in determining civil penalties based on the amount defendants fraudulently induced the GSEs to pay for HSSL loans.

7. Whether this Court should reassign this matter to a new district judge in the event of a remand.

## Statement of the Case

### A. Procedural History

This matter arose from a complaint filed on February 24, 2012, by Edward O'Donnell under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. The government filed a complaint against Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, and Countrywide Home Loans, Inc., on October 24,

2012, under FIRREA and the False Claims Act. (Joint Appendix ("JA") 55-100). On January 11, 2013, the government filed an amended complaint adding defendants Countrywide Bank, FSB, and Rebecca Mairone, the former Chief Operating Officer of FSL. (JA 101-164). By order dated May 8, 2013 (SPA 1-2) and opinion dated August 16, 2013 (SPA 3-26), the district court (Jed S. Rakoff, J.) denied defendants' motions to dismiss the FIRREA claims, but dismissed the FCA claims. Following discovery, defendants' motions for summary judgment were denied on September 9, 2013. (SPA 29, 79-85).

On September 6, 2013, the government filed a second amended complaint. (JA 1317-1369). The government then voluntarily dismissed its claims against Bank of America Corporation and Countrywide Financial Corporation, leaving Countrywide Bank FSB and Countrywide Home Loans, Inc. (collectively, "Countrywide") and Bank of America, N.A. ("Bank of America"—together with Countrywide, the "Bank") as the remaining financial institution defendants. (JA 1717).[1] The district court decided the parties' motions *in limine* on September 24, 2013. (JA 1694-1714). The case was tried to a jury between September 24, 2013, and October 23, 2013, and the jury found that the government had proved defendants had committed fraud. (JA 5224). Following the verdict, the parties submitted evidence regarding

---

[1] Bank of America is the successor to Countrywide pursuant to a merger. (Plaintiff-Appellee's Appendix ("GA") 4, 22-23).

7

penalties, which the district court imposed on July 30, 2014. (SPA 86-104). Final judgment was entered on July 31, 2015. (SPA 105-106). On February 3, 2015, the court denied defendants' motions for judgment notwithstanding the verdict or new trial. (SPA 107-121). This appeal followed.

## B. Facts Proved at Trial

### 1. Countrywide's Representations to the GSEs Regarding the Loans It Sold

Fannie Mae and Freddie Mac are government sponsored enterprises that purchase mortgage loans from lenders such as Countrywide to allow the lenders to free up capital to issue more loans to borrowers. (JA 2709-2710, 2958-2959). The volume of loans the GSEs purchase is far too great for the GSEs to review or re-underwrite themselves before purchase; thus the GSEs rely heavily on lenders to ensure the quality of the loans they buy through representations and warranties. (JA 1810, 2709-2710, 2974-2975, 3220).

Pursuant to contracts, Countrywide represented to the GSEs at the time of transfer or delivery that each loan it sold to the GSEs was "investment quality" or an "acceptable investment." (JA 5905, 5908, 5935, 5938, 6366, 6368). According to Countrywide's own underwriting manual, an investment-quality loan is one "that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual (CTM) and Loan Program Guides (LPGs)." (JA 5959).

8

Freddie Mac uses essentially the same definition of "investment quality" as Countrywide (JA 2977-2978, 6368), and Fannie Mae requires lenders to represent that they know "of nothing involving the mortgage . . . that can reasonably be expected to: cause private institutional investors to regard the mortgage as an unacceptable investment; cause the mortgage to become delinquent; or adversely affect the mortgage's value or marketability," which is synonymous with investment quality. (JA 2720-2721, 3219-3220, 5905, 5908, 5935, 5938).

## 2. The 2007 Subprime Market Collapse Intensifies Focus on Quality

Following the collapse of the subprime market, FSL, previously the subprime lending division of Countrywide, was transformed to a prime lending division throughout 2007 to sell a larger percentage of its loans to the GSEs. (JA 1808-1809, 2169, 3310-3311). Simultaneously, the GSEs began to tighten their purchasing requirements to phase out certain riskier loan products. (JA 1932-1933, 3563-3564).

Countrywide also recognized that its credit quality had declined in 2006 and 2007, jeopardizing its ability to sell loans into the secondary market. For example, in August 2007, Countrywide Home Loans president Andrew Gissinger sent a memorandum to all employees, stating that "[o]ur success in the environment is absolutely contingent on our ability to employ rigorous underwriting discipline. We need to adapt our business to new market realities which requires ongoing manufacturing quality enhancement

and further operating controls." (JA 1849-1852, 5979-5982, 6036-6040).

### 3. FSL Devises the HSSL Loan Origination Process to Boost Revenues

Before the HSSL, FSL had in place a model for processing prime loans called the Prime CLUES Accept work flow. The pre-HSSL process utilized skilled underwriters to evaluate borrowers' ability to repay the loans. (JA 1811-1813, 1823-1834, 2123-2131, 2377-2378, 2380-2382). Underwriters validated information entered into Countrywide's automated underwriting system (called CLUES), cleared conditions, and cleared loans to close. *Id.* The pre-HSSL workflow worked and produced quality loans. (JA 1834).

To increase revenues from originating and selling prime loans, FSL developed the High Speed Swim Lane, designed to dramatically reduce the time spent underwriting and processing loans (*i.e.*, the "turn time") by removing the quality safeguards that ensured that borrowers would be able to repay the loans. (JA 1834-1835, 1855-1858, 1881-1885, 2207-2209, 5985, 5988-89). Defendants recognized that the HSSL was "aggressive" and a "drastic" change "beyond most people's comfort range." (JA 1881-1885, 5989). One of the HSSL's "guiding principles" was "Loans Move Forward, Never Backward." (JA 3316-3317, 5985). The HSSL, introduced in August 2007 and expanded in October 2007 (JA 1866, 1893, 2385, 2448, 5460-5468), layered risk upon risk to maximize speed.

10

*The HSSL eliminated underwriters and replaced them with clerks.* The HSSL removed underwriters (the independent checks on loan quality) and replaced them with unskilled and poorly trained clerks (known as loan processors or loan specialists) who reported to operations and ultimately to Mairone. (JA 1823-1841, 2242-2243). Prior to the HSSL, clerks entered borrower information into Countrywide's automated system, and if it returned an "Accept" recommendation (meaning that the loan had an acceptable level of credit risk subject to certain conditions), a loan processor returned the loan to an underwriter to validate the data entered and to review and clear conditions on the loan until the loan was "cleared" to close. (JA 1830-1834). Under the HSSL, however, when the automated system returned an "Accept" recommendation, the loan processor was authorized to validate the data that she herself had entered and was responsible for reviewing and clearing conditions and approving the loan to close. (JA 1835-1841).

*The HSSL relaxed training requirements.* Because FSL wanted to move ahead with the HSSL as quickly as possible, training and certification requirements were suspended. Loan specialists were "grandfathered" into underwriting authority without completing basic underwriter training, even though they were performing complicated underwriting tasks such as assessing the reasonability of income on stated-income loans, a task that requires the seasoned judgment of a trained underwriter. (JA 1842-1849, 1924-1925, 3314-3320, 5648-5653, 5991-5998). Indeed, months after the HSSL began, one underwriting manager commented that "training for these peo-

11

ple to show them how to actually underwrite a file is still forthcoming." (JA 5998). Although training regarding loan file reviews was eventually done, defendants relaxed the requirements because too few loan specialists were able to pass. (JA 4437-4444, 7450-7452, 7453-7454).

*Defendants pushed loan specialists to fund loans without regard to defects.* Defendants gave strong financial incentives to loan specialists to fund loans as quickly as possible without fear of being penalized for approving bad loans. Mairone suspended financial penalties for loan processors with poor quality ratings (known as Quality of Grade scores), which allowed loan specialists to approve defective loans without fear of a negative effect on their pay. (JA 1861-1866, 2220-2222, 2303-2306, 2657-2658, 2668-2670, 5991-5992). FSL simultaneously introduced "turn time" and funding bonuses effective August 1, 2007. (JA 2223-2229, 6000-6003, 6508-6510). Employees were given targets for processing prime loans and funding goals of thirty loans per specialist per month. (JA 5988). FSL paid bonuses (or reduced compensation) depending on whether employees hit their targets. (JA 6002, 6508-6509). Managers kept close track of whether loan specialists were meeting their targets, urging them to move loans forward at "lightning speed," tracking processing speed as if it were a horse race, running speed competitions (JA 4423-4437, 6496, 7313-7364, 7370-7379), and threatening to be on them "like white on rice" if speed goals were not met (JA 4417-4421, 7380-7381).

### 4. Defendants Knew That the HSSL Would Produce Defective Loans

Employees immediately raised concerns about HSSL's design in light of lessons learned from other processes that pushed turn time at the expense of quality, like those operated in the Regional Operating Centers of Countrywide's Consumer Markets Division (JA 5980) and in FSL's New Customer Acquisition group (JA 4068-4069, 6041-6051, 6511). The New Customer Acquisition group in particular, which Mairone led (JA 2220), was known to have produced poor quality loans as a result of imposing funding quotas on loan processors and allowing them to clear loans to close; in some cases loan processors were not even allowed to leave at night before approving a loan. (JA 2175-2197, 3364-3365, 6041-6051). Employees complained that this pressure drove some loan processors to fraudulently clear conditions on loans. (JA 2193-2196, 6041-6051). Nevertheless, the HSSL followed a similar design and employed many of the same loan processors and managers from that group. (JA 2207, 2211, 3311-3312).

When O'Donnell forwarded to Mairone employees' concerns that the Quality of Grade suspension and "the request to move loans" meant the company "no longer care[d] about quality" and would "just fund everything and worry about it later," Mairone brushed off the concern by responding, "sounds like it may work." (JA 2235-2236, 6052-6054).

Those who spoke out about the apparent disregard for quality were ignored. (JA 1853-1856, 1939-1941, 2229-2243, 2283, 3371-3372, 6036-6040, 6052-6054).

Employees were pressured to approve underwriting authority for HSSL loan specialists whom they did not even know. (JA 3320, 5993). Employees such as O'Donnell and Michael Thomas repeatedly raised concerns about the quality of HSSL loans originated during the pilot period and thereafter (JA 1928-1941, 2244-2253, 2255-2261, 2281-2285, 3366-3369, 3387-3390, 3486-3487, 3489-3491, 6071-6073, 6084-6088, 6130-6132, 6133-6138, 6716-6722, 7002-7005, 7019-7022), but the expansion of the HSSL was considered a "sensitive" subject (JA 4084-4088, 6493-6495).

## 5. Defendants Roll Out and Expand the HSSL Despite Knowledge of Poor Loan Quality

The HSSL rollout occurred in August 2007; Mairone presided over a large kickoff meeting with over 100 employees. (JA 1858-1863, 3311-3312). As Chief Operating Officer, Mairone was in charge of the HSSL. (JA 1835-1836, 3369-3370). The HSSL pilot was managed by Loren Rodriguez, an engineer who reported directly to Mairone. (JA 1835-1836, 1851, 1946, 4317).

Although the HSSL purportedly started as a test, it was a test only of funding and turn time. (JA 6055-6058, 6059-6062). HSSL designers were directed to create a process for speed, and the turn time reports showed they achieved their goal. (JA 4060-4061, 6055-6058, 6059-6062).

Notwithstanding initial quality reports demonstrating that more than 40% of the HSSL pilot loans were flagged as high risk (JA 2246-2253, 6063-6066), the direction "driven by" Mairone and others was to

14

expand the HSSL process to more loans and riskier loans, such as stated-income loans, which lack documentation of borrower income, and Expanded Approval loans, which were riskier nonprime loans (JA 1912, 1924-1925, 2251-2253, 6493-6495, 4084-4087). The HSSL was rolled out as part of a reorganization of FSL (called Central Fulfillment), and Mairone selected Wade Comeaux to run the expanded version of the HSSL. (JA 2253-2255, 2293, 4368-4370, 6032-6035). As manager of Central Fulfillment, Comeaux reported directly to Mairone. (JA 7176, 2156-2159).

The result of this expansion was a precipitous decline in loan quality, shown initially by pre-funding quality assurance ("QA") reports and later by post-funding quality control ("QC") reports. The QA reports, which were consistently ignored and criticized by FSL management (including Mairone) as focusing only on trivial "process" issues and not loan quality, showed defect rates during the fall of 2007 above 90%, and revealed that the vast majority of defects identified at the pre-funding stage were not being corrected. (JA 1890-1900, 2250-2261, 2261-2283, 2660-2661, 3371-3372, 3416-3418, 6063-6073, 6716-6722, 7002-7005, 7019-7022, 7178). Loan-quality personnel warned that the high defect rates in the pre-funding reviews could lead to much higher "severely unsatisfactory" rates. (JA 2250-2261, 2261-2283, 6071-6073). Nevertheless, FSL management responded by eliminating additional quality checks that they viewed as "distractions" from funding goals. (JA 2283-2284, 6074-6081, 7444-7447).

15

### 6. Defendants Continued to Ignore Poor Quality and Pushed for More Production

In November 2007, FSL made a year-end push for volume. Acting on directions from FSL President Greg Lumsden to "eliminate distractions" due to FSL's failure to meet sales volume projections, Comeaux instructed employees that "we have to take ownership of funding 'a hell of a lot' more loans in December!" and that "we have to increase velocity . . . [n]o rationalizations." (JA 2286-2288, 6074-6076). When Chief Credit Officer Cliff Kitashima noted that he had "asked QA and QC to work more closely with Central Fulfillment management to develop corrective measures," Lumsden warned that "[i]f we do not fund the volumes per our budget, we will not have to worry about QC and QA." (JA 2288, 6077-6081). Mairone similarly pressed Comeaux, stating, "[w]e need to get this number to 1.75 billion for break even [profit and loss]." (JA 4354-4356, 7444-7447).

On November 29, 2007, Mairone, with approval from Kitashima and Lumsden, instituted numerous changes to further increase the focus on production at the expense of quality. (JA 2292-2303, 6082-6083). Mairone ordered that QA and QC reports be directed solely to her, that loan specialists no longer be notified of their errors, that on-site reviews providing feedback and coaching to loan specialists be suspended, that mandatory checklists providing guidance to loan specialists on how to properly complete underwriting tasks be eliminated, and that the Quality of Grade reprieve be extended. (JA 2292-2303, 6082-6083).

16

Although Quality of Grade was supposed to be monitored regardless of the penalty on compensation, the evidence established that it was not monitored at all, and defendants tracked only funding and turn time. (JA 3448-3449, 3752-3753, 3760-3769, 4429-4437, 7308, 7313-7364, 7376-7379). Indeed, as loan defect rates were rising and Mairone was ordering that quality reporting go only to her, defendants instituted additional changes to further increase the focus on production, including sending out daily reports on funding projections to "increase the accountability of the operations teams for the forecasted fundings" (JA 4325-4326, 7426-7433), pressuring loan specialists to further reduce turn times (JA 4591-4592, 7380-7381), and lowering employee base pay so that their compensation would be more heavily dependent on bonuses (JA 4352-4353, 7448-7449).

In January 2008, Mairone suggested to Lumsden that the primary objective for the next month be "to fund 15,000 loans in our current pipeline," and that the "most focus will be on this initiative," notwithstanding the worsening problems with loan quality. (JA 2682, 6107, 6124).

### 7. Quality Control Reviews Find Elevated Defect Rates

The impact of defendants' continued focus on speed and volume over quality was seen throughout the HSSL period and in particular in the first quarter of 2008. During that quarter, FSL saw a dramatic increase in the percentage of its loans that were "severely unsatisfactory" (materially defective).

17

(JA 1901-1917, 1921-1924, 2306-2312, 6355, 6505-6507, 6512-6519, 6520-6535). The initial results from the first quarter of 2008 showed that material defect rates on Expanded Access and conforming loans—those sold to Fannie Mae and Freddie Mac—were approximately 30 percent, more than twice that of other Countrywide divisions. (JA 3922-3923, 6355). A review conducted to determine the "root causes" of deteriorating loan quality placed responsibility for the dramatically deteriorating loan quality on the very changes Mairone put in place. (JA 6111-6123). Internal emails among FSL employees discussing the poor loan quality in the first quarter of 2008 also pointed to the HSSL as the cause. (JA 6084-6088, 6133-6138, 6139-6144).

Defendants' sole focus on production continued in the first quarter of 2008, as they set aggressive new funding goals as the top priority for Central Fulfillment. During this time, FSL instituted various funding contests, such as the "On Fire February" contest, to motivate loan specialists to clear more loans to close despite deteriorating loan quality. (JA 4607-4615, 4271-4272, 7370-7372, 7434-7437, 7442-7443, 7498-7505). And although the Quality of Grade penalty was supposed to return in the first quarter of 2008, internal emails from that period indicated that the loan specialists received no Quality of Grade feedback and that those scores were not even calculated. (JA 6145-6150, 7308).

### 8. FSL Tried to Create Appearance of Quality with the "Sprint Incentive" and "Poker Run"

In March 2008, Lumsden complained that FSL was not fighting "severely unsatisfactory" findings issued by corporate QC hard enough and instructed O'Donnell to devote more resources to rebutting those findings. (JA 6505-6507). As a result, initiatives such as the Sprint Incentive and the FSL Poker Run were put in place to incentivize employees to overturn "severely unsatisfactory" findings and make FSL's defect rate appear closer to the industry standard of 4%. (JA 7386-7394, 4461-4466, 4531-4534). Meanwhile, Mairone instructed O'Donnell to alter a slide presentation to Gissinger so that FSL quality would not appear to look as bad as it was. (JA 2317-2319).

### 9. Expert Evidence Confirmed the Poor Quality of HSSL Loans Sold to the GSEs

The government's experts confirmed the poor quality of HSSL loans. Countrywide sold at least 28,882 HSSL loans to the GSEs. (JA 1836-1838, 2448, 2674, 3397-3398, 5460-5468). Dr. Charles Cowan, the government's expert statistician, performed a random sampling of the pool of HSSL loans, which were reviewed by the government's expert underwriter, Ira Holt. (JA 3081-3088, 3090-3096). This review established that approximately 43% of the HSSL loans were materially defective, *i.e.*, not investment quality. (JA 3095-3096).

19

### 10. Throughout the HSSL, Countrywide Misrepresented Facts to the GSEs

Throughout the HSSL period, defendants never told Fannie Mae or Freddie Mac about the poor quality of the HSSL loans. Even though the GSEs required Countrywide to report defects to them (JA 2978-2979, 3137-3141, 3179-3182, 3302-3304), and even though FSL employees, including Mairone, knew that HSSL loans were being sold to Fannie Mae and Freddie Mac with representations that each loan was investment quality (JA 1810, 3371-3373, 3801, 4324), only six defective HSSL loans were self-reported to Fannie Mae or Freddie Mac out of the thousands known to be defective (JA 3402).

Witnesses from the GSEs testified that the investment-quality representation was important, that it was never waived, that it applied to each loan they purchased, and that they did not want to purchase defective loans. (JA 2716, 2720-2721, 2974-2978, 2982-2983, 2989-2990, 3123-3131, 3219-3220, 4802, 4819-4821, 4823-4825). GSE witnesses further testified that they expected lenders to use qualified personnel. (JA 2724, 3068-3069, 4822, 4826). They also testified that the loan origination process lenders used was important to the GSEs, and if the process the lender was using negatively affected quality, it would factor into the purchasing decision. (JA 2981-2982, 2989-2990, 3045-3046, 3235-3237, 3243-3244, 4829-4833). In addition, GSE witnesses testified that they were never told about the HSSL. (JA 2963, 2985, 3290, 4799-4801).

20

\*　\*　\*

In sum, the trial evidence established that defendants, driven by a desire to boost FSL's revenues, intentionally deceived Fannie Mae and Freddie Mac into purchasing thousands of mortgage loans that the Bank and Mairone knew were defective, by misrepresenting that they were quality investments.

## C.　Civil Penalties

Following the jury's verdict of liability, the parties submitted evidence concerning the pecuniary gains to the Banks and the pecuniary losses to the GSEs from the fraud. The government offered evidence from expert economist Dr. Joseph R. Mason, opining that the total amount the Bank received for the HSSL loans was $5,021,303,719. (GA 352). Mason also opined that the loss to the GSEs from HSSL loans, based on unpaid balance at the time of default, was $863,634,548. (JA 1247).

On July 30, 2014, the district court imposed civil penalties of $1,267,491,770 against the Bank and $1,000,000 against Mairone. (SPA 86-104). The court held that the maximum civil penalty against the Bank allowable under § 1833a(b) was $2,960,737,608. (SPA 99). The court reasoned that the gross pecuniary gain and loss from the scheme to defraud was the amount that defendants fraudulently induced the GSEs to pay for all HSSL loans. (SPA 95-100). The court then reduced the gross proceeds amount to account for defendants' argument that 11,057 HSSL loans had been processed through "field branches,"

noting that there was evidence the HSSL process generally was not used in field branches and a perceived absence of evidence that field branches had poor loan quality. (SPA 93-94). The court then reduced the penalty by 57.19% to account for the fact that, according to the evidence, only 42.81% of the HSSL loans sold to the GSEs were not investment quality. (SPA 100).

## Summary of Argument

The jury in this case found that the Bank and Mairone were liable for mail and wire fraud, and the district court imposed the civil penalties called for by FIRREA. Defendants cannot meet the high bar to overturning the jury's verdict, or show that the district court abused its discretion in determining the penalties. Accordingly, this Court should affirm the district court's judgment.

FIRREA imposes liability on "whoever" violates the enumerated offenses, including mail and wire fraud "affecting a federally insured financial institution." The government proved at trial that the Bank's conduct affected a federally insured financial institution: the Bank itself. FIRREA's plain and broad language, as well as its structure and history, demonstrate that a financial institution is liable for fraud affecting itself. In considering nearly identical language in a different provision of FIRREA, this Court and other courts of appeals have held a financial institution is "affected" if it is exposed to an increased risk of loss—even if it is not the victim of, or even if it is the perpetrator of or willing participant in, the

fraud. Nor does FIRREA's creation of overlapping administrative penalties that may be imposed by bank regulators mean that the fraud penalties at issue here do not apply: again the text, structure, and legislative history of the statute demonstrate that the various penalties FIRREA creates are separate and may be cumulative. Defendants' contrary construction subverts a major purpose of FIRREA: to deter and punish frauds that put federally insured deposits at risk. *See infra* Point I.

In addition, FIRREA's penalties for fraud apply even though defendants' misrepresentations also constitute a breach of their contracts with the GSEs. As the government proved to the jury, defendants repeatedly and knowingly misrepresented critical facts about the loans they were selling. That is fraud, as the jury determined, regardless of whether the defendants had fraudulent intent at the time they entered the preexisting contracts, and this Court and others have repeatedly upheld liability for fraud in similar circumstances. Nor is there any established meaning of the common-law term "fraud" that exempts a party to a contract from fraud liability simply because the same facts would support a breach-of-contract action; to the contrary, common-law courts have permitted such fraud claims for over a century. *See infra* Point II.

The district court also did not err regarding the trial evidence. The district court did not abuse its discretion in excluding evidence showing that defendants sold the GSEs other loans of equally poor quality to the HSSL loans at issue here. That evidence was

23

irrelevant: it would not disprove any of the elements of the fraud the Bank and Mairone committed and the government proved at trial. Nor did the government open the door to such evidence. The government offered proof concerning other loans and other Countrywide divisions to explain the concerns Countrywide employees expressed to their superiors, which those superiors ignored or suppressed—that evidence was relevant to defendants' knowledge and intent, but was not the type of comparative quality evidence defendants now claim they were entitled to offer. Moreover, the government's expert evidence regarding the prevalence of defects in HSSL loans did not address non-HSSL loans, nor did the expert demonstrate bias or impropriety or testify inconsistently regarding his review, contrary to defendants' arguments. *See infra* Point III.

Defendants have also failed to show that no reasonable juror could conclude that their misrepresentations were material. There was ample evidence that the investment-quality representations defendants made were of paramount importance to the GSEs, that any origination process negatively affecting loan quality would have impacted their purchasing decisions, and that they would not have purchased loans known to be defective. Defendants cannot negate this evidence by arguing that the GSEs should have known that they were buying defective loans despite defendants' fraudulent misrepresentations, or that defendants' loans were not that bad, a contention the jury rejected. *See infra* Point IV.

24

The district court further did not abuse its discretion in excluding testimony from witnesses that the HSSL was "proper" and produced quality loans. The mental states of these witnesses were not at issue and they never communicated their views to the Countrywide employees whose fraudulent intent was proved at trial. It was therefore irrelevant, as the district court concluded. To the extent defendants sought to offer this opinion testimony to show that the HSSL process was in fact proper, it was inadmissible because the witnesses were not offered as experts. *See infra* Point V.

Regarding the civil penalties, the district court again did not abuse its discretion in determining the maximum allowable penalties based on the amount the GSEs paid for the defective HSSL loans. District courts need only make a reasonable estimate of loss or gain for purposes of determining a civil penalty, and the terms and purposes of the statute support the district court's calculation based on the gross, rather than net, measure of the Bank's pecuniary gain. Moreover, the pecuniary loss suffered by the GSEs was proximately caused by the Bank's fraud. *See infra* Point VI.

Finally, the Court should deny the Bank's request for reassignment to another district court if there is a remand. That request was forfeited as it was not raised below, and in any event the Bank fails to identify the type of rare and severe circumstances that would warrant reassignment. *See infra* Point VII.

25

# ARGUMENT

## Standard of Review

The Court reviews *de novo* a district court's denial of judgment as a matter of law, drawing all inferences and viewing all evidence in the light most favorable to the non-moving party, and only setting aside a jury verdict "when there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Kaye v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000) (quotation marks omitted). The Court may not "weigh the credibility of witnesses or consider the weight of the evidence." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998).

The Court reviews a district court's denial of a Rule 59 new trial motion for abuse of discretion. Such a motion "should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 623 (2d Cir. 2001) (quotation marks omitted).

The Court reviews "a district court's evidentiary rulings for abuse of discretion, and will reverse only for manifest error." *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010). Even if evidentiary rulings were manifestly erroneous, a new trial is not warranted if the improper admission was harmless. *Id.* The Court reviews "evidentiary rulings with deference" and is "mindful of [the trial court's] superior

position to assess relevancy." *Stampf v. Long Island Railroad Co.*, 761 F.3d 192, 203 (2d Cir. 2014) (quotation marks omitted).

Civil penalties are reviewed for abuse of discretion. *See SEC v. Pentagon Capital Management PLC*, 725 F.3d 279, 287 (2d Cir. 2013).

## POINT I

### The Bank May Be Held Liable Under FIRREA for Committing Fraud Affecting Itself

FIRREA provides that "whoever" commits fraud "affecting a federally insured financial institution" is liable for a civil penalty. That plain language applies to defendants here: the fraud proved at trial affected the Bank, threatening the security of its own federally insured deposits. FIRREA's purpose is to penalize and deter fraudulent conduct that puts federally insured deposits or depository institutions at risk. The Bank's fraud did so here, and is therefore subject to FIRREA's civil penalties.

### A. FIRREA Civil Penalties Apply to Financial Institutions' Conduct Affecting Themselves

#### 1. The Plain Text of § 1833a Imposes Liability on Financial Institutions for Violations "Affecting" the Institutions Themselves

FIRREA is clear that federally insured financial institutions, like Countrywide and Bank of America, may be held liable under § 1833a(c)(2). Section 1833a(a), which defines who may be liable, states: "Whoever violates any provision of law to which this

27

section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section." 12 U.S.C. § 1833a(a). Subsection (c) then provides that "[t]his section applies to a violation of" various criminal statutes, including 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud) "affecting a federally insured financial institution." *Id.* § 1833a(c)(2).

As the district court held, the effect of the Bank's conduct on the Bank itself is covered by FIRREA and the "unambiguous" and "dispositive" "plain language" of § 1833a(c)(2). 961 F. Supp. 2d 598, 605 (S.D.N.Y. 2013). FIRREA uses the term "whoever" to specify who can be liable, and "whoever" is a "broad term that the Code specifically defines as including any person, corporation or other entity." *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 462 (S.D.N.Y. 2013) (citing 1 U.S.C. § 1 (defining "whoever" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies")); *accord United States v. A&P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958) ("whoever" should be "liberally interpreted"). While this Court has not yet considered this language of § 1833a, the two district courts in this circuit (in addition to the district court in this case) to have done so have held that financial institutions may be held liable under § 1833a(c)(2) for fraud that affects themselves. *BNY Mellon*, 941 F. Supp. 2d at 462; *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 630 (S.D.N.Y. 2013).

28

The Bank argues that the most "natural" reading of the word "affecting" in § 1833a(c)(2) means the violator must be separate from the affected financial institution. (Bank Br. 30). But this Court and others have repeatedly rejected this argument when interpreting virtually identical language in section 961(*l*) of FIRREA, which increases the statute of limitations for mail and wire frauds "affect[ing] a financial institution." Pub. L. No. 101-73, § 961(*l*)(1); 18 U.S.C. § 3293(2). In *United States v. Bouyea*, this Court held that "'the statute is clear: it broadly applies to any act of wire fraud that affects a financial institution.'" 152 F.3d 192, 195 (2d Cir. 1998) (quoting *United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992)). As in this case, the defendants argued that FIRREA applies only when "'the financial institution is the object of fraud'"; but the Court held that "'Congress chose to extend the statute of limitations to a broader class of crimes.'" *Id.* (quoting *Pelullo*, 964 F.3d at 215-16). As the Court later explained in *United States v. Heinz*, another section 961(*l*) case, "[t]he verb 'to affect' expresses a broad and open-ended range of influences." ___ F.3d ___, No. 13-3119, 2015 WL 3498664, at *1-2 (2d Cir. Jun. 4, 2015) (quotation marks omitted).

While the effect of the fraud must be "sufficiently direct," "[t]he role of the banks as co-conspirators in the criminal conduct does not break the necessary link between the underlying fraud and the financial loss suffered." *Id.* Even where a bank is a "willing participant[ ]" or "active perpetrator" in a scheme, it is still "affected" within FIRREA's meaning, as it is "exposed to additional risks." *United States v. Ser-*

*pico*, 320 F.3d 691, 695 (7th Cir. 2003); *accord Heinz*, 2015 WL 3498664, at *1-2 (financial institution co-conspirators were affected by their participation in the fraud).[2]

That interpretation of FIRREA's section 961(*l*) applies equally to § 1833a, as courts assume that "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quotation marks omitted). Thus, a financial institution that partici-pates in a fraud that subjects itself to an increased risk of loss affects itself within FIRREA's meaning, and may therefore be liable under § 1833a. Contrary to defendants' contention, there is nothing strained about that reading: "[i]t is perfectly natural to say that one's actions may affect oneself. For example, one might say 'John's criminal behavior is affecting his future career prospects,' and 'John's criminal be-havior [thus] is affecting him.' Certainly, the con-struction is not so awkward as to permit [a bank] to conjure an exception to 'whoever' that otherwise is absent from the text." *BNY Mellon*, 941 F. Supp. 2d at 461-62 (first pair of brackets in original).

---

[2] Courts have also broadly interpreted a prior version of the Sentencing Guidelines that enhanced punishment for crimes that "affected a financial insti-tution" to apply where the financial institution itself was involved in perpetrating the fraud. *United States v. Hoffecker*, 530 F.3d 137, 198 (3d Cir. 2008); *United States v. Collins*, 361 F.3d 343, 348 (7th Cir. 2004).

30

Nor does the fact that the statute provides for penalties, or incorporates criminal provisions, require the crabbed construction defendants advance under the rule of lenity. (Bank Br. 33-34; Mairone Br. 51-52). That rule "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended"; it "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013) (quotation marks omitted). Here, the plain text controls. *Boyle v. United States*, 556 U.S. 938, 950 (2009) ("Because the statutory language is clear, there is no need to reach . . . the rule of lenity.").

Accordingly, the three district courts that have considered § 1833a(c)(2) have all correctly held that the word "affecting" is broad and unambiguous, and applies when the affected federal insured financial institution is a perpetrator of the mail or wire fraud violation. *See BNY Mellon*, 941 F. Supp. 2d at 462; *Countrywide Fin. Corp.*, 941 F. Supp. 2d at 457; *Wells Fargo*, 972 F. Supp. 2d at 630. This Court should do the same.

## 2. FIRREA's Structure Confirms That Financial Institutions May Be Liable for Frauds That Affect Themselves

Defendants' contentions relying on the statutory structure "misconstrue[] the statute." *BNY Mellon*,

941 F. Supp. 2d 453. The violations listed in
§ 1833a(c)(1) and (3), which concern crimes against
financial institutions or false statements to regula-
tors, stand alone to trigger FIRREA liability, while
the violations in (c)(2)—all involving more general
categories of false statements—must "affect[ ]" a fi-
nancial institution. The "readily apparent" purpose of
that limitation in paragraph (c)(2) is to prevent
§ 1833a liability from being "applied to any false
statement made within federal jurisdiction . . . , even
those having nothing to do with the financial indus-
try." *Id.* at 453 n.88.

Defendants' attempt to read a far broader limita-
tion into the statute is unconvincing. They contend
that under the canon of *noscitur a sociis*, paragraph
(c) must be constrained to "offenses committed
against (or directly concerning) financial institutions
or regulators." (Bank Br. 31-32). To begin with, the
argument does not help them: a financial institution's
fraud "directly concern[s] financial institutions." The
fraud proved in this case—where a bank routinely
sold loans to GSEs under false pretenses—is at the
heart of what defendants themselves believe to be the
statute's meaning.

In any event, defendants' take on § 1833a(c)'s
structure is incorrect. Financial institutions need not
be victims: they may participate in and benefit from
the offenses listed in paragraphs (1) and (3), just as
they can from the frauds listed in paragraph (2). For
example, a financial institution can violate 18 U.S.C.
§ 1005, which prohibits fraudulent transactions with
the intent to defraud the government or a financial

institution, and thus be liable under § 1833a(c)(1). *Wells Fargo*, 972 F. Supp. 2d at 629 (applying *United States v. Van Brocklin*, 115 F.3d 587, 596-97 (8th Cir. 1997)). Nor do the listed crimes necessarily concern financial institutions, as some of them need not involve a financial institution at all. *See* 18 U.S.C. §§ 1014 (defrauding, among others, the Federal Housing Administration), 15 U.S.C. § 645(a) (defrauding the Small Business Administration). "If anything, the violations in [paragraphs (1) and (3)] suggest that Congress, in passing § 1833a, was not necessarily concerned only with harm to financial institutions— let alone only their victimization—as it was with the presence of criminal activity in matters meaningfully involving financial institutions however that activity may affect them." *BNY Mellon*, 941 F. Supp. 2d at 453.

Nor does the district court's interpretation read the "affecting" clause out of the statute. As noted above, absent that clause, FIRREA liability would apply to nearly any fraud by any person. Defendants are thus correct that the clause was meant to limit paragraph (2)—but they construe that limitation far beyond what its words can mean.[3]

_____

[3] The words of § 1833a are clear, but if they were not, the meaning of an ambiguous statute can be clarified by reference to its caption. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). The caption of the FIRREA title in which § 1833a appears is "Civil Penalties For Violations *Involving* Financial Institutions," Pub. L. No. 101-73, Title IX(E) (empha-

33

### 3. FIRREA's Administrative Penalty Provisions Do Not Exempt Financial Institutions from Further Liability

Nor do FIRREA's other mechanisms for penalizing financial institutions for conduct affecting their own safety and soundness undercut the district court's interpretation of § 1833a. Under 12 U.S.C. § 1818(i)(2), federal banking regulators may impose daily penalties for a financial institution's misconduct, including violations of federal law. 12 U.S.C. § 1818(i)(2). The Bank incorrectly argues that that regulatory scheme must be read as precluding any liability by a financial institution under § 1833a. (Bank Br. 36-38).

But nothing in § 1818(i)(2) suggests it was intended to be exclusive, and defendants' suggestion to the contrary suffers from multiple flaws. First, there is no doubt that employees of financial institutions are subject to penalties under both § 1833a and § 1818(i)(2), plainly indicating Congress meant them to overlap. *BNY Mellon*, 941 F. Supp. 2d at 462. Equally, there is no doubt that financial institutions can be held liable, alongside administrative liability, for penalties for violating at least some of the criminal provisions enumerated in § 1833a(c)(1), demonstrating that even if also subject to penalties under § 1818(i), financial institutions may be liable under other potentially applicable laws, including § 1833a. *Id.* As the *BNY Mellon* court pointed out, it is easy to

_____

sis added), confirming that a bank's involvement in fraud is subject to FIRREA penalties.

34

understand why Congress would allow regulators to assess penalties "for general violations and unsafe practices," while permitting the Attorney General the authority to pursue penalties for specified criminal violations, as the Department of Justice has the requisite expertise in prosecuting criminal cases. *Id.*

FIRREA's legislative history confirms that § 1833a was intended to impose a penalty separate from, and cumulative of, those imposed by regulatory agencies. *Id.* at 462 & n.137 (citing H.R. Rep. No. 101-54(V) (1989), at 6, 1989 U.S.C.C.A.N. 397, 398-99 ("the Administration states that the penalties can also be cumulative to other civil penalties . . . imposed by bank regulatory agencies under other provisions of this bill")). Indeed, the committee report suggests that "three separate penalties"—criminal fines, § 1833a penalties, and § 1818(i) penalties—may be imposed "'for the same violation.'" *Id.* (quoting H.R. Rep. No. 101-54(V), at 6, 1989 U.S.C.C.A.N. 397, 398-99).

Defendants suggest that separate civil penalties would defeat the purpose of FIRREA by weakening banks (Bank Br. 37). But FIRREA is meant to deter misconduct, and "Congress well could have concluded that the deterrent effect of meaningful penalties is more important than permitting institutions to engage in dangerous fraudulent behavior without sanction for fear of hurting them." *BNY Mellon*, 941 F. Supp. 2d at 463. Further, contrary to defendants' claim that prosecutors would have "*carte blanche* to inflict penalties" on banks (Bank Br. 38), it is the district court's power, subject to statutory limits, to de-

termine the appropriate penalties, "and the court can tailor them to provide both for deterrence of future frauds and for avoiding harm to innocent parties like taxpayers and depositor." *Id.* Defendants' view that the mere existence of administrative penalties may bar other kinds of penalties would yield absurd and wide-ranging results, potentially immunizing any regulated entity from civil and criminal liabilities.

Finally, the overlapping possibility of penalties ensures that banks will be held responsible for conduct that puts their own federally insured deposits at risk, consistent with FIRREA's deterrent purpose. *Id.* at 463; *see United States ex rel. Onnen v. Sioux Falls Independent School District*, 688 F.3d 410, 415 (8th Cir. 2012) ("complex regime of regulatory sanctions" does not preclude False Claims Act suit—"Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud" (quotation marks omitted)).

### 4. FIRREA's Legislative Purpose and History Establish That Congress Intended Financial Institutions to Be Liable for Frauds Putting Their Own Deposits at Risk

Additionally, FIRREA penalties for a bank's fraud that affects itself is consistent with the statute's history and purpose. While the Court need not look to legislative history and purpose where, as here, the text and structure of the statute are clear, *Boyle*, 556 U.S. at 950, in this case those sources confirm the district court's interpretation was correct.

36

As Congress stated in the statute itself, FIRREA —enacted in the wake of the savings and loan crisis of the 1980s—was intended to "strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions *and their depositors*." Pub. L. No. 101-73, § 101(10) (emphasis added). Congress thus evinced its intent to protect not just financial institutions themselves, but those who deposited money with them. *BNY Mellon*, 941 F. Supp. 2d at 456.[4] It did so, in part, by provisions to civilly and criminally prosecute the kinds of misconduct and abuse involving financial institutions that threaten the safety and soundness of federally insured deposits. *See, e.g.*, H.R. Rep. No. 101-54(I), at 301-02, 1989 U.S.C.C.A.N. 86, 97, 98 ("thrifts were free to engage in fraudulent and risky activities, often at the expense of the FSLIC . . . which would lead to their ultimate failure"); S. Rep. No. 101-19 (1989), 1989 WL 1178181, at *7 ("fraud and insider abuse by thrift managers" was one of "three sets of factors" contributing substantially to the crisis).

---

[4] The president, upon signing FIRREA, made clear that it was the taxpayers who were the victims, and FIRREA would make sure that deposits remained secure. FIRREA "says to tens of millions of S&L depositors: You will not be the victim of others' mistakes. We will see—guarantee—that your insured deposits are secure." Remarks by President Bush Upon Signing H.R. 1248 into Law, 1989 WL 1178375, at *1 (Aug. 9, 1989).

37

Contrary to defendants' argument that Congress viewed banks as "victims" (Mairone Br. 2-3) that FIRREA was designed to "protect . . . from fraud by others" (Bank Br. 29-30), Congress was in fact also concerned about misconduct by financial institutions themselves for their own gain. *See, e.g.*, H.R. Rep. No. 100-1088, at 34-35 (1989) ("bankers (including thrift insiders) have resorted to fraud" to benefit ailing bank); *see also Failure of Independent CPA's to Identify Fraud, Waste and Mismanagement and Assure Accurate Financial Position of Troubled S&L's: Hearings Before H. Comm. on Banking, Finance and Urban Affairs*, 101st Cong. 13 (1989) (statement of Assistant Comptroller General) ("financial institutional failures have often been associated with . . . insider abuse and fraud); 135 Cong. Rec. S3993-01 (daily ed. Apr. 17, 1989) (statement of Sen. Bond) ("Not only did these institutions gamble with our money, many of their officers engaged in massive outright fraud."). "Congress was addressing not only frauds by insiders who were trying to harm their employers, but also frauds by insiders seeking to benefit their employers —perhaps through deception of auditors or regulators. In cases of the latter sort, the fraudulent practices cannot be understood to be directed at, or victimizing, the thrifts—after all, the thrifts themselves could have been charged with crimes in those very instances." *BNY Mellon*, 941 F. Supp. 2d at 455.

Moreover, Congress explicitly recognized that poor underwriting and loan administration—the very conduct targeted in this action—could seriously threaten a financial institution's stability. *See, e.g.*, H.R. Rep. No. 101-54(I), at 299, 1989 U.S.C.C.A.N. 86, 95

38

("Failed institutions have a number of similar traits including . . . poor underwriting and loan administration standards"); H.R. Rep. No. 101-54(I), at 300, 1989 U.S.C.C.A.N. 86, 96 ("Poor loan underwriting and administration standards have proved particularly detrimental to thrift institutions.").

This "legislative history shows who Congress truly believed were the victims of the S&L crisis and whom Congress sought to protect through FIRREA: S&L depositors and federal taxpayers put at risk by the thrifts' fraudulent behavior." *BNY Mellon*, 941 F. Supp. 2d at 455. Congress furthered its goal of protecting taxpayers and depositors by stiffening penalties for financial crimes. H. Rep. No. 101-54(I) (1989), at 107 ("The legislation increases civil and criminal penalties for crimes involving financial institutions and improves methods to detect misconduct in financial dealings.").

In sum, the legislative history demonstrates that one of the main purposes of FIRREA was to civilly and criminally prosecute the kinds of misconduct and abuse involving financial institutions and their officers and directors that threaten the safety and soundness of federally insured deposits, which taxpayers must pay for when financial institutions fail. Holding banks and their employees responsible for conduct that puts the bank's own federally insured deposits at risk is consistent with and furthers this legislative purpose of FIRREA.

39

## B.   The Fraud Proved at Trial Affected the Bank

The mail and wire fraud proven at trial affected the federally insured financial institutions Country-wide and Bank of America within the meaning of FIRREA.

A financial institution need not incur an actual economic loss to be affected under FIRREA; rather, exposure to a "new or increased risk of loss" is sufficient. *United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010) ("new or increased risk of loss" is sufficient effect under section 961(*l*)); *Serpico*, 320 F.3d at 694-95 (same); *United States v. Ghavami*, 10 Cr. 1217, 2012 WL 2878126, at *6 (S.D.N.Y. July 13, 2012) (same, "even if there is no actual or net loss"), *aff'd*, *Heinz*, 2015 WL 3498664 at *2; *BNY Mellon*, 941 F. Supp. 2d at 458-59 (same under § 1833a); *Wells Fargo*, 972 F. Supp. 2d at 630-631 (same).[5]

Here, defendants' fraudulent sale of defective HSSL loans to the GSEs exposed both Countrywide and Bank of America to actual losses, risk of loss, and other harm. The fraudulent sale exposed the Bank to the risk that the GSEs would demand that the Bank repurchase the loans (JA 2668-2669, 2761-2762,

──────────

[5]   Defendants rely on *United States v. Agne*, but, consistent with the "new or increased risk of loss" standard, that court held that the bank "suffered no actual financial loss and experienced *no realistic prospect of loss*." 214 F.3d 47, 53 (1st Cir. 2000) (emphasis added); *see Serpico*, 320 F.3d at 694 (distinguishing *Agne*).

2994, 3121-3123, 3146), resulting in "costs . . . in the form of re-work expenses, higher credit losses and worse future secondary market execution due to a reputation for poor quality loans." (GA 87). While this exposure alone suffices for the Bank to be "affected" for FIRREA purposes, here the Bank did in fact receive such repurchase demands (JA 3185-3190, 3417-3419, 3423-3428, 7307), and Bank of America subsequently entered into a multi-billion dollar settlement with Fannie Mae that covered repurchase demands with respect to, *inter alia*, HSSL loans. (District Court ECF No. 129, Defendants' Statement of Undisputed Facts ¶ 159).[6] Additionally, the Bank presumably has been exposed to litigation costs in connection with the instant action, including attorneys' fees, and has incurred civil-penalty liability for the fraud.

Mairone argues that the costs of litigation or prosecution are not "sufficiently direct" to constitute a FIRREA-cognizable effect, but this Court recently foreclosed that argument. *Heinz* held that "nonprosecution agreements and settlement agreements" resulting from misconduct DOJ charged a bank with committing, as well as attorneys' fees from the preceding investigation, constituted a foreseeable effect of the fraud under section 961(*l*). 2015 WL 3498664, at *1-2. Moreover, "[t]he role of the banks as co-conspirators in the criminal conduct does not break

---

[6] *See also* Exhibit 99A to Bank of America Corp. 2012 Form 10-K, available at http://www.sec.gov/Archives/edgar/data/70858/000007085813000097/bac-12312012x10kex99a.htm.

41

the necessary link between the underlying fraud and the financial loss suffered." *Id.* The Bank's costs resulting from the government's prosecution of this action were therefore an effect under FIRREA.

Mairone also relies on agreements by which Bank of America Corporation agreed to indemnify Bank of America for losses relating to loans Countrywide sold to the GSEs. (Mairone Br. 39). But such indemnity agreements, which only cover actual losses rather than risk of loss, do not negate the effect on Bank of America. (GA 387-390, 397-398). Even if Bank of America later recoups its losses, it has still suffered a loss and thus an effect. *See United States v. Millar*, 79 F.3d 338, 346 (2d Cir. 1996) (sentencing enhancement for conduct that "affected a financial institution" applies even when loss recovered from third party); *United States v. Johnson*, 130 F.3d 1352, 1355 (9th Cir. 1997) (same). "A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (L. Hand, J.); *accord Johnson*, 130 F.3d at 1355. Mairone's view "would lead to the absurd conclusion that no enhancement could be ordered whenever the financial institution's loss was made up by a third party," *Millar*, 79 F.3d at 346—a result that would contradict the public interest by allowing perpetrators of fraud to avoid penalties under § 1833a merely by purchasing an insurance policy, negating the deterrent to fraud enacted by Congress.

Mairone's additional argument—that her fraudulent conduct cannot affect her employer if she acted

42

within the scope of her employment (Mairone Br. 47-48)—contradicts the broad meaning of Congress's chosen term, "whoever," to specify who is liable under § 1833a, as detailed above. *See supra* Point I.A.1. It also contradicts the extensive legislative history making clear that Congress meant to target bank insiders whose conduct, authorized by the bank or not, affected a financial institution. *BNY Mellon*, 941 F. Supp. 2d at 455; *see infra* Point I.A.4. Finally, even if, as Mairone contends, she "was the bank" for this purpose, as argued above the bank may incur § 1833a liability for affecting itself. For all those reasons, both the Bank's conduct and Mairone's were sufficient to trigger penalties under § 1833a.

## C. The District Court Correctly Held That Bank of America Was Affected Within the Meaning of FIRREA

Apart from the effect Countrywide's fraud had on Countrywide itself, the district court correctly held that Bank of America was "affect[ed]" by Countrywide's fraud.

In *Bouyea*, the Court held that "affect" should be construed broadly to apply to a financial institution that was not involved in the fraud, but had lent money to a defrauded subsidiary. 152 F.3d at 195. Here, although Bank of America similarly was not involved in the fraud, it later merged with Countrywide and assumed its liabilities, including liabilities for loans Countrywide fraudulently sold to the GSEs. (GA 4, 22-23). Bank of America was therefore exposed to the risk of having to repurchase those loans, and did in

43

fact pay the GSEs billions of dollars to resolve repurchase liabilities for loans originated by Countrywide, including HSSL loans. In addition, Bank of America has been exposed to civil penalties and litigation costs from this action. The effect of the fraud on a subsequent purchaser of Countrywide who would assume liability for the defective loans was foreseeable to Countrywide and Mairone when the fraud was perpetrated. Accordingly, the link between the fraud and the effect on Bank of America is sufficiently direct. *Heinz*, 2015 WL 3498664 at *2.

## POINT II

### The Bank's Contractual Relationship with the GSEs Does Not Immunize Defendants from Liability for Mail or Wire Fraud

As the district court correctly held, the government's claims of mail and wire fraud were valid despite the preexisting contracts between the Bank and the GSEs. After entering into contracts in which Countrywide warranted that loans sold to the GSEs in the future would be investment quality, defendants repeatedly misrepresented the quality of the loans they were delivering to fraudulently induce the GSEs to purchase loans known to be defective. That those false statements may also give rise to breach of contract or breach of warranty claims does exempt defendants from liability for fraud.

Federal fraud statutes are not cabined by private-party contracts. If a defendant makes fraudulent misrepresentations that satisfy the elements of the mail and wire fraud statutes, it is irrelevant if there

44

is a contractual relationship between the defendant and the victim. Thus, this Court has upheld convictions under 18 U.S.C. §§ 1341 and 1343 when a defendant fraudulently misrepresented its performance under a contract. For instance, in *United States v. Frank*, the Court affirmed a fraud conviction where a party to a contract "did not receive the service . . . for which [it] had contracted and paid," but the defendant misrepresented that the service had been performed according to the contract's specifications. 156 F.3d 332, 334-36 (2d Cir. 1998). In *United States v. Naiman*, the defendant was convicted of fraud for falsely certifying whether money was used in accordance with contractual terms. 211 F.3d 40, 49 (2d Cir. 2000).

These cases demonstrate that while fraudulent intent cannot be inferred from a mere breach of contract, neither will the existence of a contract negate the existence of fraudulent intent. If the misrepresentation is made to induce a party to enter into a contract, then fraudulent intent must exist when that misrepresentation was made, as a later misrepresentation cannot be said to have induced the party to contract. *See Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 995, 1007 (7th Cir. 2004); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175-76 (2d Cir. 1993). But no case cited by defendants holds that fraudulent intent must have existed at the time of contracting, when the alleged fraud (inducing the other party to the contract to take action through a scheme to defraud) occurred later. Indeed, cases like *Frank* and *Naiman*—where the defendants' fraudulent representations occurred after the contractual promises were

45

made—demonstrate the opposite is true: in those cases, the Court never mentioned, much less relied on, the defendants' intent at the time of contracting. In sum, a post-contract fraudulent inducement does not become non-fraudulent just because the fraud also breached the contract.

Applying those principles, courts have upheld fraud claims nearly identical to the government's in this case. In *First Bank of the Americas v. Motor Car Funding*, the defendant lender entered a contract to sell loans in the future to the plaintiff, and that agreement contained warranties that the loans to be sold would meet certain underwriting guidelines. 257 A.D.2d 287, 289 (N.Y. App. Div. 1st Dep't 1999). In the course of selling those loans, the lender made representations about their quality—representations that the buyer claimed were false and induced it to buy the less-valuable loans. *Id.* The court permitted the buyer's claim for fraud under New York law to proceed. The misrepresentations of "pertinent facts about the individual loans that plaintiff purchased under the [a]greement," which made the loans "appear to satisfy [the agreement's] warranties," were not merely "insincere promise[s] of future performance" (that could only be actionable as breach of contract), but "statement[s] of present fact." *Id.* at 292. "This is fraud, not breach of contract"—"a breach of duty separate from, or in addition to, a breach of the contract." *Id.* The fraud claim is not "rendered redundant by the fact that the[] alleged misrepresentations breached the warranties made" in the contract; indeed, the fraud claim "can be based on a breach of contractual warranties notwithstanding the existence

46

of a breach of contract claim." *Id.* Those facts are materially indistinguishable from this case, and the same rule should apply. *Accord In re Refco Inc. Securities Litigation*, 826 F. Supp. 2d 478, 524-525 (S.D.N.Y. 2011) (alleged post-contractual statements were "'extraneous' to the contract in that they misrepresented a present fact," as opposed to statements made "at the outset about the Defendants' future intent to honor a contract," and thus fraud and contract claims were not duplicative; citing *First Bank*).

Here, the government proved just such post-contract fraudulent misrepresentations that affected the GSEs' decisions to accept defective loans for purchase as investment-quality loans. (JA 5219-5220). The trial evidence showed that representations and warranties were made with each loan sale (JA 2977, 4746-4747, 4819-4820, 5905, 5908, 5935, 5938, 6366, 6368)—not, as defendants suggest, only at the time the Bank contracted with the GSEs, "long before" the fraud at issue here (Mairone Br. 35). Indeed, the parties' agreements expressly stated that the representations and warranties would apply at the time of sale or delivery. (JA 6366, 6368, 5905, 5908, 5935, 5938). Just as in *Frank* and *First Bank*, the relevant fraudulent misrepresentations were made continually in the period after the contract was formed. That is sufficient to sustain a charge of fraud, regardless of whether there was fraudulent intent at the time of contracting.

Defendants erroneously assert that common-law limitations on fraud actions, such as those articulated under New York law by this Court in *Bridgestone/*

47

*Firestone Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996), support their theories as to the limitations on fraud liability. There are several flaws in that argument.

First, defendants have not established that the federal mail and wire fraud statutes are governed by the New York law described in *Bridgestone*. It is true, as defendants note, that the Supreme Court held in *Neder v. United States* that Congress intended to incorporate the "well-settled" and "established" common-law meaning of the term "defraud" in §§ 1341 and 1343—though, as both *Neder* and the district court recognized, "the fraud statutes did not incorporate *all* the elements of common-law fraud." 527 U.S. 1, 25 (1999); (SPA 19 (citing *Durland v. United States*, 161 U.S. 306, 312-13 (1896))).

But defendants have not demonstrated that absence-of-contract ever was an established element of common-law fraud. To the contrary, common-law courts near the time the mail fraud statute was enacted in 1872 held that the legal duty to "refrain from invading [rights of others] by force or fraud" exists independently of a contract between the parties, such that "the party may be sued in tort for any negligence or misfeasance in the execution of the contract." *Rich v. New York Central & Hudson River Railroad Co.*, 87 N.Y. 382, 398-99 (1882) (permitting fraud claim arising out of contractual duty, even where "[i]n the making of this contract there was no deceit or fraud" or "any purpose or intention of not fulfilling its terms"). Indeed, "[p]roof of the contract and its breach" may be "essential links in the chain" of proving fraud. *Id.* at

48

399. Thus "a tort may grow out of, or make part of, or be coincident with, a contract," and "precisely the same state of facts, between the same parties, may admit of an action either *ex contractu* or *ex delicto*." *Id.* at 390; *accord Mobile Life Insurance Co. v. Randall*, 74 Ala. 170, 176-78 (1883); *Stock v. City of Boston*, 149 Mass. 410, 414 (1889); *Jones v. Kelly*, 280 P. 942, 943 (Cal. 1929); *Smith v. Weber*, 16 N.W.2d 537, 539 (S.D. 1944); *Vernon Fire & Casualty Insurance Co. v. Sharp*, 349 N.E.2d 173, 180 (Ind. 1976). "Simply put, a contract is not a license allowing one party to cheat or defraud the other." *Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493, 501 (S.D. 1997).

Recently, the California Supreme Court upheld a common-law fraud claim where—as here—"[b]ut for [the defendant's] affirmative misrepresentations" that the items it sold conformed to contractual promises, the purchaser "would not have accepted delivery," and therefore the "tortious conduct was separate from the breach itself." *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 273-74 (Cal. 2004) (enumerating situations where "breach of a [contractual] duty may support a tort action," including where "breach is accompanied by a traditional common law tort, such as fraud" or breach is intentional by party who knows damages will result). While damages for breach of contract are limited to the benefits each party expected to receive and negotiated for, contracting parties cannot "be expected to anticipate fraud and dishonesty in every transaction," and a fraud claim lies when that occurs. *Id.* at 276 (quotation marks omitted).

49

Indeed, the decisions holding that a fraud claim cannot proceed when it is duplicative of a breach-of-contract claim appear to be rooted in the desire not to inappropriately expand the scope of civil remedies under contract law, in particular the constraints on damages or limitations periods. *Id.* at 272-73; *Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 401 (Fla. 2013); *Grynberg*, 573 N.W.2d at 500. The *Bridgestone* rule against duplicative fraud and breach claims ensures a plaintiff cannot "plead two independent claims, and recover twice, for the same conduct." *Blank v. Baronowski*, 959 F. Supp. 172, 180 (S.D.N.Y. 1997). The New York cases to that effect originated with holdings that the statute of limitations on civil contract actions should not be end-run by allowing parallel fraud claims. *Carr v. Thompson*, 87 N.Y. 160, 162-65 (1881); *Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 262-64 (1937). Accordingly, these cases do not speak to the "elements" of fraud itself, or the "well-settled" or "established" common-law meaning of the term "fraud," *Neder*, 527 U.S. at 25, but rather to limitations on recovery in civil actions.[7] As both this Court and the Supreme

---

[7] *United States v. D'Amato* stated in a footnote in a criminal case that "breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract." 39 F.3d 1249, 1261 & n.8 (2d Cir. 1994). In context, that language only states the uncontroversial view that breach of a contract, without further evidence of fraudulent intent, does not establish a fraud claim.

Court have recognized, such civil limitations have "'no application to criminal liability'" under §§ 1341 and 1343. *Id.* (quoting *Rowe*, 56 F.2d at 749).[8]

Finally, even if the *Bridgestone* rule applies, the government's fraud claim survives. This Court explained that a fraud claim predicated on a breach of contractual commitments may be maintained if there is a "fraudulent misrepresentation collateral or extraneous to the contract." 98 F.3d at 20. As the New York Court of Appeals stated, a statement "lulling the plaintiffs into the belief" that the contract is being performed is "fraud extraneous to the contract." *Brick*, 276 N.Y. at 264. Post-contract misrepresentations intended to induce a purchase under the terms of the contract—such as those proved at trial in this case—are, by definition, extraneous to that contract. *Blank*, 959 F. Supp. at 180 (post-contract misrepresentations, even those repeating terms of contract, are statements of present fact extraneous to the con-

_____

*See id.* (discussing issue of intent further). The language should not be read to go beyond that, particularly as it was dicta (the ground for vacating the conviction was that there was no evidence the defendant believed he had to perform the relevant term of the contract).

8   While this, of course, is a civil case, the Bank's liability depends on violation of the criminal fraud statutes. Additionally, FIRREA provides for penalties instead of the usual measure of civil recovery, which is compensatory in both contract and tort cases.

tract and sufficient to support fraud clam); *First Bank*, 257 A.D.2d at 292 (fraudulent statement about post-contract sales were misstatements of present fact); *see also MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 294 (N.Y. App. Div. 1st Dep't 2011) ("a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim"; false statement cannot "be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract" (quotation marks omitted)). These misrepresentations are accordingly actionable fraud.

## POINT III

### The District Court Properly Excluded Evidence That Non-HSSL Loans Were of Comparably Poor Quality to HSSL Loans

Defendants sought to introduce evidence that their non-HSSL loans were of comparably poor quality to the HSSL loans. The district court appropriately excluded that evidence as irrelevant.

Contrary to defendants' arguments, this evidence does not demonstrate either lack of deception or lack of materiality. Defendants knew the HSSL loans they were selling to the GSEs were of poor quality, that the representation of investment quality was critical to the GSEs, that the GSEs would not have purchased HSSL loans if they knew they were defective —but they still said nothing to the GSEs. Defendants' offer to prove that they also sold the GSEs other defective loans does not negate the materiality, the deceptiveness, or the fraudulent intent of defendants'

52

HSSL scheme. In any event, this exclusion was harmless, as the government would have countered by introducing evidence showing that defendants expanded the HSSL process throughout FSL, including the field branches, causing non-HSSL loan quality to similarly suffer.

## A. Evidence That Countrywide Sold Equally Defective Non-HSSL Loans to the GSEs Was Not Relevant

The government's expert testified that approximately 43% of the HSSL loans were materially defective, *i.e.*, not investment quality. (JA 3095-3096). Using the results from the government's experts, defendants' expert opined that approximately 41% of non-HSSL loans that FSL originated and Countrywide sold to the GSEs were also materially defective. (GA 99). However, the district court correctly held this evidence was irrelevant to any element of mail and wire fraud.

The proffered evidence was not relevant to whether defendants engaged in a scheme to defraud. A scheme to defraud is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching," "characterized by a departure from community standards of fair play and candid dealings." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quotation marks omitted). Evidence comparing the quality of HSSL and non-HSSL loans does nothing to prove that Countrywide employees did not plan to deceive the GSEs by selling them defective HSSL loans masquerading as quality loans. In essence, de-

53

fendants want to argue that there was no plan to trick the GSEs by blaming their victims: the GSEs should have known they were buying lots of bad loans, since they bought other bad loans.

But the GSEs wanted and paid for investment-quality loans across the board. GSE witnesses at trial testified that the investment-quality representation was critical because the GSEs were unable to review the loans before purchase, and it was never waived. (JA 2716, 2720-2721, 2974-2978, 2982-2983, 2989-2990, 3219-3220, 3123-3131, 4802, 4819-4821, 4823-4825). Defendants knew about the investment-quality representation and that large percentages of HSSL loans were defective, yet they said nothing to the GSEs and continued to sell them HSSL loans. (JA 1810, 3371-3373, 3402, 3801, 4324, 4361-4365, 6355). Evidence that Countrywide sold the GSEs equally defective non-HSSL loans with misrepresentations of their quality only serves to prove that defendants engaged in other fraudulent conduct, not to disprove the fraud proved in this case. Indeed, had the trial court allowed evidence comparing the quality of FSL's HSSL and non-HSSL loans, the government would have introduced evidence that defendants expanded the HSSL process throughout FSL, raising defect rates division-wide. (JA 1398, 1404-1405, 6124; GA 54-55, 65-66, 74, 76, 81).[9]

_____

[9] The Bank's peaches hypothetical is rustic but unilluminating. (Bank Br. 51-52). Putting aside the inapplicability of the posited 25% ratio, a more analogous hypothetical would be a farmer who for years

54

For the same reasons, defendants cannot prevail in arguing that evidence comparing the quality of HSSL and non-HSSL loans may negate fraudulent intent. While defendants contend that evidence that the victim was not harmed may be relevant to whether a defendant intended to harm the victim, evidence that Countrywide sold the GSEs defective non-HSSL loans does not diminish the harm the GSEs suffered from purchasing defective HSSL loans. Allowing defendants to avoid fraud liability by pointing to other likely fraudulent conduct would be rewarding defendants for the vastness of their misconduct. In any event, had the trial court permitted defendants to introduce such evidence to try to show lack of harm, the government would have introduced evidence of actual harm, such as HSSL default rates, foreclosure rates, and GSE losses. (JA 1247).

—————————

warranted that his peaches would be "grocery grade," and employed fruit inspectors to ensure that was true. At some point, however, he fired the fruit inspectors and replaced them with an ineffective fruit-inspection machine, causing the incidence of unsaleable peaches to skyrocket, while continuing to warrant to the grocer (who relied on the farmer's representations of quality) that the peaches were "grocery grade" even as he knew that was false. If the grocer sued for fraud, surely the farmer would have no defense by offering evidence that other peaches that had not gone through the machine were equally unsaleable.

55

Defendants fare no better in arguing that comparative quality evidence was relevant to the materiality of their misrepresentations. Materiality means "it would affect a reasonable person's evaluation of a proposal." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013); *accord Neder*, 527 U.S. at 16 ("natural tendency to influence, or is capable of influencing, the decision" (quotation marks and alteration omitted)). As explained above, the GSE witnesses testified at trial that these representations were important and that they would not have purchased loans known to be non-investment quality. Evidence that the GSEs bought other defective loans from FSL with misrepresentations cannot show that the promises of investment quality did not matter. The Bank's statement (Bank Br. 54) that a "reasonable purchaser" "would not have found it important" that nearly half the products it purchased were not what it paid for, on the ground that nearly half of the other products it purchased from the same vendor were also not what it paid for, demonstrates only that the Bank has a very strange notion of what it means to be "reasonable."

## B. The Government Did Not Open the Door to the Excluded Evidence of Comparative Quality

Nor did the government "open the door" to this evidence by introducing evidence comparing HSSL and non-HSSL loans. The government in fact presented no evidence concerning the quality or performance of non-HSSL loans during the relevant period and introduced no evidence at all comparing HSSL and non-

56

HSSL loans. Rather, the government offered evidence comparing FSL's defect rates (for all FSL loans) to those in other Countrywide divisions (JA 3922-3923, 6355) and those in FSL prior to the HSSL (JA 1834). This evidence was offered, first, to explain the concerns that employees such as Thomas and O'Donnell raised about the HSSL. For example, defendants point to Thomas's testimony that FSL's defect rates were "more than twice" as high as other divisions' (Bank Br. 56)—but Thomas testified that he was asked to stop circulating documents like that "QC divisional comparison" that showed that elevated defect rate and cast FSL in a negative light. (JA 1908-1917, 6355). Similarly, during O'Donnell's testimony, the government introduced an email by Lumsden stating that "corporate has stated now that our quality from approximately August through December is the worst of any division" and saying that "FSL no longer fights like it used to on ['severely unsatisfactory' ratings]." (JA 2310-2311). Such evidence suggests that defendants were informed of FSL's high defect rates and sought to bury the bad news, which directly bears on defendants' intent.

Second, the government's evidence regarding defect rates served to rebut defendants' argument at trial that O'Donnell and others initially supported a streamlined loan-origination process for prime loans. That support was premised on the fact that FSL's pre-HSSL streamlined process used underwriters at two separate points in the origination process and produced loans of good quality. (JA 1834-1838). To give context to the testimony of employees who supported a streamlined process and then raised warn-

57

ings about the HSSL, the government introduced testimony concerning the ways in which the HSSL departed from the pre-HSSL process. (JA 1850-1854, 2243-2244, 2382). The government did not, however, present evidence concerning the quality of non-HSSL loans within FSL during the relevant period.

Third, this evidence also showed that defendants knew that they were selling defective loans to the GSEs, a necessary component of the government's proof. Defendants complain about O'Donnell's testimony regarding elevated quality assurance defect rates (Bank Br. 56; Mairone Br. 17-19), but this testimony was relevant to showing why, despite having given his conditional approval to the HSSL pilot, he opposed its expansion and expressed concern that high rates of poor quality loans were being funded and sold to the GSEs. (JA 2246-2250).

None of this evidence compared FSL's HSSL loans to FSL's non-HSSL loans during the HSSL period, and accordingly it did not open the door to such evidence offered by defendants. That evidence was irrelevant to either the quality of the HSSL loans or defendants' state of mind, and therefore inadmissible as the district court properly concluded.

## C. The Court Properly Prohibited Cross-Examination of the Government's Experts Concerning Non-HSSL Loans

Defendants further contend that they should have been allowed to question Dr. Cowan, the government's expert witness, about his sampling of non-HSSL loans, seeking to show that Cowan improperly

stopped the government's underwriting expert, Holt, from completing his review of the sampled loans, and that Cowan gave inconsistent testimony regarding why he did so. (Bank Br. 57-61). These arguments lack merit.

Dr. Cowan did not improperly stop the loan review. Nor did he testify inconsistently. At the *Daubert* hearing, Cowan testified that he stopped Holt's loan review after 526 of the 600 sampled HSSL loans had been reviewed based on his analysis of the results of the review and his determination that continuing would not materially change the HSSL defect rate. (JA 2603-2308). Cowan further testified that he did not analyze the impact of stopping the loan review on the non-HSSL defect rate, which was not part of his opinion, but explained how the calculations would be done. (JA 2603-2308). Prior to the hearing, Cowan provided detailed calculations demonstrating that the sample was statistically valid and reliable despite the fact that 74 HSSL loans were not reviewed. (JA 1370-1378). At trial, Cowan again explained that he decided to stop the loan review because, among other reasons, completing it would not have significantly changed the results. (JA 3091-3092). Defendants argue, based on Cowan's answers to hypothetical questions at the *Daubert* hearing, that Cowan stopped the loan review after determining that the defect rate of non-HSSL loans was not helpful to the government—but that contention is baseless, given Cowan's testimony that he did not analyze the non-HSSL loans and was not asked to do so. (JA 2603-2610). In light of this testimony, the district court appropriately ruled that defendants could

59

not cross-examine Cowan about non-HSSL loans, which were irrelevant. (JA 3103).

At bottom, to the extent defendants wished to show that Cowan's sample was unreliable due to the fact that not all of the loans were reviewed, defendants were free to cross-examine him on this topic and introduce testimony from their own statistics expert opining that Cowan's sample was unreliable for this reason. Defendants chose not to do so. The fact that defendants were not able to question Cowan about non-HSSL loans, which were not even the subject of his opinion, is thus immaterial.

## D. If the Trial Court Erred in Excluding Evidence Comparing the Quality of HSSL and Non-HSSL Loans, the Error Was Harmless

Even if defendants could establish that the district court abused its discretion in excluding evidence comparing the quality of non-HSSL and HSSL loans that FSL originated during the HSSL process, defendants have failed to demonstrate that this excluded evidence would have "affected the outcome of the case," *Malek v. Federal Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993) (quotation marks omitted), or "substantially influence[d] the jury," *Hynes v. Coughlin*, 79 F.3d 285, 291 (2d Cir. 1996). First, none of this evidence demonstrated that HSSL loans were of good quality or that the GSEs wanted to purchase bad loans; it only shows that defendants sold other bad loans to the GSEs. Second, had the trial court allowed this evidence, the government would have introduced evidence showing that FSL's non-HSSL loans are not an

acceptable benchmark for loan quality. Many of the risky practices that were part of the HSSL—such as the minimization of underwriters, allowing non-underwriters to approve loans to close, the turn-time bonus that linked compensation to funding speed, and the suspension of pay reductions for producing poor quality loans—were applied to all of FSL, including the field branches, leading to poor loan quality throughout FSL.[10]

## POINT IV

### There Was Ample Evidence That Defendants' Misrepresentations Were Material

The district court correctly concluded that the jury's verdict that the Bank and Mairone committed mail and wire fraud was supported by sufficient evidence of material misrepresentations. Defendants' contentions are nothing more than an invitation to this Court to reweigh the evidence.

————————

[10] In December 2007, FSL expanded HSSL-type practices to the field branches, including the removal of underwriters, the reliance on CLUES and the use of loan specialists to perform underwriting tasks. (JA 6000-6003; GA 54-55, 57-58, 65-66, 74, 76, 81). When personnel in the field branches raised concerns about the negative impact this would have on loan quality, Loren Rodriguez responded that there was a "moratorium" on pay reductions for QOG. (GA 81). As warned, the field branch loans had high defect rates —over 66 percent—in January 2008. (GA 6124).

### A. Defendants' Claim That the GSEs Should Have Known They Were Buying Bad Loans and That HSSL Loans Were Good Was Unsupported By the Evidence

As noted above, a misrepresentation is material if it has "a natural tendency to influence, or is capable of influencing the decision" of the person to whom it was directed. *Neder*, 527 U.S. at 16 (quotation marks and alteration omitted). In this case, the record established that the investment-quality representation, meaning that a loan is likely to be repaid, was of paramount importance. As several GSE witnesses explained, because of the tremendous volume of loans the GSEs were purchasing and their limited resources, the GSEs could not perform a pre-purchase review of each mortgage loan to ensure that it was an investment-quality loan. (JA 2975, 2717). Instead, the GSEs operated pursuant to a "rep and warrant" model in which they relied upon the promises from lenders, like Countrywide, that each loan they purchased was an investment-quality loan. (JA 1810, 2709-2710, 2974-2975, 3220, 5905, 5908, 5935, 5938, 6366, 6368). The GSE witnesses explained that the investment-quality representation was critical to the GSEs. (JA 2978, 2982-2983, 4820-4821, 4823-4824). GSE witnesses also identified specific HSSL loans that were not investment quality and explained that they would not have purchased them had they known of the defects. (JA 3123-3124, 3176, 3176-3177, 3186, 3190). Thus, there was more than sufficient evidence for the jury to conclude that defendants' misrepresentations could influence the GSE's decisions to purchase HSSL loans.

While defendants point out that the GSEs knew
that it was inevitable that some loans they purchased
would not be investment quality, that they could seek
repurchase for loans later found to be non-investment
quality, and that their own post-purchase sampling
found that 18-25% of all loans they had purchased
from financial institutions had defects (Bank Br. 72-
73), this does not mean that it was "undisputed" that
the GSEs "reasonably expected" that 18-25% of the
HSSL loans they were purchasing from Countrywide
would be defective. Nor can it negate the evidence es-
tablishing that a representation that a loan is likely
to be repaid is capable of influencing a loan purchas-
er. That a purchaser understands that even the best-
intentioned seller makes errors, and therefore sells
some non-investment-quality loans, does not entail
that the seller's representation that every loan is in-
vestment quality is immaterial. After all, the price
the purchaser is paying is based on the representa-
tion that all of the loans are investment quality. And
GSE witnesses repeatedly testified that the existence
of the repurchase remedy did not minimize the im-
portance of the representations and warranties as to
investment quality. (JA 3072, 3141).

The fact that the GSEs conducted post-purchase
reviews of a sample of lenders and found elevated de-
fect rates does not diminish the importance of de-
fendants' own misrepresentations about the quality of
HSSL loans. Defendants cannot point to evidence
showing that the GSEs knew at the time of purchase
that Countrywide was misstating the quality of
HSSL loans. Countrywide did not have license to sell
defective loans to the GSEs through misrepresenta-

63

tions so long as the defect rates did not exceed the rates the GSEs found in their reviews—a theory akin to saying that a used-car salesman may peddle lemons because others are doing so as well. In any event, defendants' suggestion that the GSEs should have known that Countrywide was selling them lemons is beside the point; the question for materiality purposes is not what the GSEs should have expected, but whether defendants' misrepresentations at the time of sale were capable of influencing the decision to purchase HSSL loans. *See Corsey*, 723 F.3d at 373 n.3 ("The question is not whether victims might smell a rotten deal before they hand over money. Instead, a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do." (citing *United States v. Gotti*, 459 F.3d 296, 331 (2d Cir. 2006))).

## B. Defendants' Claim That Countrywide's "Final" Quality Control Reports Proved That HSSL Loans Were Good Was Unsupported by the Evidence

Defendants' argument that Countrywide's internal quality control reviews showed that HSSL loans were "well within industry standards for quality" (Bank Br. 74), is both factually wrong and irrelevant. The jury apparently declined to accept defendants' view of the loan quality based on the QC reviews, and this Court may not revisit that decision.

The Bank concedes that the "final" quality control reports all showed FSL's material defect rates during the applicable period as between 4.4% and 9.8%.

64

(Bank Br. 74). Defendants' suggestion that the "industry standard" defect rate was 18 to 25% is factually wrong. GSE witnesses merely confirmed the rates they found from their own due diligence reviews, not that these were the "industry standard" defect rates. (JA 3004, 3268). Moreover, multiple witnesses testified that the industry standard material defect rate was actually 4% (JA 1907, 1924, 1956, 2517), and, indeed, 4% was Countrywide's own internal standard for quality control (JA 2152, 2511). Thus, even assuming that the final quality control reports were reliable—and the trial evidence showed they were not—the reports only confirm that HSSL loan quality was consistently substandard.

In any event, the final quality control reports are irrelevant, as the trial evidence showed that FSL's internal pre-funding quality reviews found that HSSL loans had extremely high defect rates for many months (initially with "high risk" findings of 40% and then rising to as high as 90%), and that defendants knew that the vast majority of the defects were not being corrected before the loans were funded. (JA 6063-6066, 7002-7005, 7019-7022, 6071-6073). The evidence further demonstrated that the poor quality that FSL executives saw month after month in quality assurance reports eventually showed up in the post-funding reviews by corporate quality control, which identified material defects as "severely unsatisfactory." Specifically, in the first quarter of 2008, which was the first time corporate quality control reviewed any significant volume of HSSL loans, "severely unsatisfactory" findings on loans sold to Fannie Mae and Freddie Mac were more than twice that

of other Countrywide divisions and stood at approximately 30 percent. (JA 6355, 1913).

FSL employees attributed the dramatic decline in FSL's loan quality to the HSSL process. For example, a February 2008 FSL review determined that the "root causes" of the deterioration of loan quality at FSL were the changes Mairone had put in place in connection with the HSSL. (JA 6111-6123). Internal emails among FSL employees discussing the poor loan quality in the first quarter of 2008 also pointed to the HSSL as the cause. (JA 6084-6088, 6133-6138, 6139-6144). The poor quality of HSSL loans was further confirmed by the evidence and testimony from the government's experts showing that approximately 43% of the HSSL loans were materially defective, *i.e.*, not investment quality. (JA 3095-3096).

Defendants' claim that there was insufficient evidence showing that the "final" corporate quality control results were unreliable (Bank Br. 75-76) is likewise unavailing. This argument fails to account for the evidence that FSL, at the direction of Lumsden and others in FSL management, took steps to make FSL's high defect rates look better than they actually were by aggressively pushing corporate quality control to reverse the SUS findings. Specifically, in March 2008, Lumsden told O'Donnell that FSL no longer fought the SUS findings by corporate quality control like it used to, and he instructed O'Donnell to devote more resources to rebuttals of the SUS findings. (JA 6505-6507). In response, O'Donnell and others instituted the Sprint Incentive and the FSL Poker Run to financially incentivize employees to overturn

66

SUS findings and make FSL's defect rate appear closer to the industry standard of 4%. (JA 7386-7394). In light of the many pre-funding defects that were never corrected, FSL's bonus-fueled campaign to lower its SUS rating, and the 43% defect rate found by the government's experts, a reasonable jury could—and apparently did—easily conclude that the final corporate quality control rates were a fiction.

## C. Defendants' Argument That Quality Assurance Reports Had Nothing to Do with Quality Was Unsupported by the Evidence

Defendants attempt to undermine FSL's own pre-funding quality assurance reviews—again improperly asking this Court to weigh the evidence. (Bank Br. 77-78). The testimony from defense witnesses that the quality assurance reports measured only "process" and had nothing to do with quality was not plausible. On their face, the quality assurance reports themselves identified defects that went to loan quality, namely the borrowers' ability to repay the loan. (JA 5648-5653 (September 2007 QA Report identifying "income related" high-risk findings and stating loan specialists "were grandfathered in with [pre-HSSL]/HSSL condition sign off authority without training or Hustle certification requirements" and that "[a]s a result our quality was challenged."); JA 4357-4358). Witnesses, such as O'Donnell and Thomas, testified that the defects found in the pre-funding QA stage bore on loan quality and were a preview of post-funding ratings if the defects were not corrected. (JA 2257-2262, 1899-1901). Further, because most of the defects were never remedied before

67

the loans funded, it was not surprising when the post-funding SUS findings skyrocketed in early 2008. (JA 6355). Indeed, FSL quality-review employees internally blamed the deteriorating loan quality on the HSSL and expressed frustration that their red flags had been ignored. (JA 6133-6138, 6139-6144, 6084-6088).

### D. The Government's Expert Testimony Concerning the Poor Quality of HSSL Loans Was Reliable

Defendants also assail the opinions of the government's experts that approximately 43% of HSSL loans sold to the GSEs during the relevant period were materially defective (Bank Br. 78-80), but again fall short of invalidating the jury's conclusion that defendants made material misrepresentations. Specifically, defendants challenge the population of HSSL loans that the experts sampled, arguing that it included 11,000 non-HSSL loans from so-called field branches. (Bank Br. 79). This argument fails for at least two reasons.

First, defendants ignore the ample trial evidence substantiating the criteria the government's experts used to identify HSSL loans in the data produced by defendants during discovery.[11] Second, defendants'

_____

[11] The evidence showed that the HSSL ran from August 13, 2007, to May 21, 2008, which is the date range the government used to isolate HSSL loans in the loan data produced by the Bank during discovery. (JA 2448, 5460-5468). While the Bank contended that

argument that the government's HSSL population was too large was itself unreliable, because it was based on an assessment by defense counsel and a bank employee who had no personal knowledge of what branches actually processed HSSL loans,[12] and

———————

the HSSL ended in April 2008, the evidence showed that to be wrong: underwriters were brought back at that time only to fill out a short checklist, not clear conditions or underwrite loans themselves as they had done prior to the HSSL. (JA 5458-5459, 6104-6105, 6106). The evidence further showed that loans with an "Accept" rating from the automated system went through the HSSL process (JA 1836-1838), and that HSSL loans were originated at five locations (JA 2674). These criteria were used to isolate 28,882 HSSL loans in the Bank's database. (JA 3397-3398).

[12] Bank employee Anthony Ho, who purportedly determined which branches and underwriters "actually processed" HSSL loans, had no personal knowledge of which branches or personnel processed HSSL loans, and instead worked with the Bank's lawyers to generate the Bank's HSSL population. (JA 3944, 3946-3947, 3951-3952). Ho excluded every loan where an underwriter name appeared anywhere in the loan data without knowing whether any of those individuals actually underwrote the loan files. (JA 3950, 3945). He apparently also failed to consider that most of these loans (87 percent) were cleared to close by loan specialists, indicating that they were correctly included as HSSL loans. (JA 5226).

69

because it ignored evidence that field branches did in fact process HSSL loans.[13]

Defendants are incorrect to assert that the district court "effectively recognized" that the number of HSSL loans was overstated. (Bank Br. 79). While the district court excluded the 11,000 loans that defendants claimed were processed by field branches from its discretionary penalty calculation, that is far afield from a determination that the government's expert opinions were unreliable, that they failed to show that HSSL loans were widely defective, or that the jury's verdict lacks sufficient evidence. Indeed, the district court held that the expert testimony was reliable after conducting a *Daubert* hearing, and credited this testimony in denying defendants' motion for judgment notwithstanding the verdict. (SPA 119).

---

[13] For example, Thomas testified that HSSL loan volume was sometimes shifted to field branches (JA 2026), and the Bank's own loan data indicated that HSSL loans that defendants claim were processed by field branches were cleared to close by loan processors, which was the hallmark of the HSSL origination process (JA 3418-3428, 7179, 7180, 7181-7305, 7307). In fact, according to the Bank's own data, approximately 86% of the loans from the government's HSSL population that defendants claim were processed at field branches were cleared to close by loan processors (JA 5226), indicating that they were in fact HSSL loans.

70

In sum, the jury's verdict should stand, as there was ample evidence that defendants made thousands of false representations to the GSEs about the quality of HSSL loans and that those representations were material to the GSE's purchasing decisions.

## POINT V

### The District Court Appropriately Excluded Opinion Testimony from Defense Witnesses That They Believed the HSSL Process Was "Proper"

The Bank and Mairone complain that the trial court abused its discretion in excluding testimony from former Countrywide employees, whose mental states were not at issue, that "they believed the HSSL process was proper." (Bank Br. 65; Mairone Br. 57-60). In particular, defendants argue that these witnesses should have been allowed to effectively vouch for Mairone and Kitishima with testimony that "they too believed . . . that HSSL loans were investment quality and that the HSSL process was consistent with industry standards for quality control." (Bank Br. 64-65). The district court properly excluded this evidence: it was either unfounded assertions about Mairone's and Kitishima's mental states, or improper expert opinion testimony about the integrity and quality of the HSSL process. In any event, even if it were manifest error to exclude this evidence, defendants cannot demonstrate that this would have materially altered the outcome of the trial.

First, defendants mischaracterize the record in asserting that the government offered opinion testi-

mony from former Countrywide employees with respect to their concerns about the HSSL "to permit the jury to infer that that the alleged wrongdoers drew the same conclusions as the government's witnesses about the HSSL process." (Bank Br. 66-67; *accord* Mairone Br. 60). To the contrary, as explained above, this testimony was offered to show that employees raised concerns about the HSSL to defendants, and thus it was necessary for the witnesses to explain what their concerns were. While defendants complain that certain witnesses, such as Thomas, Boland, and Price, did not testify that they expressed their concerns about the HSSL directly to Mairone, Kitashima, or Lumsden, the individuals who acted with fraudulent intent (Bank Br. 66-67), defendants ignore Thomas' testimony that he raised his concerns directly to Kitashima and Lumsden (JA 1991-1993), and that Boland and Price communicated concerns indirectly through O'Donnell (JA 2237-2246, 3366-3371, 3486, 3489-3491). Moreover, other than one general relevance objection to Boland's testimony (JA 3371; GA 203), defendants either did not object to the testimony they cite, offered the testimony themselves, or asserted other inapplicable objections (JA 1841, 1865, 1899, 1937, 1939, 2125, 2238-40, 2250-52, 2255, 2294, 3366, 3372-3373, 3486-3491; GA 177, 204-208, 423, 425, 430-433, 435, 449-450, 452), and have therefore forfeited the point.

Second, testimony that former employees involved in the HSSL believed the HSSL process was "proper" was not relevant to whether Mairone, Kitashima, or Lumsden acted with fraudulent intent. Defendants contend they should have been able to elicit this tes-

72

timony from Mark Barnett and Ron Gillet. (Bank Br. 66). It is undisputed, however, that the mental states of these two witnesses were never at issue at the trial. And defendants effectively concede that the opinions of these witnesses that the HSSL was "proper" was never communicated to Mairone, Kitashima, or Lumsden, rendering Mairone's argument that such testimony would have been "highly probative . . . especially" for her (Mairone Br. 59) particularly unpersuasive. The opinion of Mairone's coworkers about their own inexpert opinions would do little more than tell the jury what result to reach, and therefore is not admissible. *See United States v. Rea*, 958 F.2d 1206, 1215-16 (2d Cir. 1992) (lay opinion testimony "which would merely tell the jury what result to reach" is inadmissible as "meaningless assertions which amount to little more than choosing up sides" are unhelpful to the jury).

The authorities defendants cite (Bank Br. 68-69) are not apposite. Defendants argue that "when a witness reaches a conclusion based on particular facts available to him at the time, the jury may find it more likely that the alleged wrongdoer, exposed to the same facts, viewed those facts the same way and reached the same conclusion." But to the extent that is correct, no case extends that reasoning to allow admission of the type of evidence at issue here. Evidence that a fact is "obvious and widely-known" may be probative of whether a defendant knew that fact as well, if there is "some other evidence in the record —concerning, for example, the nature of the fraud or the relationship of the parties—from which to conclude that the defendant would have the same

knowledge." *United States v. Kaplan*, 490 F.3d 110, 120 (2d Cir. 2007). But the cases do not address the kind of opinion or belief at issue here; rather, they concern whether a defendant knew of an obvious fact external to the witness's and defendant's mind—that widespread and blatant fraud was being conducted at an office, *Kaplan*, 490 F.3d at 120-21; that corrupt payments were being made, *United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011); that a particular legal rule regarding ownership of antiquities existed, *United States v. Schultz*, 333 F.3d 393, 415-16 (2d Cir. 2003); that a property was being used for gambling, *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990); that items were stolen, *United States v. Patrisso*, 262 F.2d 194, 196-98 (2d Cir. 1958). What defendants seek to admit here, on the other hand, is evidence not of an open and obvious fact, but of mental conclusions and beliefs that were not evidently communicated to anyone whose mental state was at issue.

Third, to the extent defendants were offering this testimony to prove that the HSSL was in fact consistent with industry standards of producing quality loans, such testimony is based on specialized knowledge acquired through professional experience, to which a lay witness may not testify. Fed. R. Evid. 701(c). But defendants never sought to qualify Barnett or Gillet as experts. As this Court has held, pursuant to Rule 701, "lay opinion must be the product of reasoning processes familiar to the average person in everyday life. This rule prevents a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satis-

74

fying the reliability standard for expert testimony." *United States v. Haynes*, 729 F.3d 178, 194 (2d Cir. 2013) (quotation marks and alteration omitted). That conflation is precisely what defendants seek here, and the district court properly refused.

Finally, even if it were error for the district court to exclude this testimony, it was harmless. The fact that certain former Countrywide employees believed the HSSL process was "proper" cannot negate the overwhelming evidence that the HSSL process layered risk upon risk by removing safeguards, and that multiple employees repeatedly told defendants that the HSSL would cause and did cause high defect rates. Nor can this evidence overcome the evidence that defendants knew from their own quality reviews and quality-review personnel that thousands of the loans that they were selling to the GSEs were defective and thus sold with material misrepresentations, and that defendants took no steps to alert the GSEs that this was the case.

## POINT VI

### The District Court Did Not Abuse Its Discretion in Determining Civil Penalties Against the Bank

The Bank seeks to evade punishment for its fraud by driving the civil penalty down to zero. Their arguments misinterpret the case law, the statute, and the punitive purpose of FIRREA. The district court's calculation of penalties should be affirmed.

75

### A. The Court Correctly Applied a Gross Measurement of "Pecuniary Gain" and "Pecuniary Loss" for Purposes of Determining the Maximum Civil Penalty

The trial court did not abuse its discretion in using the gross amounts that the defendants fraudulently induced the GSEs to pay for HSSL loans. FIRREA uses the broad terms "pecuniary loss" and "pecuniary gain," which are not limited to the narrow "net" calculation advanced by the Bank—a calculation that would defeat the punitive and deterrent purpose of FIRREA civil penalties.

### 1. The Terms "Pecuniary Gain" and "Pecuniary Loss" Are Broad Terms That Encompass Gross Gain and Loss

Section 1833a(b)(3) provides that the maximum civil penalty that the court may impose is the greater of the "pecuniary loss to a person other than the violator," or the "pecuniary gain [to any person] from the violation." 12 U.S.C § 1833a(b)(3)(A). The Bank's narrow reading of "pecuniary gain" and "pecuniary loss" to mean "net" gain or loss is an unsupportable attempt to limit the scope of FIRREA's civil penalties.

Nothing in FIRREA suggests that Congress intended to limit those terms to net gains or losses in determining the appropriate civil penalty. The definition of "pecuniary gain" extends beyond net gain or profit after expenses. *See Black's Law Dictionary* (10th ed. 2014) (defining "pecuniary gain" in criminal law as "[a]ny monetary or economic gain that serves as an impetus for the commission of an offense"); *id.*

76

(first definition of gain is "[a]n increase in amount, degree, or value");[14] *accord New Oxford American Dictionary* (9th ed. 2009) (defining "gain" as "an increase in wealth or resources" and "a thing that is achieved or acquired").[15] Likewise, the term "pecuniary loss" is defined more broadly than losses remaining after mitigation. *See Black's Law Dictionary* (defining "pecuniary loss" as "[a] loss of money or of something having monetary value"). Had Congress intended to limit the scope of civil penalties as defendants suggest, it could have done so explicitly, as it has in other contexts. *E.g.*, 18 U.S.C. §§ 981(a)(2)(A) (civil forfeiture "not limited to the net gain or profit realized from the offense"), 981(a)(2)(B) (defining "proceeds" as "the amount of money acquired through the illegal transactions resulting in

_____

[14] While the Bank argues that *Black's Law Dictionary* defines "gain" as "[e]xcess of receipts over expenditures or of sale price over cost[;] [s]ee PROFIT" (Bank Br. 83), this is a secondary definition—the first definition of "gain" in *Black's* is broader than mere profit.

[15] The Bank claims that courts have used the words "gain" and "profit" interchangeably (Bank Br. 83), but the cases the Bank cites did not involve courts interpreting the meaning of the word "gain." *See Feine v. McGowan*, 188 F.2d 738, 740 (2d Cir. 1951) (statutory term "entered into for profit"); *Heli-Coil Corp. v. Webster*, 352 F.2d 156, 167 (3d Cir. 1965) (statutory term "profit"); *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 525 (S.D.N.Y. 2012) ("profit").

77

the forfeiture, less the direct costs incurred in providing the goods or services"); 15 U.S.C. § 697f(a)(2)(B)(iii) ("net gain or loss"). Instead, Congress used more expansive language. Moreover, as discussed below, courts have rejected in similar contexts the net loss and net gain arguments defendants raise here.

### 2. Limiting Pecuniary Gain or Loss to Net Gain or Loss Would Subvert FIRREA's Punitive and Deterrent Purposes

Restricting the interpretation of "pecuniary gain" and "pecuniary loss" to only the net gain and net loss from the fraud would frustrate the legislative goals of FIRREA in punishing and deterring fraud involving financial institutions. As noted above, Congress passed FIRREA to deter the type of fraud that puts federally insured financial institutions at risk by "strengthen[ing] the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors." Pub. L. No. 101-73, § 101(10). Accordingly, FIRREA's penalty provisions should be construed broadly to effectuate the statute's deterrent purpose. *Ghavami*, 2012 WL 2878126, at *6, *aff'd*, 2015 WL 3498664.

Indeed, civil penalties are meant to be severe enough to ensure that the risk of being caught is not worth the economic gain. *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) ("[c]ivil penalties are intended to punish the individual wrongdoer and to deter him and others"); *SEC v. Sargent*, 329 F.3d 34, 41 n.2 (1st Cir. 2003) (same); *see Hudson v. United*

78

*States*, 522 U.S. 93, 102 (1997) ("[A]ll civil penalties have some deterrent effect.").

The Bank's claim that the expenses Countrywide incurred in perpetrating its fraud, such as the amounts Countrywide lent to borrowers, must be deducted from a gain calculation (Bank Br. 84) runs contrary to the purpose of FIRREA and civil penalties generally. According to defendants, even though they used fraud to trick the GSEs into paying them billions of dollars, they are allowed to drive the civil penalty down to zero by deducting various "expenses" they incurred along the way. That outcome would encourage, rather than deter and punish, mortgage fraud.

That is why the Court has applied a gross measurement to forfeiture in civil RICO cases. For instance, in *United States v. Lizza Industries*, the Court upheld a computation of forfeiture from gross profits, reasoning that forfeiture provisions should be broadly construed because "[f]orfeiture under RICO is a punitive, not a restitutive, measure" and "RICO's object is to prevent the practice of racketeering, not to make the punishment so slight that the economic risk of being caught is worth the potential gain." 775 F.2d 492, 498 (2d Cir. 1985). While recognizing that the district court's method of calculation left "open a possibility that defendants will be forfeiting profits that they would have made outside of their criminal activities," the Court affirmed the method of computation, holding that "[u]sing net profits as the measure for forfeiture could tip such business decisions in favor of illegal conduct." *Id.* at 498-99; *accord Advance Phar-*

*maceutical, Inc. v. United States*, 391 F.3d 377, 399-400 (2d Cir. 2004).

A gross measurement is also consistent with the way this Court has calculated disgorgement. It is "well established that defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011); *accord SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009) (disgorgement not limited to profits from securities laws violation, but included related fees); *FTC v. Verity International, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2006) (disgorgement based on "amount of the . . . total billings that the defendants-appellants received . . . , without deducting monies paid by the defendants-appellants to other parties").

The Court should also reject the Bank's argument that the pecuniary loss from the fraud must be reduced to account for amounts the GSEs were able to recover through loss mitigation efforts, such as foreclosures. (Bank Br. 85-87). Permitting a fraud perpetrator to benefit from a victim's successful efforts to mitigate his losses contravenes the purpose of civil penalties. The victim's loss mitigation does nothing to negate a defendant's culpability or diminish the egregiousness of the violation. *Rowe*, 56 F.2d at 749. Accordingly, because penalties punish in proportion to culpability, they should not be reduced based on victim self-help. *See Tull v. United States*, 481 U.S. 412, 422 (1987) (civil penalties are designed in part "to punish culpable individuals," and not "simply to extract compensation or restore the status quo").

80

Indeed, the bigger the loss, the greater the fraud victim's motivation to mitigate that loss—providing fraudsters with a perverse incentive to "go big" if mitigation were excluded from the measure of civil penalties. For similar reasons, in calculating losses from criminal fraud for sentencing purposes, courts do not consider a victim's efforts to mitigate or similar reductions in losses. *See United States v. Goldstein*, 442 F.3d 777, 786 (2d Cir. 2006) (rejecting defendant's argument that loss calculation should be discounted for "amounts [defrauded] customers were credited through refunds or chargebacks"); *Millar*, 79 F.3d at 345-46 (sentencing enhancement applied for affecting a financial institution even though defrauded bank was insured against the loss). Loss calculation for sentencing "properly focuses on the objective financial risk to victims caused by the defendant's criminal conduct, without consideration . . . that the full exposure of risk did not come to pass," and the victim's mitigation "does not inure to the benefit of the perpetrator of the fraud." *United States v. Lane*, 194 F. Supp. 2d 758, 772 (N.D. Ill. 2002).[16]

---

[16] The Bank cites U.S.S.G. § 2B1.1, app. note 3(E), claiming it provides that courts "should reduce the loss by the amount returned to, or recovered by, the victim." (Bank Br. 87). But the application note actually says, far more narrowly, that the court should exclude from the loss calculation the money returned "by the defendant," and also exclude the amount the victim has recovered from collateral pledged "by the defendant." U.S.S.G. § 2B1.1, app.

81

The Bank's argument that "[b]asing damages on net loss is the norm in civil litigation" (Bank Br. 87) is misplaced, as the district court was charged with imposing civil penalties (which are punitive in nature), not damages (which are compensatory). The Bank relies on False Claims Act case law concerning damages, but that precedent is irrelevant for the same reason—and indeed the FCA imposes mandatory civil penalties, separate from damages, even where the government suffers no damages at all. *See* 31 U.S.C. § 3729(a). Notwithstanding the foregoing, district courts are free to take net loss or net gain factors into account when determining the ultimate civil penalty to be imposed, as appropriate. But, it would be contrary to the plain text and legislative purpose of FIRREA to, as defendants urge here, prohibit courts in all cases from ever considering gross loss or gross gain factors when determining the maximum civil penalty.

Finally, requiring courts to make deductions for net losses and gains in all cases would place an unreasonable burden on the courts. As the Court has observed in similar contexts, courts are only required to make a "reasonable estimate" of the loss or gain. *See, e.g.*, *United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010); *United States v. Uddin*, 551 F.3d 176,

─────────

note 3(E)(i), (ii). Importantly for this case, the application note also states that the amount returned is only excluded if returned "before the offense was detected," further demonstrating its focus on culpability, not what the Bank describes as actual loss.

180 (2d Cir. 2009). In contrast, requiring courts to use net gain or loss measurements would likely involve complex and speculative calculations. *See Lizza Industries*, 775 F.2d at 498-99 ("Often proof of overhead expenses and the like is subject to bookkeeping conjecture and is therefore speculative. RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced.").[17]

---

[17] Defendants complain that it was unreasonable for the district court to base its maximum civil penalty calculation on what the GSEs paid for all HSSL loans, arguing that the GSEs would have bought non-defective loans that went through the HSSL process. (Bank Br. 88-89). But, defendants ignore the testimony from GSE witnesses that the loan origination process was material to their purchasing decisions if it affected quality, which the HSSL clearly did. (JA 2981-2982, 2989-2990, 3045-3046, 3235-3237, 3243-3244, 4829-4833). And, ultimately, the district court elected to reduce the civil penalty to account for the fact that only 43% of the loans ended up being materially defective.

## B. The Fraud Proximately Caused the Pecuniary Loss

Lastly, there was more than sufficient evidence that defendants' scheme to defraud proximately caused a pecuniary loss.[18]

The Bank advances an untenably stringent standard of causation, which would require the government to isolate the losses caused solely by the violation, and exclude "other causal factors," such as the housing crisis. (Bank Br. 89). But the proximate causation standard is a "flexible concept that generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged," and serves to preclude liability where the causal link "is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) (quotation marks, citation, and altera-

––––––––––

[18]  The Court need not consider this argument at all if it concludes that the penalty that the district court imposed based on pecuniary gain was not an abuse of discretion. The Bank has never argued that proximate causation is a requirement with respect to the imposition of civil penalties based on pecuniary gain, nor has it challenged the civil penalty imposed by the district court on that ground. Accordingly, the Bank has forfeited any such arguments. *See Bogle-Assegai v. Connecticut,* 470 F.3d 498, 504 (2d Cir. 2006) (issue raised for first time on appeal is generally forfeited).

84

tions omitted). This context-specific inquiry "reflects ideas of what justice demands, or of what is administratively possible and convenient." *United States v. Aumais*, 656 F.3d 147, 154 (2d Cir. 2011) (quotation marks omitted).

Courts assessing the pecuniary loss that "results" from fraud have considered all losses reasonably foreseeable from the violation. *See Paroline*, 134 S. Ct. at 1719 ("Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct."). For instance, in criminal fraud cases, the loss for sentencing and restitution purposes is the "reasonably foreseeable pecuniary harm," meaning "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 application note 3(A)(i), (iv). Under this standard, when a fraudster "could not have obtained [its] victims' money" absent the deceit, "[i]t follows that a potential direct result" of that fraud "was the total loss of the moneys" obtained. *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010).

The pecuniary harm that defendants in this case knew or reasonably should have known was a potential result of their scheme to defraud was the amount the GSEs paid for HSSL loans. Defendants knew the loans were of poor quality, and therefore could result in total loss to the GSEs if the loans defaulted. They knew that the HSSL process diminished loan quality: they were warned of that effect in the design phase (JA 2237-2243); the warnings were confirmed by quality assurance reports in the pilot phase showing

extremely high rates of defective loans at the pre-funding stage (JA 5993-5994, 6493-6495, 6052-6054) that were not being corrected before the loans were funded (JA 6063-6066, 6071-6073, 7002-7005, 7019-7022); they were warned about high "severely unsatisfactory" rates to come (JA 6082-6083, 7426-7433, 7444-7447, 7448-7449); and when the high defect rates that were foretold became a reality, reports and internal emails identified the cause as the HSSL loan process and other changes that Mairone implemented (JA 4364-4365, 6111-6123, 6133-6138, 6139-6144, 6084-6088).

In short, defendants knew they were selling thousands of loans to Fannie Mae and Freddie Mac on the false pretense that they were investment quality, a deceit that induced the GSEs to purchase them, when in fact the loans were low quality and at risk of default from which the GSEs would incur losses. The GSEs certainly would not have purchased HSSL loans known to be defective and the HSSL process, which negatively impacted loan quality, would have influenced the GSEs' decision whether to purchase any HSSL loans at all. The "potential direct result"—the reasonably foreseeable amount of loss, and therefore the appropriate FIRREA penalty—was thus the amount the GSEs paid for HSSL loans.

Nor may that penalty be reduced by the possible sale of collateral, as this Court held in *Turk*. "[A] defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct"—that rule is "necessary to ensure that defendants who

fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct." *Id.* at 750. Defendants' contrary approach would "encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." *Id.* at 750. Likewise, the Bank's argument that the HSSL loans could have defaulted for other reasons (such as the general downturn in the economic market) and that the district court should have segregated the various potential causes of losses, was rejected by *Turk* as well. While courts sometimes use that approach to determine loss in securities fraud cases, "[a] loan cannot be compared to a stock because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." *Id.* at 751.[19] The Bank's

---

[19] The Bank's attack on the loss analysis of the government's expert economist for failing to consider the effect of the mortgage crisis and other factors, such as borrowers' losing their jobs (Bank Br. 89), is therefore misplaced. The government is not required to disentangle the various causal influences on the loan defaults. In any event, this argument is irrelevant, as the district court did not rely on the government's loss analysis based on unpaid principal balance and instead calculated civil penalties based on the amount defendants fraudulently induced the GSEs to pay for HSSL loans.

"error again stems from [its] failure to recognize that the item of value lost by [its] victims was the unpaid principal of the loans," a loss separate from market conditions and similar external factors. *Id.*

In this case, the evidence at trial established that defendants implemented a process that they knew would originate poor quality loans, targeted Fannie Mae and Freddie Mac as the purchasers of those bad loans, and sold the bad loans by misrepresenting their quality in the midst of a worsening financial crisis. The losses incurred by Fannie Mae and Freddie Mac were a natural and foreseeable consequence of, and thus were proximately caused by, defendants' fraud. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123-24 (2d Cir. 2003) (those whose injuries are "reasonably foreseeable or anticipated as a natural consequence" generally include "the targets . . . and intended victims . . ." (quotation marks omitted)).

## POINT VII

### The Bank's Request for Reassignment to a New District Judge Should Be Rejected

The Bank's summary request that the Court remand the matter to a new district judge should not be countenanced.

"Remanding a case to a different judge is a serious request rarely made and rarely granted," appropriate only in "special" circumstances. *United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006). Defendants claim reassignment is appropriate due to public statements by the district judge "criticiz[ing] the Jus-

88

tice Department for failing to pursue bank executives more aggressively for their role in the [mortgage] crisis" (Bank Br. 21-22, 90-91), which they assert "might reasonably cause an objective observer to question [the judge's] impartiality," *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 21 (2d Cir. 1996) (quotation marks omitted); *see* 28 U.S.C. § 455(a).

To begin with, the Bank has forfeited this request by failing to raise it below, for "'a party must raise its claim of a district court's disqualification [under § 455] at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim.'" *Taylor v. Vermont Dep't of Education*, 313 F.3d 768, 795 (2d Cir. 2002) (quoting *Apple v. Jewish Hospital & Medical Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987)). Here, defendants describe statements by the district judge beginning in September 2013—just as the trial began, and well before the extensive post-trial proceedings—and continuing through May 2014 (Bank Br. 21-22), yet the Bank made no motion to recuse at any time before its February 2015 notice of appeal. The claim has therefore been waived. *United States v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995).

In any event, defendants' complaints fall short. While defendants complain that the district judge criticized the Department of Justice for not criminally prosecuting bank executives for mortgage fraud, those comments do not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing as example of proper recusal a judge presiding over espionage trial against German-

89

American who publicly stated German-Americans' "'hearts are reeking with disloyalty'"). In fact, the judge's comments recited by the Bank were critical of both the government and bank executives. The Bank cannot meet the stringent test for reassignment. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 296 (2d Cir. 2006) (denying reassignment absent proof "that the district court will be unable to—or could reasonably be perceived to be unable to—faithfully apply the law on remand").

## CONCLUSION

**The judgment of the district court should be affirmed.**

Dated:    New York, New York
          July 22, 2015

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Plaintiff-Appellee.*

PIERRE G. ARMAND,
JOSEPH N. CORDARO,
CARINA H. SCHOENBERGER,
BENJAMIN H. TORRANCE,
     *Assistant United States Attorneys,*
          *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B), as expanded by this Court's order of April 6, 2015. As measured by the word processing system used to prepare this brief, there are 20,896 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: PIERRE G. ARMAND,
*Assistant United States Attorney*